Nos. 25-11253, 25-11254

# In the United States Court of Appeals for the Fifth Circuit

———————

**In re: Naoise Connolly Ryan, et al.,**

**Petitioners**.

———————

ON PETITIONS FOR WRIT OF MANDAMUS TO THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS NO. 4:21-CR-5-O (O'CONNOR, C.J.)

———————

## CONSOLIDATED RESPONSE FOR THE UNITED STATES

COURTNEY L. COKER
Attorney for the United States
Acting under Authority Conferred by
28 U.S.C. § 515
Northern District of Texas

JEREMY SANDERS
Assistant Chief, Fraud Section
Criminal Division

JOSH A. GOLDFOOT
Deputy Assistant Attorney General

W. CONNOR WINN
Appellate Attorney
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave. NW
Washington, DC 20530
(202) 669-6551
William.Winn@usdoj.gov

## CERTIFICATE OF INTERESTED PERSONS

*In re Ryan*, Nos. 25-11253, 25-11254

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal:

Adam L.D. Stempel (government counsel)

Adam Warren Aston (airline counsel in prior proceedings)

Adhitya Wirawan (petitioner)

Adrian Vuckovich (crash-victim counsel below)

Allan Jonathan Medina (former government counsel)

Alex C. Lewis (former government counsel)

Alexandra N. Daly (airline counsel in prior proceedings)

Anthony Battista (airline counsel in prior proceedings)

Bayihe Demissie (petitioner)

Benjamin L. Hatch (Boeing's counsel)

Brandon Michael Santos (Boeing's counsel)

Brian W. Strang (government counsel)

C. Harker Rhodes (Boeing's counsel)

Callie A. Castillo (airline counsel in prior proceedings)

Carlos Antonio Lopez (former government counsel)

Catherine Berthet (petitioner)

Chad E. Meacham (government counsel)

Charles S. Siegel (crash-victim counsel)

Chase Hilton (crash-victim counsel)

Chris Moore (petitioner)

Christopher Fenton (former government counsel)

Colin Patrick Benton (airline counsel in prior proceedings)

Cory E. Jacobs (prior government counsel)

Courtney L. Coker (government counsel)

Crash Victims of Lion Air Flight JT 610

Crash Victims of Ethiopian Airlines Flight 302

Craig Scott Primus (Boeing's counsel)

Darren P. Nicholson (crash-victim counsel)

David J. Drez III (airline counsel in prior proceedings)

David M. Schoeggl (airline counsel in prior proceedings)

Dayinta Anggana (petitioner)

Diana Gurfel Shapiro (airline counsel in prior proceedings)

Dody Widodo (petitioner)

Elissa Baur (Boeing's counsel)

Emily Chelangat Babu (petitioner)

Erin Nealy Cox (former government counsel and movant below)

Erin R. Applebaum (crash-victim counsel)

Evan Kwarta (airline counsel in prior proceedings)

Filippo Marchino (crash-victim counsel)

Glenn Leon (prior government counsel)

Helda Aprilia (petitioner)

Hendrarti Hendraningrum (petitioner)

Huguette Debets (petitioner)

Ian Brinton Hatch (Boeing's counsel)

Jason Robert Marlin (crash-victim counsel below)

Javier de Luis (petitioner)

Jeffrey Richard Gilmore (airline counsel in prior proceedings)

Jeffrey Wallace Hellberg, Jr. (airline counsel in prior proceedings)

Jeremy Alan Fielding (Boeing's counsel)

Jeremy Raymond Sanders (government counsel)

Jerrob Duffy (former government counsel)

John Karanja Quindos (petitioner)

John R. Lausch (Boeing's counsel)

Josh A. Goldfoot (government counsel)

Joshua Mwazo Babu (petitioner)

Katherine Ann Staton (airline counsel in prior proceedings)

Katia Soriano (victim-witness liaison)

Katie D. Bass (airline counsel in prior proceedings)

Kenneth A. Polite, Jr. (former government counsel)

Kyle Kilpatrick Oxford (crash-victim counsel)

Lauren M. Kootman (government counsel)

Leigha Simonton (former government counsel)

Linda Manfredi (petitioner)

Lisa H. Miller (former government counsel)

Lorinda Laryea (government counsel)

Luca Dieci (petitioner)

Matthew R. Galeotti (prior government counsel)

Margaret Ann Garvin (amicus counsel in prior proceedings)

Mariel A. Brookins (Boeing's former counsel)

Mark Filip (Boeing's counsel)

Marianne Auld (counsel below for movant Erin Cox)

Marnee R. Rand (government counsel)

Mary Dow (airline counsel in prior proceedings)

Maurizio Manfredi (petitioner)

Merdian Agustin (petitioner)

Michael P Heiskell (Boeing's counsel)

Michael Stumo (petitioner)

Michael T. O'Neil (prior government counsel)

Myrna Juliasari (petitioner)

M. Sholekhudin Zuhri (petitioner)

Nadia Milleron (petitioner)

Naoise Connolly Ryan (petitioner)

National Crime Victim Law Institute (amicus in prior proceeding))

Nicole M. Argentieri (former government counsel)

Nicholas Jon Ganjei (amicus counsel in district court)

Pablo Rojas (crash-victims' counsel)

Patrick Haney (Boeing's former counsel)

Paul D. Clement (Boeing's counsel)

Paul G. Cassell (crash-victim counsel)

Paul Njoroge (petitioner)

Permana Anggrimulja (petitioner)

Philip B. Trout (government counsel)

Polskie Linie Lotnicze Lot S.A. (Polish airline)

Ralph N. Dado, III (Boeing's counsel)

Richard Bratton Roper, III (Boeing's counsel)

Richard Cullen (Boeing's counsel)

Rini Soegiyono (petitioner)

Robert A. Clifford (crash-victim counsel)

Rohmiyatun (petitioner)

Sanjiv N. Singh (crash-victim counsel)

Scott Philip Armstrong (former government counsel)

Sean Tonolli (government counsel)

Senator Ted Cruz (amicus in district court)

Serly Oktaviani (petitioner)

Siska Ong (petitioner)

Smartwings A.S. (Czech airline)

Sonia Lorenzoni (petitioner)

Sri Umi Anggraini (petitioner)

Suharto (petitioner)

The Boeing Company (respondent)

The Honorable Reed C. O'Connor (district judge)

Tracy A. Brammeier (crash-victim counsel)

United States of America (respondent)

United States District Court for the Northern District of Texas (respondent)

Warren T. Burns (crash-victim counsel)

Wenny Sia Wijaya (petitioner)

Wilson Sandi (petitioner)

 William Connor Winn (government counsel)

Yuke Meiske Pelealu (petitioner)

Zipporah Muthoni Kuria (petitioner)

<div align="right">

s/ W. Connor Winn

W. CONNOR WINN
</div>

## STATEMENT REGARDING ORAL ARGUMENT

The government does not oppose the request for oral argument.

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ..........................................i

STATEMENT REGARDING ORAL ARGUMENT ...............................viii

TABLE OF AUTHORITIES.......................................................................xi

INTRODUCTION.....................................................................................1

JURISDICTIONAL STATEMENT ...........................................................3

ISSUES PRESENTED ..............................................................................3

STATEMENT OF THE CASE ..................................................................4

     I.     Procedural History .................................................................4

     II.    Factual Background ...............................................................5

     III.   Course of Proceedings ...........................................................6

          A.    The Investigation, Information, and DPA.....................6

          B.    The 2022-2023 CVRA Litigation ..................................9

          C.    The Breach Finding and Plea-Deal Litigation ...........13

          D.    The NPA and Rule 48(a) Litigation.............................18

     IV.   Rulings Under Review .........................................................26

SUMMARY OF ARGUMENT .................................................................27

ARGUMENT ...........................................................................................29

     I.     The District Court Did Not Abuse Its Discretion by
          Refusing to Set Aside the Breached and Expired DPA........29

          A.    Standard of Review....................................................30

B.    The Request to Set Aside the Breached and Expired DPA Was and Is Moot. ................................... 30

C.    Alternatively, The District Court Rightly Declined to Set Aside the Breached and Expired DPA. ............. 35

D.    Any Abuse of Discretion Was Harmless. ..................... 40

II.    The District Court Reasonably Ruled That The Government Complied With the CVRA and Granted Leave to Dismiss. .................................................................. 41

A.    Standard of Review ...................................................... 42

B.    The District Court Did Not Abuse Its Discretion by Ruling That Prosecutors Abided By the CVRA........... 42

1.    The Government Reasonably Conferred with the Families and Treated Them Fairly. ............. 44

2.    The Objecting Families' Counterarguments Lack Merit. ........................................................... 46

3.    Any Error Was Harmless.................................... 54

4.    The District Court Cannot Void the NPA. ......... 55

C.    The Rule 48(a) Dismissal Should Stand...................... 55

1.    Victims Cannot Challenge the Substance of a Rule 48(a) Order............................................... 56

2.    The District Court Also Did Not Abuse Its Discretion When Granting Leave to Dismiss. ......................................................................... 57

CONCLUSION .................................................................................. 62

CERTIFICATE OF SERVICE................................................................ 63

CERTIFICATE OF COMPLIANCE......................................................... 64

# TABLE OF AUTHORITIES

**Cases**

*Apprendi v. New Jersey,*
530 U.S. 466 (2000) ............................................................. 7

*Arnold v. U.S. Dep't of Interior,*
213 F.3d 193 (5th Cir. 2000) ............................................. 61

*Bank of Nova Scotia v. United States,*
487 U.S. 250 (1988) .......................................................... 40

*Bender v. Donoghue,*
70 F.2d 723 (5th Cir. 1934) ........................................ 30, 32

*Dietz v. Bouldin,*
579 U.S. 40 (2016) ............................................................ 37

*Groupo Mexicano de Desarollo, S.A. v. Alliance Bond Fund, Inc.,*
527 U.S. 308 (1999) .......................................................... 37

*In re Bonvillian Marine Serv., Inc.,*
19 F.4th 787 (5th Cir. 2021) ............................................. 61

*In re Dean,*
527 F.3d 391 (5th Cir. 2008) ....................................... 43, 47

*In re J.H.,*
138 F.4th 1347 (9th Cir. 2025) ......................................... 57

*In re Ryan,*
88 F.4th 615 (5th Cir. 2023) ..................................... *passim*

*In re United States,*
345 F.3d 450 (7th Cir. 2003) ............................................ 59

*In re Wild,*
994 F.3d 1244 (11th Cir. 2021) (en banc) ......................... 51

*Lefebure v. D'Aquilla*,
   15 F.4th 650 (5th Cir. 2021) ........................................................57

*McLane Co. v. EEOC*,
   581 U.S. 72 (2017)........................................................................42

*Miller v. U.S. ex rel. Hunt*,
   181 F.2d 363 (5th Cir. 1950)........................................................53

*Musacchio v. United States*,
   577 U.S. 237 (2016)......................................................................52

*N.L.R.B. v. SW Gen., Inc.*,
   580 U.S. 288 (2017)......................................................................43

*Rinaldi v. United States*,
   434 U.S. 22 (1977)........................................................................56

*Southern Union Co. v. United States*,
   567 U.S. 343 (2012)..................................................................7, 34

*Stolt-Nielsen, S.A. v. United States*,
   442 F.3d 177 (3d Cir. 2006) ....................................................48, 51

*Strickland v. Wilkie*,
   105 F.4th 285 (5th Cir. 2024) ......................................................61

*Trump v. United States*,
   603 U.S. 593 (2024)......................................................................56

*United States v. Bird*,
   709 F.2d 388 (5th Cir. 1983)..............................................19, 48, 51

*United States v. Castaneda*,
   162 F.3d 832 (5th Cir. 1998)........................................................31

*United States v. Cowan*,
   524 F.2d 504 (5th Cir. 1975)....................................................50, 59

*United States v. Evans,*
    892 F.3d 692 (5th Cir. 2018)..............................................................40

*United States v. Fernandez,*
    48 F.4th 405 (5th Cir. 2022) ...........................................................46

*United States v. Flood,*
    635 F.3d 1255 (10th Cir. 2011).......................................................52

*United States v. Garza,*
    448 F.3d 294 (5th Cir. 2006)............................................................46

*United States v. Hamm,*
    659 F.2d 624 (5th Cir. 1981) (en banc) ........... 29, 42, 50, 56, 58, 59, 60

*United States v. HSBC Bank USA, N.A.,*
    863 F.3d 125 (2d Cir. 2017) ...........................................................37

*United States v. Irby,*
    703 F.3d 280 (5th Cir. 2012)............................................................54

*United States v. Jones,*
    664 F.3d 966 (5th Cir. 2011)............................................................42

*United States v. Kattar,*
    840 F.2d 118 (1st Cir. 1988) ..........................................................46

*United States v. Manges,*
    110 F.3d 1162 (5th Cir. 1997)..........................................................53

*United States v. Schmick,*
    904 F.2d 936 (5th Cir. 1990).............................................................53

*United States v. Slovacek,*
    699 F.3d 423 (5th Cir. 2012)............................................................57

*United States v. Welborn,*
    849 F.2d 980 (5th Cir. 1988)........................................................57, 58

*Utah v. Streiff,*
    579 U.S. 232 (2016)...................................................................39

*Weaver v. Massachusetts,*
    582 U.S. 286 (2017)...................................................................40

## Statutes and Rules

18 U.S.C. § 371 ............................................................... 1, 4, 6, 8

18 U.S.C. § 3231 ....................................................................... 3

18 U.S.C. § 3282 ......................................................................53

18 U.S.C. § 3288 ......................................................................54

18 U.S.C. § 3571 .......................................................... 7, 15, 16, 34

18 U.S.C. § 3771 ................................................................ *passim*

28 U.S.C. § 1651 ....................................................................... 3

Fed. R. Crim. P. 11 ..................................................................49

Fed. R. Crim. P. 48 ..................................................................55

Fed. R. Crim. P. 52 .............................................................30, 40

## Other Authorities

150 Cong. Rec. S4260-01 (Apr. 22, 2004)...................................43

Attorney General Guidelines for Victim and Witness
    Assistance (2022) .................................................................9

Black's Law Dictionary (8th ed. 2004)..................................43, 44

Webster's New Collegiate Dictionary (11th ed. 2005) ..............43

## INTRODUCTION

These consolidated mandamus petitions are the latest entry in a long running criminal case against the Boeing Company for conspiring to defraud the Federal Aviation Administration's (FAA) pilot-training team about the Boeing 737 Max aircraft, in violation of 18 U.S.C. § 371. *See generally In re Ryan*, 88 F.4th 615 (5th Cir. 2023) (pre-2024 litigation). Nineteen months ago, the government found that Boeing had breached a prior deferred prosecution agreement (DPA) by failing to implement a satisfactory anti-fraud compliance program. The government has since negotiated with Boeing and repeatedly conferred with the families who lost loved ones in two 737 Max crashes after Boeing defrauded the FAA.

In May 2025, after the district court rejected a proposed plea deal and after conferring further with the crash-victim families, the government and Boeing executed a non-prosecution agreement (NPA). The career prosecutors who had supported the prior plea deal had seen new litigation risk springing from the court order rejecting that plea deal and recent meaningful strides in Boeing's anti-fraud compliance regime. As a result, they believed that an NPA—forcing Boeing to pay a statutory maximum $487.2 million total fine, distribute $444.5 million equally

amongst the families, retain an independent compliance consultant, and invest $455 million in safety and compliance programs—would impose proper penalties and oversight (on top of what the DPA had imposed). In return for Boeing's acceptance of those penalties and oversight, the government agreed not to prosecute Boeing further in this matter and also agreed to move to dismiss the pending Section 371 charge under Federal Rule of Criminal Procedure 48(a). The government preserved its right, however, to reinstitute the case if Boeing ever breached the NPA.

The district court later granted leave to dismiss under Rule 48(a). Over 100 crash-victim families, Boeing, and the government supported or did not oppose the NPA and dismissal. They agreed (or did not contest) that the government had complied with the Crime Victims' Rights Act (CVRA), 18 U.S.C. § 3771, and had moved to dismiss based on its good-faith view of the public interest. But other families opposed dismissal. They claimed violations of their reasonable conferral right and right to fair treatment and disputed the government's view of the public interest. They also sought to set aside the breached and expired DPA. The court ruled that the government had followed the CVRA and dismissed the case because it found that the government had sought dismissal in good faith.

This Court should now deny the mandamus petitions of 31 families, who opposed the NPA and dismissal (the Objecting Families) and have renewed their claims and requests for relief. Their first petition seeks moot, unavailable, and unwarranted relief—setting aside a breached and expired DPA to somehow newly enable further government conferral. Their second petition misreads the CVRA and Rule 48(a) to allow victims to micromanage a prosecution and fails to show that the court abused its discretion in ruling that the government both complied with the CVRA and sought dismissal based on its good-faith view of the public interest.

## JURISDICTIONAL STATEMENT

The district court (O'Connor, C.J.) had jurisdiction in this criminal case. 18 U.S.C. § 3231. This Court may issue mandamus relief if the district court wrongly denied a victim relief. 18 U.S.C. § 3771(d)(3); *see* 28 U.S.C. § 1651(a) (courts may issue writs necessary or appropriate in aid of jurisdiction). The Objecting Families have sought such writs here.

## ISSUES PRESENTED

1.    Whether the district court abused its discretion by not setting aside the breached and expired DPA before granting leave to dismiss.

2.      Whether the district court abused its discretion by ruling that the government complied with the CVRA when negotiating the NPA or by granting leave to dismiss the information under Rule 48(a).

## STATEMENT OF THE CASE

## I.   Procedural History

In 2021, the government filed an information charging Boeing with conspiring to defraud the FAA, in violation of 18 U.S.C. § 371, along with the DPA. D.E.1; D.E.4.[1] The DPA expired in January 2024, and the government had six months to determine if Boeing had breached that agreement during its term. D.E.4:3, 16. In May 2024, the government determined in its sole discretion that Boeing had breached the DPA, D.E.199, and the district court later rejected a plea agreement, D.E.282. In May 2025, after further conferral with the crash-victim families, the government and Boeing signed the NPA, and the government moved to dismiss under Federal Rule of Criminal Procedure 48(a). D.E.312; D.E.312-1. The court granted leave to dismiss the information. D.E.358.

---

[1] Citations to D.E.xx:yy refer to district court docket entries and ECF-stamped page numbers. Citations to DPA Pet. refer to the mandamus petition in case number 25-11253. Citations to NPA Pet. refer to the petition in case number 25-11254.

4

## II.    Factual Background

In the 2010's, Boeing designed a commercial passenger aircraft known as the Boeing 737 Max (a new model of the Boeing 737 aircraft). *In re Ryan*, 88 F.4th 615, 618 (5th Cir. 2023). This new model came with new software—the Maneuvering Characteristics Augmentation System (MCAS)—to pitch the plane downward and balance out its aerodynamics. *Id.* As first designed, MCAS would activate only outside the aircraft's normal operating setting. *Id.* The FAA's pilot-training team therefore provisionally determined that pilots of prior 737 models would need less training before beginning to fly the 737 Max. *Id.* That finding, if it stood, promised to ease airlines' transition to this model and increase sales. *Id.*

But Boeing then changed MCAS's operational scope and concealed that fact from the FAA's pilot-training team to prevent it from issuing more stringent training requirements. *Ryan*, 88 F.4th at 618. Now, the software could activate during takeoff and landing. *Id.* Unaware of this change, the agency's pilot-training team did not alter its provisional determination concerning the 737 Max's pilot-training requirements. *Id.* When the agency cleared the aircraft for sale, it thus approved relevant

training standards and materials unattuned to MCAS's capabilities. *Id.* Foreign regulators adopted parallel standards and materials. *Id.*

In late 2018 and early 2019, two 737 Max aircraft crashed shortly after takeoffs during which MCAS activated. *Ryan*, 88 F.4th at 618. These crashes—of Lion Air Flight 310 off the Indonesian coast and Ethiopian Airlines Flight 302 in Ethiopia—claimed hundreds of lives. D.E.312-1:35-36. The FAA grounded U.S.-based 737 Max aircraft. *Id.*

## III.  Course of Proceedings

### A.    The Investigation, Information, and DPA

**1.**    The government investigated, conducted hundreds of interviews, and collected more than 15 million documents. D.E.245-1:4. Through its investigation, the government has concluded that the most serious offense that it could readily prove beyond a reasonable doubt was that Boeing had conspired to defraud the United States by obstructing the lawful function of the FAA, in violation of 18 U.S.C. § 371. *Id.* That conspiracy rested on the acts of two technical pilots who reported MCAS's operational scope to the FAA's pilot-training division. *Id.* at 5-7.[2]

---

[2] The government charged one technical pilot in a separate case, which ended in acquittal. D.E.245-1:5-6. The government prosecuted no

At no point has the government concluded that it could prove beyond a reasonable doubt a charge that would directly cover the deaths of the Lion Air and Ethiopian Airlines crash victims. D.E.58:9; D.E.245-1:4. The government also has concluded that the highest pecuniary gross gain or loss that it could prove beyond a reasonable doubt was $243.6 million— meaning Boeing faced a maximum fine of $487.2 million. D.E.245-1:4-5; *see* 18 U.S.C. § 3571(d) (maximum fine is twice the gross gain or loss); *Southern Union Co. v. United States*, 567 U.S. 343, 350-51 (2012) (holding that any fact that alters a criminal fine's range is subject to *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and citing Section 3571(d) specifically).

2.    The media reported on the government's investigation, and families of the Ethiopian Airlines crash victims contacted the Department of Justice's Victims' Rights Ombudsman. D.E.56-1:42-44. But a "regrettable and inadvertent internal miscommunication" caused that office to represent that no investigation was ongoing. D.E.128:10-11. The Ombudsman further advised that, if the government filed charges, it would notify victims and inform them of their rights. D.E.56-1:43.

---

other individuals because it found the evidence insufficient to prove them guilty of a federal offense beyond a reasonable doubt. *Id.* at 6 n.4, 18-19.

**3.**     In January 2021, the government filed both an information charging Boeing with conspiring to defraud the FAA, in violation of 18 U.S.C. § 371, and the DPA. D.E.1; D.E.4. The DPA provided that the government would defer prosecution and, if Boeing satisfied certain conditions over three years, dismiss the case and release the company from related criminal liability. D.E.4:16. Among other things, Boeing had to create a $500 million fund to compensate families of the Lion Air and Ethiopian Airlines crash victims (without prejudice to any civil recovery) and pay a $243.6 million criminal fine (half the statutory maximum). *Id.* at 9-11. Boeing made admissions that bound it in this case and civil cases. *Id.* at 2, 20-21. And the company was obligated to design, implement, and enforce a satisfactory anti-fraud compliance program. *Id.* at 14-15, 47-52.

The government had "sole discretion" to decide if Boeing had abided by the DPA's conditions during its three-year term and until July 2024 (the agreement's term plus six months of review) to make that decision. D.E.4:16-17. If the government found that Boeing had satisfied the DPA's terms, the government would move to dismiss the case with prejudice. *Id.* at 16. If the government found that Boeing had breached the DPA, Boeing would have the chance to explain the nature and circumstances

8

of its breach and any related remediation efforts, which the government promised to consider in weighing whether to prosecute. *Id.* at 18. But a breach would permit the government, after weighing Boeing's response, to prosecute further if it found such prosecution warranted. *Id.* at 17.

Although the DPA secured benefits for the crash-victim families, the government did not view them as "crime victims"—"directly and proximately harmed as a result of" the conspiracy to defraud the FAA. 18 U.S.C. § 3771(e)(2); D.E.58:13-14. Justice Department policy also did not then require notifying or conferring with individuals who, in prosecutors' views, did not meet the technical crime-victim definition.[3] The government thus regrettably did not notify or confer with the families about the information and DPA before filing those documents. *Ryan*, 88 F.4th at 619.

## B.  The 2022-2023 CVRA Litigation

**1.**    Ten months into the DPA's term, some crash-victim families appeared in the district court. D.E.15. They asserted crime-victim status

---

[3] Later revisions to Justice Department policy required prosecutors to take such steps, where reasonable, for certain individuals who are not statutory victims. *See* Attorney General Guidelines for Victim and Witness Assistance 18 (2022), https://www.justice.gov/archives/ag/file/1547571-0/dl?inline.

and claimed that their lack of notice and conferral with the government before it filed charges and executed the DPA had violated the CVRA. *Id.* They argued that the government had specifically violated their "reasonable right to confer with the attorney for the Government," "right to be treated with fairness," and "right to be informed in a timely manner of any … deferred prosecution agreement." 18 U.S.C. § 3771(a)(5), (8), (9). And they sought remedies for these violations, including modifying, supervising, or rescinding approval of the DPA. D.E.17:18; D.E.52:33-34.

The government quickly engaged with the families outside of court. As noted, it had not viewed them as crime victims due to the CVRA's direct and proximate causation requirements but recognized that it nonetheless should have conferred with them about the charge and DPA. D.E.58:6-7, 13-14. Prosecutors thereafter met with the families three times in January 2022 and listened to their views on the case and DPA. *Id.* at 7 The government apologized for not having conferred with them and for the false information that they received from the Ombudsman. *Id.* at 23-24. And it revised internal guidelines to prevent such situations in the future, no matter the CVRA's precise requirements. *Supra*, at n.3.

10

Meanwhile, the CVRA litigation before the district court continued. After an evidentiary hearing, the court found by a preponderance of the evidence that Boeing's conspiracy to defraud the FAA had directly and proximately harmed the families (meaning that they were crime victims). D.E.116:18. It also ruled that the government had violated their CVRA rights by failing to notify and confer with them before filing the DPA. *Id.* Even so, the court found that these violations arose from government "legal error" in applying the CVRA's crime-victim definition, "not bad faith or impropriety." D.E.185:20. The court finally held that it lacked the authority to review, disapprove, or modify the DPA and found the families' other requested remedies unwarranted. *Id.* at 16, 20, 26.

**2.**    Some families challenged the district court's remedial ruling through victim mandamus petitions. 18 U.S.C. § 3771(d)(3). This Court denied mandamus relief without prejudice. *Ryan*, 88 F.4th at 614, 629.

In pertinent part, *Ryan* "not[ed] general accord with the … holding that courts lack authority to exercise substantive review over DPAs." 88 F.4th at 621. "[T]he decision to prosecute," it explained, "is made, not by judges or crime victims, but by officials in the executive branch." *Id.* As a result, for a court to make "substantive changes" to a DPA, a court

11

would need "affirmative authority" authorizing that review. *Id.* at 622 (emphasis omitted). And no statute or inherent power, this Court held, granted the authority necessary to "rewrite" the DPA or "excise [its] conditional-release provision" and preserve its remainder. *Id.* at 623.

Afterwards, this Court clarified the district court's authority to see the CVRA's commands honored during the remainder of this prosecution. *Ryan*, 88 F.4th at 623-28. It explained that the "district court ha[d] an ongoing obligation to uphold the public interest and apply the CVRA" as the case resolved, whether by trial, guilty plea, or Rule 48(a) dismissal. *Id.* at 627. As the case then stood, the DPA could resolve in several ways. If the government later found that Boeing had breached that agreement, its promise not to prosecute would no longer prevent it from pursuing a conviction through a guilty plea or trial. *Id.* But if Boeing adhered to the DPA, then, in line with that agreement, the government would move to dismiss under Rule 48(a). *Id.*

If this case ended with a Rule 48(a) motion, this Court expected two things to happen. *Ryan*, 88 F.4th at 627. The government would need to "'recount that the victim[s] had been consulted on the dismissal and what the victim's views were.'" *Id.* The district court would then rule on the

motion after "assess[ing] the public interest according to caselaw as well as the CVRA, including violations already admitted to, as well as any other circumstances brought to its attention by the victims' families." *Id.*

"For this reason," this Court viewed "mandamus intercession [as] premature." *Ryan*, 88 F.4th at 627. It explained that the district court had "yet to resolve the criminal prosecution still pending before it" and had shown "careful competence" in "uphold[ing] crime victims'" rights. *Id.* This Court was "confident that the district court [would] uphold victims' CVRA rights throughout the instant criminal proceedings, above all when, how, and if judicial approval is sought the resolve this case." *Id.* at 629. It therefore denied "mandamus relief without prejudice." *Id.*

## C.    The Breach Finding and Plea-Deal Litigation

**1.**    The DPA expired less than a month later, in January 2024, and the government then had six months to evaluate whether Boeing had breached its obligations under the DPA during the agreement's term. D.E.4:16; D.E.245-1:7. In preparation for that decision, the government accepted written submissions from the crash-victim families and held a 5.5-hour conferral with them to explain how the government would make

its breach determination and to gather their input. D.E.245-1:8-12. It weighed their input during its decision-making. *Id.* at 15-16.

In May 2024, the government determined in its sole discretion that Boeing had breached the DPA. D.E.245-1:14-16. The government found that Boeing had failed during the DPA's term "to design, implement, and enforce a compliance and ethics program to prevent and detect violations of the U.S. fraud laws." D.E.199:1. The government notified Boeing and the families of the breach before informing the public or district court, D.E.245-1:15, and it explained to the families that Boeing was "subject to prosecution," including for any offense that the DPA had covered, D.E.245-17:3-4. Boeing would also, the government noted, have a chance to explain its breach and efforts to remediate the situation, which the government would weigh in determining whether to prosecute. *Id.* at 4.

**2.** About two weeks later, the government met with the families to discuss potential paths forward now that the government's promise not to prosecute Boeing further in the case was undone. D.E.245-1:17-18. During that 4.5-hour conferral, and through written submissions, the government solicited the families' views on whether to dismiss the case, enter a new non-prosecution or deferred prosecution agreement, or seek

a conviction through a guilty plea or trial. *Id.* at 17-19. The government also solicited views as to what sentencing terms the families supported either in a plea agreement or in a post-trial sentencing posture. *Id.* at 19.

The families urged "aggressive criminal prosecution" of Boeing. D.E.245-28:2. They dismissed the prospect of a pretrial resolution and gave their views on the proper charges and punishments. D.E.245-1:20. For example, they urged the government to seek a $24 billion fine at sentencing based on their interpretation of 18 U.S.C. § 3571(d), views of and methodologies for calculating the gross loss or gross gain that flowed from Boeing's offense, and proposed Sentencing Guidelines calculations. D.E.245-28:6-24. They likewise requested that the government seek the maximum probation term and an independent compliance monitor with a broad mandate as a probation condition. *Id.* at 25-28. And they sought the restitution that may follow a conviction and a meeting with Boeing's Board of Directors. *Id.* at 24-25, 30.

After weighing this input, the government scheduled another conferral to preview for the families a plea offer that it intended to make. D.E.245-1:25-26. It explained that it planned to offer Boeing a binding plea agreement under Federal Rule of Criminal Procedure 11(c)(1)(C)

15

that would require Boeing to plead guilty to the information. *Id.* at 27. The agreement would call for what the government deemed the statutory maximum and top-of-guidelines $487.2 million fine (with credit for the $243.6 million penalty that Boeing had paid under the DPA) given the evidence and burden under Section 3571(d) and *Southern Union* to prove Boeing's gross gain or loss from its offense beyond a reasonable doubt. *Id.* at 27-28; 18 U.S.C. § 3571(d). The deal would place Boeing on probation for three years and mandate new compliance and safety investments. D.E.245-1:28-29. It also would require Boeing to install a government-selected and district-court sanctioned independent anti-fraud compliance monitor (from a pool provided by Boeing), who would report to the government and publicly share summaries of his annual report. *Id.* The offer would, as had been requested, permit restitution and require Boeing's directors to meet with the crash-victim families. *Id.*

The families opposed any plea agreement and this specific agreement at the conferral session and in later letters. D.E.245-1:29-31. They criticized the monitor-selection process, the fine amount, and the lack of government support for restitution. *Id.* at 30. The government weighed that input as it opened negotiations with Boeing. *Id.* at 30-31.

**3.**     In July 2024, the government and Boeing announced that the company would plead guilty under a Rule 11(c)(1)(C) plea agreement, D.E.204, and the parties memorialized their agreement, D.E.221-1. Although the agreement largely tracked the framework that the government had laid out for the families, the government had made and secured two changes to the agreement based on the families' feedback. D.E.245-1:31-32. The agreement newly allowed the government to support lawful restitution and provided that the government, not Boeing, would assemble the pool of independent monitor candidates. *Id.*

The families asked the district court to reject the plea agreement and, with government support for their right to be heard, filed written objections and spoke at a hearing on the agreement. D.E.234; D.E.274; *see* D.E.245-1:26. Their objections echoed those raised to the government, urging a public trial of Boeing without a plea deal and presenting their view of the proper charges and punishments. D.E.234; D.E.254; D.E.274.

**4.**     In December 2024, the district court rejected the proposed plea agreement. D.E.282. The court gave two reasons for that rejection. It had concerns as to how since-repealed Justice Department policies on diversity and inclusion would affect selection of an independent monitor.

*Id.* at 6-10. The court also reasoned that it should play a larger role than the agreement allowed when selecting and overseeing a monitor given the breach of the DPA. *Id.* at 11. In so ruling, the court thought it "not clear what all Boeing ha[d] done to breach the [DPA]," *id.*, although the government had detailed its breach basis in the proposed plea agreement, D.E.221-1:34-42. Boeing, the court noted, had also "hint[ed] that it may have legitimate arguments" challenging the breach finding. D.E.282:11.

That same month, the government conferred with the families and reengaged with Boeing about next steps. D.E.312-2:8-10. The families reiterated that the government should go to trial and not seek a further pretrial resolution or grant concessions to Boeing. *Id.* at 10. Meanwhile, the government revived negotiations about a pretrial resolution. *Id.* These negotiations at first focused on a revised plea deal addressing the district court's concerns. D.E.301-1:3. No such deal was reached. *Id.*

### D.    The NPA and Rule 48(a) Litigation

1.    In May 2025, negotiations led to a potential framework for a non-prosecution agreement (NPA), D.E.312-2:12, which the government had told the families was one way to resolve the case, *see* D.E.245-22:4. An NPA had gained momentum for two reasons. First, the language in

the court decision rejecting the plea agreement had caused Boeing (and the government) to reappraise the likelihood that the district court might welcome a challenge to the government's breach finding and to conclude that any monitorship that the court might approve was one that Boeing could not voluntarily accept. D.E.318-1:103. Second, the government had continued, in line with Justice Department policy, to review Boeing's anti-fraud compliance and ethics program. *Id.* at 108. The government had seen Boeing make meaningful progress on that front and seen the FAA sustain increased oversight of Boeing. *Id.* In the government's eyes, Boeing now sat "in a much different place" than when the government had sought a monitorship ten months earlier. *Id.*; D.E.312-2:13.[4]

These points, ongoing litigation risk, and the possible punishments in this case led to a potential NPA framework along the following lines.[5] The government would have two main obligations. D.E.318-1:105-06. It would "not prosecut[e]" Boeing further. *Id.* at 105. And, after entering

---

[4] The prosecutors overseeing these judgments were the ones that had earlier pursued a guilty plea. *See* D.E.221:4. *Contra* NPA Pet. 7 (claiming that new prosecutors made these determinations).

[5] Although the government often enters NPAs before filing charges, it sometimes strikes such agreements after a charge is pending. *See, e.g.*, *United States v. Bird*, 709 F.2d 388, 389-90 (5th Cir. 1983); *infra*, n.14.

the NPA, it would "move to dismiss the charge pending against Boeing." *Id.* at 106. The government would revive this case only if it later found in its sole discretion that Boeing had breached the NPA. *Id.* at 105-06.

The potential NPA would impose many more obligations on Boeing. D.E.318-1:106-08. As the plea agreement had envisioned, Boeing would have to pay $243.6 million, such that payments under the DPA and NPA would total what the government deemed the statutory and Guidelines maximum $487.2 million fine. *Id.* at 106; *supra*, at 16. Boeing's directors again would have to meet with the families. D.E.318-1:106; *supra*, at 16. Because the lack of a conviction would prevent restitution, an NPA would guarantee and divide equally amongst the crash-victim families a second fund of $444.5 million—a sum based on a recent analysis of restitution claims that the families had submitted. D.E.312-2:4-8; D.E.318-1:106-07. Boeing would make $455 million in compliance and safety investments, continue enhanced self-reporting, and retain an independent compliance consultant, who would make recommendations to Boeing about its compliance program and report to the government on that program's continued progress. D.E.318-1:107-09.

**2.** Once the government had this potential framework, but no agreement and no shared draft of an NPA, it conferred with the families. D.E.312-2:12. The conferral lasted about 2.5 hours, and the government recounted how it thought circumstances had changed since July 2024, the ongoing negotiations with Boeing, and the potential NPA framework. D.E.312-2:16-17; D.E.318-1:101-09.[6] The government affirmed that it had not yet decided what to do in this case or whether to pursue an NPA. D.E.312-2:19; D.E.318-1:101-02, 104. And it sought to answer questions and received input from the families for the remainder of the conferral. D.E.312-2:12, 14-15; D.E.318-1:109-29. The government also accepted written submissions for a further week. D.E.312-2:19-20; D.E.312-24.

The families had diverse views about the NPA. Over 110 of them either favored or did not oppose the NPA or resolving the case generally. D.E.309:3. Some valued the NPA because it would bring closure and because of the immediate benefits that it promised the families. *Id.*; *see* D.E.312-24:2; D.E.353:12-26. Others protested the NPA during and after

---

[6] Transcripts for this and one other conferral exist because a crash-victim family recorded these conferrals despite the government's request. D.E.318-1:7, 33.

the conferral and continued to urge aggressive criminal prosecution. D.E.312-24:28; D.E.318-1:109-29. They also signaled that they would oppose any motion to dismiss, and the government affirmed that it would support their right to be heard in that regard. D.E.318-1:109, 125.

**3.** After considering this input, the government offered Boeing an NPA in line with the earlier framework, and the company accepted. D.E.312-2:21. The government informed the families that the parties had agreed upon the material terms of an NPA. *Id.* In the government's judgment, the NPA was a "fair and just resolution that serve[d] the public interest" by guaranteeing further accountability for Boeing and benefits for the families and public while avoiding litigation risk. *Id.* The NPA also accounted for the change of circumstances since July 2024 (more likely breach litigation and improved anti-fraud compliance at Boeing). *Id.* at 7. The government knew that some families had a different view of the NPA, this case, and the proper punishments for Boeing. D.E.309:3-4. But its independent assessment convinced it that the NPA and dismissal would best serve the public interest. *Id.*; D.E.312:6-7.

The government sent Boeing a draft NPA, and the parties edited and signed an NPA that tracked the framework laid out for the families.

D.E.312-1; D.E.312-2:21. Several provisions matter here. First, Boeing had to pay a statutory and Guidelines maximum $487.2 million penalty (with credit for the $243.6 million paid under the DPA). D.E.312-1:4. The NPA did not specify its guidelines calculations. *Id.* Second, unless Boeing breached, the government promised "not to further criminally prosecute" regardless of how the district court ruled on a government Rule 48(a) motion to dismiss. *Id.* at 11-12. Third, the government agreed to move to dismiss the information without prejudice under Rule 48(a). *Id.* at 8. Fourth, if the government found that Boeing breached the NPA, it would have until one year after the agreement expired to refile charges "not time-barred" when the NPA was signed. *Id.* at 10.

4.    With a final NPA, the government filed a Rule 48(a) motion and sought leave to dismiss without prejudice. D.E.312. The government noted that binding circuit precedent required the government to explain its reasons for moving to dismiss, forbade it from acting in a bad-faith manner when seeking dismissal (for example, seeking dismissal due to a bribe or personal animus toward victims), and required it both to consult with the families about dismissal and recount their views to the court. *Id.* at 13-16. The motion, its 25 exhibits, and a sworn declaration from a

23

supervising career prosecutor covered that ground—explaining the government's reasons for dismissal, its efforts to comply with the CVRA, and the mixed victim views on the NPA and dismissal. *Id.* at 5-13, 17-24.

Without alleging any government bad faith, the Objecting Families argued that dismissal was contrary to the manifest public interest. D.E.318:13.[7] They advanced their views about the litigation risk and the obligations imposed on Boeing under the NPA. *Id.* at 33-56. They criticized the NPA's statute-of-limitations language as failing to ensure that the government could reinitiate this prosecution and derivatively claimed that the government had violated the CVRA by not conferring with them about this language and so not treating them with fairness. *Id.* at 28-32. And they contended that the decision not to prosecute even if the court denied leave to dismiss nullified Rule 48(a), *id.* at 13-23, and again had violated their conferral and fairness rights because they had expected that a Rule 48(a) denial would void the NPA, *id.* at 26-28. Lastly, they renewed the call to set aside the breached and expired DPA based on the CVRA violations from over four years earlier. *Id.* at 47-48.

---

[7] The Objecting Families also urged appointing a special prosecutor, D.E.318:23-26; D.E.321, a request later denied, D.E.358:10.

The district court held a hearing and heard from the government, Boeing, and many supporting and objecting families. D.E.353. These groups restated their positions on the NPA and dismissal. *Id.* at 9-129. The supporting families, the government, and Boeing agreed that the government had followed the CVRA. Indeed, a lawyer for over 60 families thought it "unfair" to deny that there had been reasonable conferral and that the government had "been fair" in its dealings with the families. *Id.* at 124-25. The families opposing dismissal disagreed. *Id.* at 102-04.

**5.**    The district court granted leave to dismiss without prejudice. D.E.358. Following circuit precedent, the court presumed that the government had sought dismissal in good faith. *Id.* at 4. And it noted that it could deny leave to dismiss only if the government had given conclusory reasons for dismissal or, when moving to dismiss, had either clearly evinced a betrayal of the public interest or violated the CVRA. *Id.* at 4, 8.

The district court ruled that the government had sought dismissal in accordance with Rule 48(a) and the CVRA. D.E.358:9-10. It noted that the government had "given more than mere conclusory reasons for its dismissal." *Id.* at 9. It also found that the government had not acted in bad faith and clearly betrayed the public interest by seeking dismissal.

*Id.* Although the court deemed persuasive "some" criticisms of the NPA—those about litigation risk and the lack of an independent monitor, *id.* at 5-7—it saw no betrayal of the public interest, *id.* at 7-8; *see also id.* at 4 (noting that such betrayals "include harassing a defendant, accepting a bribe, dismissing an indictment to gain a strategic advantage, to attend a social event, or because the prosecutor personally dislikes a victim").

The district court last concluded that the government had complied with the CVRA. D.E.358:9. The court recognized that the government had met with the families and solicited their views about how to proceed after rejection of the plea agreement and, in May 2025, repeated that process when it came to a potential NPA. *Id.* The government, the court noted, had told the families before telling the public of the executed NPA. *Id.* And the court agreed that the government, in its Rule 48(a) motion, had recounted the families' views on the NPA and dismissal. *Id.*

## IV.    Rulings Under Review

The Objecting Families have filed two CVRA mandamus petitions. 18 U.S.C. § 3771(d)(3). The first seeks reversal of the Rule 48(a) dismissal and a setting aside of the breached and expired DPA. DPA Pet. 34. The second petition seeks reversal of the Rule 48(a) dismissal and an

order to void the NPA based on what the Objecting Families view as new CVRA violations and a clear betrayal of the public interest. NPA Pet. 32.

## SUMMARY OF ARGUMENT

The government has accorded the crash-victim families their rights under the CVRA and weighed how to resolve this case with deliberation. The 31 families who have filed these mandamus petitions have shown no legal error in the challenged rulings, let alone the kind of prejudicial legal error necessary to turn their voice under the CVRA into a veto of the government's discretion and many other crash-victim families' wishes. These mandamus petitions should be denied.

1.    The district court did not abuse its discretion by dismissing the information without setting aside the breached and expired DPA. The Objecting Families' request to set aside the DPA was and is moot. The DPA, once breached, did not limit prosecutorial discretion, and the government and families conferred freely afterwards. The families can gain nothing by now setting aside an already breached and expired DPA.

If the breached and expired DPA somehow still mattered when the government executed the NPA and moved to dismiss, the district court soundly declined to set aside the DPA. Although *Ryan* left the issue open,

courts lack authority to set aside DPAs and NPAs. The court, in any case, had ample grounds to refuse again, as a discretionary matter, to set aside the DPA. The good-faith CVRA violations here occurred long ago and did not prevent good-faith, meaningful, and fair conferral with the families. These conferrals also rendered harmless any failure to set aside the DPA.

      **2.**    The district court did not abuse its discretion by ruling that the government had satisfied its victim-related obligations and by granting leave to dismiss under Rule 48(a). The government conferred at length with the families about the case, the NPA, and the final dismissal. It had no obligation to go over the new agreement's fine minutiae. Still, the government noted that it would make two promises (to not prosecute and to move to dismiss) in the agreement and that it could revive this case despite the statute of limitations if Boeing breached the agreement. The Objecting Families' claim of surprise and resulting CVRA violations then arose from misassumptions about the law and NPAs and a misreading of this agreement—not any deceit or lack of conferral. The government afforded the families their rights and, as a lawyer for over 60 families put it, "to say otherwise would be unfair." D.E.353:124.

The bid to overturn the Rule 48(a) dismissal also must fail. The CVRA does not permit victims to challenge that order substantively. If it did, the Objecting Families have neither shown nor contended that the government sought dismissal in bad faith or failed to explain why it moved to dismiss. They instead argue that this Court's case law and *Ryan* permit a court to substitute its views on whether the public interest favors prosecution for the considered judgment of the Executive Branch. But this Court has long affirmed that, unless bad faith drives a Rule 48(a) motion to dismiss, leave to dismiss "must be granted." *United States v. Hamm*, 659 F.2d 624, 631 (5th Cir. 1981) (en banc). It should do so again.

## ARGUMENT

### I.    The District Court Did Not Abuse Its Discretion by Refusing to Set Aside the Breached and Expired DPA.

Much has changed since this Court considered the DPA in *Ryan*. What remains true is that district courts lack authority to set aside a DPA and that any theoretical remedy of that kind was unwarranted here. Boeing's breach and later events also have rendered moot the request to set aside, and harmless any failure to set aside, that agreement. This Court should therefore deny the first mandamus petition.

## A.    Standard of Review

This Court applies "ordinary standards of appellate review" when reviewing a crime victim's mandamus petition. 18 U.S.C. § 3771(d)(3). It reviews legal conclusions de novo, factual findings for clear error, and discretionary judgments for abuse of discretion. *In re Ryan*, 88 F.4th 615, 621 (5th Cir. 2023). It disregards harmless error. Fed. R. Crim. P. 52(a). Here, it reviews de novo if the request to set aside the DPA was moot and allowable and for abuse of discretion if that course was warranted. It considers whether a failure to set aside that agreement was harmless.

## B.    The Request to Set Aside the Breached and Expired DPA Was and Is Moot.

A third-party request to "set aside" a contract that no longer binds a contracting party seeks relief on a moot point. *Bender v. Donoghue*, 70 F.2d 723, 724 (5th Cir. 1934). When in 2025 some families asked for the breached and expired DPA to be set aside, they thus sought moot relief. The prior finding that Boeing had breached that agreement had freed the government to pursue any legal and warranted prosecution and to confer freely with the families. And repeated and free conferrals then followed.

**1.**    The DPA was a contractual agreement between Boeing and the government. *Ryan*, 88 F.4th at 625; *see United States v. Castaneda*,

162 F.3d 832, 835 (5th Cir. 1998) (contract-law principles govern criminal contractual agreements). It placed many obligations on Boeing but only a few on the government: deferring prosecution and, if the company fulfilled its promises over three years, dismissing the case with prejudice and releasing it from related criminal liability. D.E.4:2, 14, 16. However, if Boeing breached the DPA, the agreement affirmed that the company would "be subject to prosecution for any federal criminal violation" known to the government, *id.* at 17, and did not limit the punishments that the government could pursue, *id.* at 11-12, 14. And Boeing and the government agreed that the government had sole discretion to decide if Boeing had breached the DPA. *Id.* at 3, 17, 19; *Ryan*, 88 F.4th at 627.

In line with these terms, the government found in May 2024 that Boeing had breached the DPA, D.E.199, and provisions constraining the government's ability to prosecute Boeing were "set aside," DPA Pet. 20. Only the facts and law then limited the charges the government could bring or the punishments it could seek. The Objecting Families could lobby for an aggressive prosecution of Boeing, and the government, if it found such a prosecution supported and warranted, could bring it.

A victim request to set aside the DPA was thereafter a moot point. *Cf. Bender*, 70 F.2d at 724. The Objecting Families recognized as much, seeking "aggressive criminal prosecution" after the breach finding. D.E.245-22:2. They spent the next year and a half "mak[ing] their arguments" about the case "to the [g]overnment, and ultimately to the district court—free from the taint of" the DPA. DPA Pet. 31. In 2024, they met with the government and wrote letters about the case's course (and why the government should not proceed with a plea agreement),[8] convinced the government to alter the terms of a proposed plea deal,[9] and persuaded the court to reject the plea agreement.[10] In late 2024 and 2025, they again urged the government to refuse a pretrial resolution (whether a plea deal or a non-prosecution agreement) and not to seek dismissal.[11] None of that would have been logical or necessary if the DPA still blocked

---

[8] D.E.245-1:17-31; *e.g.*, D.E.245-22:2, 4-6 (urging and roadmapping prosecution); D.E.245-28:2-33 (advocating for particular punishments).

[9] D.E.245-1:31-32.

[10] D.E.282:4-11; *see* D.E.234, D.E.236, D.E.238, D.E.242, D.E.254, D.E.256 (court filings); D.E.274 (court hearing).

[11] D.E.312-2:9-10, 14-20; D.E.318-1:32-68, 100-29 (conferrals); D.E.318, D.E.321, D.E.322, D.E.323, D.E.340 (court filings); D.E.353 (court hearing).

prosecution and prevented an "unfettered opportunity to confer with prosecutors about holding Boeing criminally accountable." DPA Pet. 34.

2.    Only since June 2025, after the government declined further prosecution and executed an NPA, have the Objecting Families argued that the breached and expired DPA controls. D.E.318:47. On their telling, it "haunt[s] this case" because the NPA references that prior agreement and because, despite post-breach conferrals, the NPA took the same view as the DPA of the maximum available statutory (and so, Guidelines) fine. DPA Pet. 27-30. These arguments do not show a specterlike DPA.

The NPA refers to the DPA almost exclusively to recount the events that led to the government's decision to execute an NPA. Most references concern Boeing's breach of the DPA and how the government weighed that fact before deciding to offer the NPA. *E.g.*, D.E.312-1:2-4, 14-22, 38. On one occasion, the NPA refers to the administrative-claims process the DPA used to distribute money to the families and notes that the parties have agreed to that same process under the NPA to distribute the second $455 million crash-victim fund. *Id.* at 7-8. The NPA further credits Boeing's payment of a $243.6 million penalty under the DPA against the

$487.2 million statutory maximum penalty that Boeing will pay. *Id.* at 8. Nothing in these references reflects a lingering DPA.

The NPA's calculated monetary penalty, meanwhile, stemmed from the government's view, affirmed in light of its post-breach conferrals with the families, of the statutory (and hence, Guidelines) maximum fine. D.E.312-1:4; *see generally* D.E.245-1:4-5, 19-23, 27-28; D.E.312-2:3, 18. The maximum fine is twice the gross gain or gross loss from the offense, and the government must prove loss or gain beyond a reasonable doubt. *See* 18 U.S.C. § 3571(d); *Southern Union Co. v. United States*, 567 U.S. 343, 350-51 (2012). In 2024, after the breach determination, the DPA's fine calculations did not bind the government (as the Objecting Families' bids for the government to increase the fine reflected, *e.g.*, D.E.245-28). But after conferring with the families on the gross gain or gross loss from Boeing's offense and again reviewing the evidence, the government affirmed that "[t]he highest pecuniary gross gain or loss the [g]overnment can allege and prove beyond a reasonable doubt is $243.6 million." D.E.245-1:4-5; *see id.* 19-23, 27-28. The NPA required Boeing to pay twice that sum—the statutory maximum $487.2 million penalty (with credit

for a prior payment of $243.6 million under the DPA). D.E.312-1:4; *see* D.E.312-2:3 (incorporating D.E.245-1's fine-related statements).

The NPA's monetary penalty, then, did not emerge from the Sentencing Guidelines calculations in the DPA. *Contra* DPA Pet. 30. Indeed, the NPA did not specify its guidelines calculations, D.E.312-1:4, and the government did not consider its prior calculations binding when preparing that agreement, D.E.334:20. The $487.2 million sum simply represented the statutory maximum fine that the government believed it could secure based on the evidence and law after hearing out the families. *Id.*; *accord* D.E.312-1:4. That sum also represented "the top of [any] applicable Sentencing Guidelines" range for a fine, D.E.312-1:4, because a statutory maximum always caps that range, U.S.S.G. § 8C3.1(a) (2018).

## C.    Alternatively, The District Court Rightly Declined to Set Aside the Breached and Expired DPA.

**1.**    *Ryan* noted "general accord" with the idea "that courts lack authority to exercise substantive review over DPAs." 88 F.4th at 621. Courts require "affirmative authority" to make "*substantive* changes" to such agreements, *id.* at 622, and this Court found no such authority to "rewrite" or "excise" any of the DPA's provisions, *id.* at 623. This Court did not, however, resolve if a court may set aside a DPA. *Id.* at 621-23;

*id.* at 630 (Clement, J., concurring) (stating that the panel held only that "the district court was not *required*" to set aside the DPA).

Whether the Objecting Families truly seek such relief is unclear. They wanted the DPA set aside but also wanted the government to rely on the DPA's binding factual admissions at trial to convict Boeing. *See* D.E.318:53. Yet setting aside the DPA would void those admissions and presumably require unwinding the multi-billion-dollar payments that Boeing made under the DPA to the families and its airline customers. As best the government can tell, the Objecting Families do not seek that result and so a true setting aside of the DPA. They instead once more ask a court to "excise" and "rewrite" (no-longer binding) portions of a breached and expired DPA—a course *Ryan* foreclosed. 88 F.4th at 623.

If the Objecting Families truly seek to set aside the DPA entirely, this Court should confirm that courts lack that power. Courts at most can exercise their inherent Article III power over such an agreement. *Ryan*, 88 F.4th at 624. But that power does not allow courts to set aside out-of-court agreements between the Executive Branch and defendants—like DPAs or NPAs—based on good-faith legal errors of the kind the government has been found to have committed at this case's inception.

Where that authority comes into play is in passing on any Rule 48(a) motion to dismiss and, as appropriate, denying or granting the motion. *Id.* at 626-28; *infra*, at 57-61. Indeed, a judicial voiding of a DPA or NPA would solve one wrong with another. *See Groupo Mexicano de Desarollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 332 (1999) (courts sitting in equity cannot "create remedies previously unknown"); *United States v. HSBC Bank USA, N.A.*, 863 F.3d 125, 136 (2d Cir. 2017) ("'[T]he federal judiciary's supervisory powers over prosecutorial activities that take place outside the courthouse is extremely limited, if it exists at all.'").

**2.** The district court in any case reasonably did not set aside the breached and expired DPA before granting leave to dismiss. D.E.358:7 n.19. Again, courts implement CVRA remedies through their preexisting authority, *Ryan*, 88 F.4th at 624, and the only relevant authority here is a district court's inherent Article III powers, *id.* at 622-23. But "[j]ust because a district court has [an] inherent power … does not mean that it is appropriate to use that power in every case." *Dietz v. Bouldin*, 579 U.S. 40, 48 (2016). Rather, courts must exercise such powers with restraint and discretion, even when remedying CVRA violations. *See Ryan*, 88 F.4th at 623; *id.* at 630 (Clement J., concurring) (noting such discretion).

The district court previously declined to set aside the DPA on this understanding. That court long ago found that the government made a good-faith "legal error" in 2021 as to whether the families were directly and proximately harmed by Boeing's conspiracy to defraud the FAA and, so, crime victims. D.E.185:20; 18 U.S.C. § 3771(e)(2). The government thus failed to confer with the families or timely notify them of the DPA. However, since the families appeared in this case, and even before their recognition as crime victims, the government has striven to honor and exceed its CVRA obligations. D.E.185:20. Its "historic engagement" with the families undercut arguments that it had ever acted in bad faith. *Id.* The court therefore found no "bad faith" or CVRA "impropriety," a finding on which *Ryan* relied, 88 F.4th at 629, and law of the case, DPA Pet. 18 (law-of-the-case rule covers matters "'decided by necessary implication'"). That finding led the court to decline to set aside the DPA even if it could, D.E.185:20, a choice that *Ryan* left intact, 88 F.4th at 627; *id.* at 629-30 (Clement, J., concurring), and, once more, law of the case, DPA Pet. 18.

Since 2023, the claim for setting aside the DPA has only grown weaker (if not moot and outright impossible, *see supra*, at 29-35, 36-37). The government found a breach of the DPA, releasing it from its promise

not to prosecute Boeing and allowing it to bring any charge and seek any punishment that the law and facts warranted. *Supra*, at 31-33. That return to square one in the exercise of prosecutorial discretion provided the Objecting Families with the very thing that they were deprived of through the DPA and the 2021 CVRA violations—open conferral with the government about the charges and punishments that Boeing should face. And the government has complied with the CVRA for years and has continued to act in good faith in this case. D.E.358:9; *infra*, at 44-46, 58. Not setting aside a breached and expired DPA, based on good-faith error from long ago and given intervening events, was no abuse of discretion. *Cf. Utah v. Streiff*, 579 U.S. 232, 239-41 (2016) (passage of time, intervening events, and lack of bad faith counsel against suppression).

Nor would declining to set aside the DPA run afoul of *Ryan,* which, despite the Objecting Families' claim, DPA Pet. 20-22, 31, never held that this agreement later could, would, or should be set aside. *Ryan* suggested that this Court would grant mandamus relief, if at all, only once this case ended in the district court. *See* 88 F.4th at 627-28. In that sense, "mandamus intercession [was] premature." *Id.* at 627. But that point did not imply that any court ever would set aside the DPA. It signaled a wait-

and-see approach as to whether mandamus relief would prove necessary. *See id.* at 629; *id.* at 629-30 (Clement, J., concurring).

### D.    Any Abuse of Discretion Was Harmless.

**1.**    This Court applies "ordinary standards of appellate review," 18 U.S.C. § 3771(d)(3), like harmless-error review, Fed. R. Crim. P. 52(a); *see Bank of Nova Scotia v. United States*, 487 U.S. 250, 255 (1988) ("[C]ourts have no more discretion to disregard [Rule 52's] mandate than they do to disregard constitutional or statutory provisions."). Nonconstitutional errors, such as CVRA violations, do not warrant relief absent a "'substantial and injurious effect or influence'" on a case's outcome. *United States v. Evans*, 892 F.3d 692, 714 (5th Cir. 2018).

To argue otherwise, the Objecting Families ignore the command that this Court shall apply ordinary standards of review as it takes up and decides a victim mandamus petition. *Compare* DPA Pet. 25-26, *with* 18 U.S.C. § 3771(d)(3). And instead of invoking Rule 52's ordinary harmless-error rule, they turn to the extraordinary structural-error rule that exists to protect "certain basic, constitutional guarantees." *Weaver v. Massachusetts*, 582 U.S. 286, 294-95 (2017). But Congress decided that this Court shall apply "ordinary," not extraordinary, standards of review.

40

**2.**     Any error in not setting aside the DPA was harmless. That agreement did not prevent the families from sharing their views on prosecuting Boeing or the punishments that Boeing could or should face. *Supra*, at 31-33. Nor did it stop the government from acting upon their views if sound and wise. The Objecting Families have had "unfettered opportunity to confer with prosecutors about holding Boeing criminally accountable," DPA Pet. 34, even if the case did not end as they wished. The CVRA promises no more. *See* 18 U.S.C. § 3771(d)(6) ("Nothing in this chapter shall be construed to impair … prosecutorial discretion.").

## II.     The District Court Reasonably Ruled That The Government Complied With the CVRA and Granted Leave to Dismiss.

The second mandamus petition challenges both the government's compliance with the CVRA as to the NPA and the grant of leave to dismiss under Federal Rule of Criminal Procedure 48(a). NPA Pet. 14-31. But the district court did not abuse its discretion in ruling that the government satisfied the CVRA, and the relief sought (voiding the NPA) is, again, unavailable and unwarranted. The court also properly granted leave to dismiss, a decision which victims cannot substantively attack. Accordingly, the second mandamus petition should be denied.

### A.    Standard of Review

This Court reviews de novo the CVRA's meaning, the rights and remedies available under the statute, and Rule 48(a)'s scope. *Ryan*, 88 F.4th at 621-23; *United States v. Hamm*, 659 F.2d 624, 628 (5th Cir. 1981) (en banc). The "'history of appellate practice'" and the district court's "'better position[]'" to make pertinent "case-specific" calls, *McLane Co. v. EEOC*, 581 U.S. 72, 79, 81 (2017), confirms that this Court should review for abuse of discretion whether the government complied with the CVRA. It reviews for abuse of discretion a Rule 48(a) grant of leave to dismiss. *United States v. Jones*, 664 F.3d 966, 973 (5th Cir. 2011). CVRA errors again are subject to harmless-error review. *Supra*, at 40.

### B.    The District Court Did Not Abuse Its Discretion by Ruling That Prosecutors Abided by the CVRA.

The CVRA grants crime victims several rights, including "the reasonable right to confer with the attorney for the Government in the case" and "right to be treated with fairness." 18 U.S.C. § 3771(a)(5), (8). Prosecutors must "make their best efforts" to ensure that victims are told of and accorded these rights, and courts "shall ensure" victims are "afforded" their rights. *Id.* § 3771(b)(1), (c)(1). Nothing in the CVRA shall "be construed to impair … prosecutorial discretion." *Id.* § 3771(d)(6).

The reasonable right to confer requires the government to make its best efforts to ensure that victims can "communicate meaningfully with the government, personally or through counsel." *In re Dean*, 527 F.3d 391, 395 (5th Cir. 2008) (per curiam); *see* 18 U.S.C. § 3771(c)(1). Even so, this "reasonable" right has limits. It requires only conferral that is "fair, proper, or moderate under the circumstances," *Reasonable*, Black's Law Dictionary 1293 (8th ed. 2004), "not extreme or excessive," *Reasonable*, Webster's New Collegiate Dictionary 260 (11th ed. 2005); *accord Dean*, 527 F.3d at 394. Accordingly, although a prosecutor must give the victim an opportunity to "communicate meaningfully with the government," *Dean*, 527 F.3d at 395, he need not review every fine detail of a case with the victim. The government must only "confer in some reasonable way with the victims before ultimately exercising its broad discretion." *Id.*[12]

The right to fair treatment, meanwhile, requires prosecutors and courts to deal with victims honestly and impartially. Indeed, fair courts

_____

[12] The CVRA's text limits the conferral right despite legislators' floor statements stating that the right was "intended to be expansive." NPA Pet. 15 (quoting 150 Cong. Rec. S4260-01, S4268 (Apr. 22, 2004)); *cf. N.L.R.B. v. SW Gen., Inc.*, 580 U.S. 288, 307 (2017) ("[F]loor statements by individual legislators rank among the least illuminating forms of legislative history.").

and prosecutors are "marked by impartiality and honesty" and "free from self-interest, prejudice, or favoritism." *Fair,* Webster's New Collegiate Dictionary 449 (11th ed. 2005); *see Fair*, Black's Law Dictionary (8th ed. 2004) ("Impartial, just, equitable, disinterested"). Understood this way, the right does not impair prosecutorial discretion. 18 U.S.C. § 3771(d)(6).

1. <u>The Government Reasonably Conferred with the Families and Treated Them Fairly.</u>

The district court did not abuse its discretion in ruling that the government had afforded the Objecting Families their reasonable right to confer and their right to be treated fairly. D.E.358:9. After finding a breach of the DPA, the government met with the families four times. Two conferrals (May 2024 and December 2024) concerned how the government should resolve this case. D.E.245-1:17-18; D.E.312-2:9-10. In two conferrals (June 2024 and May 2025), the government discussed possible pretrial offers to Boeing. D.E.245-1:25-30 (plea agreement); D.E.318-1:101-09 (NPA). The government asked for the families' views on these matters and welcomed feedback, comments, or questions on any issue. D.E.245-1:19-20, 29-30; D.E.312-2:10, 19-20. After each conferral, it accepted their and their lawyers' written submissions, D.E.245-1:20-

44

24, 30-31; D.E.312-2:11-12, 19-20, and often structured or changed pretrial resolutions due to their input, D.E.245-1:26-27, 31; D.E.312-2:19.

After each round of conferrals, the government continued to treat the families with fairness. It told them about its decision to enter into a plea agreement or NPA before it told the public or even the district court. D.E.245-1:25-26, 30; D.E.312-2:2. The government supported them in filing objections to the plea agreement, noticing support for or objections to the NPA, and expressing their views at court hearings. D.E.245-1:26; D.E.312-2:19; *accord* D.E.234; D.E.274; D.E.318; D.E.319; D.E.353. It even helped families secure visas to attend court hearings. D.E.306.

In short, as counsel for over 60 crash-victim families recognized at the Rule 48(a) hearing, there was "reasonable conferral," and the government was "open" and "fair" with the families. D.E.353:124-25. Nothing about its conferrals was "perfunctory," as the Objecting Families assert, NPA Pet. 15. The government engaged with the families on a range of issues and allowed them to ask any question or offer any input that they wished. D.E.318-1:101-29. It declined to answer certain questions, such as whether it had disclosed to the district court all the evidence about what caused the two 737 Max crashes, DPA Pet. 30,

where the government's "position [was] clear" or where a question did not affect the issue at hand, D.E.318-1:38 (conferring on changes to plea deal rejected on other bases); *cf.* D.E.245-1:4-5, 31-32 (supporting restitution but no charge based on crash-victim deaths). The government also prudently declined to delve into its work product or internal deliberations about the case or evidence. D.E.318-1:113-15, 120; *see* D.E.245-1:4-7; *cf. United States v. Kattar*, 840 F.2d 118, 130-31 (1st Cir. 1988) (treating prosecutors as party opponents and their statements to others as admissible non-hearsay); *United States v. Garza*, 448 F.3d 294, 298 n.14 (5th Cir. 2006) (leaving open that possibility).

2.     The Objecting Families' Counterarguments Lack Merit.

The Objecting Families assert two violations of their reasonable right to confer and right to fair treatment based on two NPA terms—one obligating the government not to prosecute no matter how a Rule 48(a) motion fared and one about the statute of limitations.[13] NPA Pet. 14-23.

---

[13] The Objecting Families do not develop an argument that the conferrals were broadly inadequate. Under ordinary standards of appellate review, 18 U.S.C. § 3771(d)(3), they have waived that argument, *United States v. Fernandez*, 48 F.4th 405, 412 (5th Cir. 2022).

But the district court had ample cause to rule that the government had abided by the CVRA given the law, the conferrals, and the NPA's terms.

1.    Together, the CVRA's reasonable conferral and fairness rights require that the government honestly confer "in some reasonable way." *Dean*, 527 F.3d at 395. But those reasonable and procedural rights, *supra*, at 42-44, do not require the government to review with victims all possible variations of potential terms in a potential pretrial resolution. Candidly outlining the framework of such a potential agreement, as the government did at the May 2025 conferral, is reasonable and fair. And reading the CVRA otherwise could require the government to preview to victims every sensitive provision in a pretrial resolution, including those that promise witness protection to cooperating defendants or that will affect a public company's price on a stock exchange. The CVRA does not call for such granularity. D.E.353:125 (attorney for families supporting the NPA agreeing that the government need not "detail" to victims "every line and every provision of an agreement … to comply with the [CVRA]").

2.    The government, in any case, adequately previewed the two relevant NPA terms at the May 2025 conferral. It addresses in turn the no-further-prosecution term and the statute-of-limitations term.

**a.** The government at the May 2025 conferral conveyed to the families that any NPA would contain two promises: to not prosecute further and to move to dismiss the charge under Rule 48(a). It reiterated first that NPAs impose obligations on a defendant "in exchange for [the government] not prosecuting." D.E.318-1:105. Such a promise bars a future conviction but does not alone bar indictment or even a trial. *See Stolt-Nielsen, S.A. v. United States*, 442 F.3d 177, 184 (3d Cir. 2006); *United States v. Bird*, 709 F.2d 388, 392 (5th Cir. 1983). Therefore, the government also noted that, if it "entered an NPA with Boeing," that agreement would also require it to "move to dismiss" under Rule 48(a), D.E.318-1:106, which would prevent a future trial. Those two separate promises in tandem would end this case and bar a future conviction of Boeing if it complied with a potential NPA's terms. No one questioned, at or after the conferral, these two separate promises or their sequencing.

That silence reflected a point the Objecting Families once made: unlike a Rule 48(a) motion to dismiss, a non-prosecution agreement requires no court approval "to go into effect." D.E.17:13. "Courts are uninvolved, so accountability for the … decision not to prosecute lies squarely on the government." *Ryan*, 88 F.4th at 625. By contrast, when

the government seeks Rule 48(a) leave of court to dismiss and avert trial, a court can in rare cases refuse to grant leave and sanction that course. *Id.* at 627; *infra*, at 57-61. A promise not to prosecute and a promise to move to dismiss under Rule 48(a)—both of which, the government noted, it would make in any future NPA, D.E.318-1:105-06—are therefore separate creatures with different effects. *Cf.* Fed. R. Crim. P. 11(c)(1)(A) (plea agreement may specify that prosecutor will "not bring, *or* will move to dismiss, other charges") (emphasis added). That is true even if both promises were needed here to prevent future conviction *and* end the case.

In the final NPA, the government made both of the promises that it had previewed. The NPA provides that the government will "not further criminally prosecute" Boeing for crimes in this case. D.E.312-1:2, 9, 12. It also committed the government to move to dismiss the pending charge under Rule 48(a). *Id.* at 2, 4, 9. However, although a district court may only rarely deny such a motion, the parties could not know how the court would rule on the motion—for example, granting leave to dismiss with or without prejudice or denying leave to dismiss. What the parties could do was reaffirm the inherently separate nature of a promise not to prosecute and a promise to move to dismiss under Rule 48(a). They did so, holding

49

Boeing to its promises and the government to its promise not to prosecute
no matter how the court resolved the Rule 48(a) motion. *See id.* at 11-12.

In claiming that the government violated their CVRA rights, the
Objecting Families cite no government representation that it would
condition its promise not to prosecute on a grant of its Rule 48(a) motion.
NPA Pet. 15. They note only that the government told the families that
they could consult with their lawyers "about the legal authority a judge
has to deny" such a motion and that the government supported their
being heard on any such motion. *Id.* at 16 (quoting D.E.318-1:106, 125).
But those statements said nothing about the effect that a denial would
have on the government's promise not to prosecute. And functionally,
denial of a Rule 48(a) motion never "compel[s]" prosecutors to proceed;
they can always allow a charge to lie dormant and trigger dismissal
under a constitutional or statutory provision. *Hamm*, 659 F.2d at 632
(noting inevitable dismissal for delay that will follow under Rule 48(b));
*United States v. Cowan*, 524 F.2d 504, 511 (5th Cir. 1975) (noting courts
are "constitutionally powerless to compel the government to proceed").

The Objecting Families also cannot maintain that the government
misled them based on some "normal sequence," where a Rule 48(a) ruling

comes before a promise not to prosecute goes into effect. NPA Pet. 8, 16. That is because the sequence that they envision is far from normal. When the government promises not to prosecute, it often makes that promise before filing charges, *In re Wild*, 994 F.3d 1244, 1247-48 (11th Cir. 2021) (en banc); *Stolt-Nielsen*, 442 F.3d at 179-80, and so never seeks dismissal. When it makes such a promise after filing charges, as here, it does not necessarily (if ever) tie that promise to a Rule 48(a) dismissal.[14] *E.g.*, *Bird*, 709 F.2d at 389-90 (charges "will be dismissed and no further prosecution will be instituted"). And the Objecting Families notably cite no NPA that conditions a promise not to prosecute on a Rule 48(a) ruling.

A promise not to prosecute runs, by default, on a separate track from any resolution of a separately promised Rule 48(a) motion.

---

[14] D.E.318-1:4 (noting familiarity with *Wild* and NPAs available on the Corporate Prosecution Registry); *see also* Cap. Ship Mgmt. NPA at 1-2 (C.D. Cal. Sept. 4 2019), https://corporate-prosecution-registry.com/media/agreement/capital-ship.pdf; Hong Kong Entm't NPA at 5-6 (D.N.M.I. July 23, 2015), https://corporate-prosecution-registry.com/media/agreement/hong-kong-entertainment.pdf; Advanced Cosmetic Rsch Labs, Inc. NPA at 3-4 (C.D. Cal. Oct. 3, 2008), https://corporate-prosecution-registry.com/media/agreement/advanced-cosmetic.pdf; Facility Grp. NPA at 3-4 (N.D. Miss. Aug. 21, 2008), https://corporate-prosecution-registry.com/media/agreement/facility-group.pdf; Milberg LLP NPA at 13-15, (C.D. Cal. June 16, 2008), https://corporate-prosecution-registry.com/media/agreement/milberg.pdf.

The government statements at the May 2025 conferral reflected as much, and the NPA's no-further-prosecution term reaffirmed that default rule.

**b.**    The government also correctly told the Objecting Families that a breach of the NPA would allow the government to refile this case. The Objecting Families' contrary reading of the NPA and derivative claim that the government failed to reasonably confer with them or treat them fairly, NPA Pet. 20-23, again misreads the law and this agreement.

Should Boeing breach the NPA, the agreement allows the government to commence any prosecution, including specifically one based on the facts of this case, if "not time-barred by the applicable statute of limitations on the date" the NPA was executed. D.E.312-1:10. The government may file such charges up to one year after the NPA's two-year term has expired. *Id.* at 5, 10. And it may file them "notwithstanding the expiration of the statute of limitations" during the interval between the NPA's signing and expiration-plus-one-year date. *Id.* at 10; *see Musacchio v. United States*, 577 U.S. 237, 246 (2016) (explaining that a statute-of-limitations defense becomes part of a case only if the defendant invokes it); *United States v. Flood*, 635 F.3d 1255, 1258-59 (10th Cir. 2011) (pre-expiration written waiver of defense valid).

These provisions allow the government to refile this case if Boeing breaches because, when the NPA was signed, the pending Section 371 charge was not time barred by the applicable statute of limitations. D.E.312-1:10. That charge covered Boeing's conspiracy to defraud the FAA from at least November 2016 until at least December 2018. D.E.1:1. The government filed that charge in an information in January 2021, *id.*, within five years of the conspiracy's last overt act and within the statute of limitations, *see* 18 U.S.C. § 3282(a); *United States v. Manges*, 110 F.3d 1162, 1170 (5th Cir. 1997). From that day on, the information tolled the statute of limitations for the Section 371 charge. *United States v. Schmick*, 904 F.2d 936, 940 (5th Cir. 1990); *see Miller v. U.S. ex rel. Hunt*, 181 F.2d 363, 364 (5th Cir. 1950) (tolling rule applies to an information). The Section 371 charge was pending (and its statute of limitations tolled) when the parties signed the NPA, meaning that the charge was not then time barred. D.E.312-1:10.

Whether the January 2021 information "'stopped the clock'" on or "suspend[ed]" the Section 371 statute of limitations, NPA Pet. 21-22, makes no difference. That charge was either way not time barred—*i.e.*, subject to dismissal due to the expiration of the statute of limitations.

*Cf. United States v. Irby*, 703 F.3d 280, 283 (5th Cir. 2012) (per curiam) (count "not time barred as long as [the defendant] was indicted within six years of when the crime … was completed"). The Section 371 charge and a case based on it would also remain not time barred, even absent the NPA's provisions, for six months after the November 2025, dismissal. *See* 18 U.S.C. § 3288 (new indictment allowed for six months after dismissal "for any reason" despite statute of limitations); *accord* NPA Pet. 22.

The government therefore did not violate the CVRA when it told the families that any NPA would allow it to "refile the charge and prosecute the case" if Boeing breached that agreement. D.E.318-1:106. But, if a drafting error had cost the government its right to bring this case anew, that error would not show a CVRA violation. The government believed (and still does) that it signed an agreement permitting revival of this case if Boeing breaches the NPA. The CVRA demanded no more.

### 3. Any Error Was Harmless.

Assuming the government did not reasonably confer with or treat the families fairly, that error did not affect this case's outcome. *Supra*, at 40 (harmless-error standard). The families who supported and opposed the NPA and dismissal had the opportunity to review the agreement and

54

object to or support it and the Rule 48(a) motion in the district court. Once the Objecting Families had voiced their concerns with the two terms just discussed, the government again affirmed that it continued to view the agreement and dismissal as being in the public interest. D.E.334:6-8. The court also recognized that the government was acting and moving for dismissal in good faith when it gave leave to dismiss. D.E.358:7 n.19, 9. Nothing about the NPA or dismissal, then, would have changed even if the government had proceeded as the Objecting Families desired.

### 4.    The District Court Cannot Void the NPA.

Because courts lack authority to void out-of-court agreements between the Executive Branch and a defendant, the district court cannot void the NPA—as the Objecting Families presume, NPA Pet. 23-24— even if a prejudicial CVRA error occurred. *Supra*, at 36-37; *see Ryan*, 88 F.4th at 625 (calling courts "uninvolved" in NPAs). Alternatively, the court had discretion and cause not to void the NPA. *Supra*, at 37-39.

### C.    The Rule 48(a) Dismissal Should Stand.

The government may, with leave of court, dismiss an information. Fed. R. Crim. P. 48(a). Pertinently, district courts in this circuit may "in extremely limited circumstances in extraordinary cases" deny such a

motion if "the prosecutor's actions clearly indicate a 'betrayal of the public interest.'" *Hamm*, 659 F.2d at 629.[15] That betrayal arises only if the request for dismissal "is clearly motivated by considerations other than [a prosecutor's] assessment of the public interest"—for example, "'because he has accepted a bribe[,] … desires to attend a social event instead of'" trial, or "'personally dislikes the victim.'" *Id.* at 630. As the district court here ruled, nothing like that occurred in this case.

1. <u>Crime Victims Cannot Challenge the Substance of a Rule 48(a) Order.</u>

The CVRA gives victims procedural guarantees and allows them to seek relief for violations of their rights, including by filing a mandamus petition. *Ryan*, 88 F.4th at 621, 624; 18 U.S.C. § 3771(d)(3). But that "mandamus procedure does not permit" them "to challenge—and does not empower a court of appeals to address—matters other than a district court's denial of the rights enumerated in that statute." *In re J.H.*, 138

---

[15] *Rinaldi v. United States* found it unnecessary to decide if a district court may refuse leave to dismiss in this scenario. 434 U.S. 22, 29 n.15 (1977). To preserve the issue, the government objects to precedent limiting its ability to dismiss on this ground. *Cf. Trump v. United States*, 603 U.S. 593, 620 (2024) ("[T]he Executive Branch has 'exclusive authority and absolute discretion' to decide which crimes to investigate and prosecute.").

F.4th 1347, 1349 (9th Cir. 2025); *see United States v. Slovacek*, 699 F.3d 423, 426-27 (5th Cir. 2012) (nonparty victims cannot appeal sentence). The Objecting Families thus cannot now challenge the Rule 48(a) order's substance. *J.H.*, 138 F.4th at 1349; *cf. Lefebure v. D'Aquilla*, 15 F.4th 650, 654 (5th Cir. 2021) ("'[O]ur entire criminal justice system is premised on the notion that a criminal prosecution pits the government against the governed, not one private citizen against another.'").

### 2.  The District Court Also Did Not Abuse Its Discretion When Granting Leave to Dismiss.

**1.**    District courts must follow three steps to resolve a Rule 48(a) motion in a case with victims. First, the court must "begin with the presumption that the prosecutor acted in good faith" given the division of power between the executive and judicial branches. *United States v. Welborn*, 849 F.2d 980, 983 (5th Cir. 1988) (per curiam). Second, the court must ensure that a prosecutor gave "'sufficient reasons'" for dismissal, instead of "a bare conclusion in support of [the] motion," *id.*, and that he consulted the victims and "recount[ed]" their relevant views, *Ryan*, 88 F.4th at 627. Victims may bring other points to the court's attention. *Id.* Finally, the court must decide based on these explanations and responses if "the presumption of good faith is overcome by 'an affirmative reason to

believe that the dismissal motion was motivated by considerations contrary to the public interest.'" *Welborn*, 849 F.2d at 984.

2. The district court applied these principles and acted within its discretion by granting leave to dismiss. It began with the presumption that the government acted in good faith, D.E.358:4, and reviewed the government and the families' extensive filings arguing over the merits of dismissing the case, *id.* at 4-7; *see* D.E.312; D.E.318; D.E.334; D.E.340. Although the court did not embrace all the views that led to the NPA and dismissal, D.E.358:5-7 & n.19, the court found that the government "ha[d] not acted with bad faith" in moving to dismiss, *id.* at 9. And it ruled that the government had met its CVRA obligations. *Id.*; *supra*, at 42-54.

The district court also properly rejected the Objecting Families' claim that its disagreement with the government's assessment of the public interest allowed it to deny leave to dismiss. D.E.358:7-8. Rule 48(a) does not allow a court to "'substitute its judgment for the prosecutor's determination or … second guess the prosecutor's evaluation.'" *Id.* at 7. Dismissal, therefore, "must be granted" absent proof that a prosecutor was "motivated by considerations clearly contrary to the public interest," *Hamm*, 659 F.2d at 631—*e.g.*, a bribe or "'personal[] dislike[]'" of a victim,

*id.* at 630. The court therefore rightly declined to "place[] the burden on the prosecutor to show that dismissal itself would be in the public interest," *id.*, as the Objecting Families now say it should have, *see* NPA Pet. 27-28 (misreading the earlier decision in *Cowan*, 524 F.2d at 506-07, 514-15, to impose such a burden despite *Hamm*'s later holding).

      **3.**     The Objecting Families wanted the district court to assess the public interest and deny dismissal based on *Ryan*. NPA Pet. 25-26; *id.* at 28-31 (debating the public interest). But no appellate decision has upheld a denial of a motion to dismiss based on such an assessment. *See In re United States*, 345 F.3d 450, 453 (7th Cir. 2003). And *Ryan* did not silently overrule the rule that no trial or appellate court may reassess the prosecutor's evaluation of the public interest. *See Hamm*, 659 F.2d at 631.

      Instead, *Ryan* clarified how district courts "uphold the public interest and apply the CVRA" in a Rule 48(a) posture. 88 F.4th at 627. The government would need to recount in any Rule 48(a) motion that it had consulted with the families and their views on dismissal. *Id.* Then, the court would "assess the public interest according to caselaw as well as the CVRA, including violations already admitted to, as well as any other circumstances brought to its attention by the" families. *Id.* As the

district court noted, that case law included *Hamm*, which *Ryan* described as reiterating precedent that judges "are empowered to deny dismissal when 'clearly contrary to manifest public interest' as assessed 'at the time of the decision to dismiss.'" *Id.* (quoting 659 F.2d at 629).

By invoking *Hamm* and requiring assessment of the public interest "according to caselaw as well as the CVRA," *Ryan* did not license courts to engage in the freewheeling inquiry that prior precedent had forbidden. It affirmed that the CVRA required the government and court to take steps to safeguard victims' procedural rights. *See Ryan*, 88 F.4th at 627. And a prosecutor's past CVRA violations or the victims' views could, in some circumstances, cast light on whether that prosecutor sought to dismiss a case for a long-disapproved-of reason. For example, an earlier bad-faith CVRA violation might help show that "'personal[] dislike[]'" of a victim motivated dismissal—allowing for denial of a Rule 48(a) motion, *Hamm*, 659 F.2d at 629-30.[16] But *Ryan* did not unwind prior precedent.

Reading *Ryan* in this way also comports with this Circuit's "strict and rigid[]" rule of orderliness. *In re Bonvillian Marine Serv., Inc.*, 19

---

[16] The Objecting Families made no such argument below given the clear lack of personal animus by the prosecution team.

F.4th 787, 792 (5th Cir. 2021). That rule forbids a three-judge panel from overturning a prior panel decision absent an intervening change in law due to a statutory amendment, Supreme Court decision, or Fifth Circuit en banc decision. *Id.* Neither the en banc court nor Supreme Court had "'unequivocally overrule[d],'" *id.*, Rule 48(a) case law before *Ryan*. And although Congress had enacted the CVRA in the intervening years, nothing in that act "'provide[d] a clear statement'" of intent to alter the Executive and Judicial Branches' roles in the Rule 48(a) context. *See Strickland v. Wilkie*, 105 F.4th 285, 293 (5th Cir. 2024). To the contrary, Congress commanded that "[n]othing in [the CVRA] shall be construed to impair … prosecutorial discretion." 18 U.S.C. § 3771(d)(6). The *Ryan* decision, then, could not have (and did not) recast Rule 48(a) precedent.[17]

\* \* \*

In sum, the government and the families conferred at length about how this prosecution should unfold after Boeing breached the DPA, and the government considered afresh how to resolve this prosecution.

---

[17] If *Ryan* had contradicted Rule 48(a) precedent absent intervening authority, its newer language would have "no effect." *Arnold v. U.S. Dep't of Interior*, 213 F.3d 193, 196 n.4 (5th Cir. 2000).

The government exercised its discretion, with support or acquiescence from over 100 crash-victim families, to enter the NPA, dismiss the case, and thereby bring finality, certainty, and real benefits to these families. The district court rightly ruled that the government had complied with the CVRA and had sought dismissal in good faith given its view of the public interest even if some, including the court, might see parts of the case differently. The 31 families bringing these mandamus proceedings thus have no sound basis to disturb those rulings, veto prosecutorial discretion, and override the views of many other crash-victim families.

## CONCLUSION

This Court should deny the mandamus petitions.

Respectfully submitted,

<div style="display:flex">

COURTNEY L. COKER
Attorney for the United States
Acting under Authority Conferred by
28 U.S.C. § 515
Northern District of Texas

JEREMY SANDERS
Assistant Chief, Fraud Section
Criminal Division


December 17, 2025

JOSH A. GOLDFOOT
Deputy Assistant Attorney General

/s/ W. Connor Winn
W. CONNOR WINN
Appellate Attorney
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave. NW
Washington, DC 20530
(202) 669-6551
William.Winn@usdoj.gov

</div>

## CERTIFICATE OF SERVICE

I certify that, on December 17, 2025, I served an electronic copy of this Consolidated Response for the United States on all litigants via the Court's ECF system. I certify that all case participants are registered ECF users and that service will be accomplished through that system.

/s/ W. Connor Winn
W. CONNOR WINN

# CERTIFICATE OF COMPLIANCE

1.      This consolidated response complies with this Court's order permitting the government to file a consolidated response of no more than 13,000 words because it contains 12,857 words, excluding the parts exempted under Federal Rule of Appellate Procedure 32(f).

2.      This brief complies with the typeface and style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) and because this brief has been prepared on a proportionally spaced typeface using Microsoft Word 365 in 14-point Century Schoolbook font.

3.      This brief complies with the privacy redaction requirement of Federal Rule of Appellate Procedure 25(a) because it contains no personal data identifiers.

4.      This brief has been scanned for viruses with the most recent version of McAfee Endpoint Security, version 10.7, which is continuously updated, and according to that program, is free of viruses.

/s/ W. Connor Winn
W. CONNOR WINN