**Nos. 25-11253 & 25-11254**

# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

_____

IN RE NAOISE RYAN, et al.,

*Petitioners*.

_____

On Petition for Mandamus from the United States District Court
for the Northern District of Texas,
No. 4:21-cr-005-O-1

_____

## THE BOEING COMPANY'S RESPONSE TO THE
## PETITIONS FOR MANDAMUS

_____

BENJAMIN L. HATCH
BRANDON M. SANTOS
McGUIREWOODS LLP
888 16th Street NW, Suite 500
Washington, DC  20006

MARK R. FILIP
CRAIG S. PRIMIS
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue NW
Washington, DC  20004

JEREMY FIELDING
KIRKLAND & ELLIS LLP
1601 Main Street
Dallas, TX  75201

PAUL D. CLEMENT
C. HARKER RHODES IV
PHILIP HAMMERSLEY
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA  22314
(202) 742-8900
paul.clement@clementmurphy.com

*Counsel for Respondent The Boeing Company*

December 17, 2025

## CERTIFICATE OF INTERESTED PERSONS

*In re Ryan*, Nos. 25-11253 & 25-11254

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

- Abidin, Zainal – District court movant

- Agustian, Anzar – District court movant

- Agustin, Meridian – District court movant

- Anggana, Dayinta – District court movant

- Anggraini, R. Ayu Ghea Sofa – District court movant

- Anggraini, Sri Umi – District court movant

- Anggrimulja, Permana – District court movant

- Ansori LNU – District court movant

- Applebaum, Erin Ressa – District court counsel for Petitioners

- Aprilia, Helda – District court movant

- Babu, Emily Chelangat – Petitioner

- Babu, Joshua Mwazo – Petitioner

- Battista, Anthony U. – Counsel for district court movant

- Bauer, Elissa – Counsel for Respondent Boeing

i

- Benton, Colin Patrick – Counsel for district court movant

- Berthet, Catherine – Petitioner

- The Boeing Company – Respondent

- Brammeier, Tracy A. – Counsel for Petitioners

- Burns, Warren Tavares – Counsel for Petitioners

- Cassell, Paul G. – Counsel for Petitioners

- Chandra, Welly – District court movant

- Chasanah, Ulfa Wiwit – District court movant

- Clement, Paul D. – Counsel for Respondent Boeing

- Clifford, Robert A. – Counsel for Petitioners

- Crisdiana, Meylanda – District court movant

- Cruz, Hon. Ted R. – District court *amicus curiae*

- Cullen, Richard – Counsel for Respondent Boeing

- Dado III, Ralph N. – Counsel for Respondent Boeing

- Debets, Huguette – Petitioner

- Delima, Emmy – District court movant

- Demissie, Bayihe – Petitioner

- Deteresa, Michael – Amicus curiae

- Dewi, Ratna Sari – District court movant

- Dieci, Luca – Petitioner

- Dow, Mary – Counsel for district court movant

- Drez, David J. – Counsel for district court movant

- Dursbianti, Septi – District court movant

- Ellisa LNU – District court movant

- Elwood, Leslie – Amicus curiae

- Estate of Andrea Manfredi – District court movant

- Etmidalti LNU – District court movant

- Faidah, Marti – District court movant

- Fatimah, Siti – District court movant

- Fendy LNU – District court movant

- Fhildyna, Andy – District court movant

- Fielding, Jeremy Alan – Counsel for Respondent Boeing

- Filip, Mark – Counsel for Respondent Boeing

- Gaetke, Craig – Amicus curiae

- Gaetke, Todd – Amicus curiae

- Gearon, Jodelle – Amicus curiae
  (*individually and on behalf of the Estate of Daniel Gaetke*)

- Graham, Joshua Stewart – Counsel for Amicus Curiae

- Grogan, Christine – Amicus curiae

- Gusmardi LNU – District court movant

- Hammersley, Philip – Counsel for Respondent Boeing

- Hartati, Sri – District court movant

- Hasanuddin LNU – District court movant

- Hatch, Benjamin L. – Counsel for Respondent Boeing

- Hatch, Ian Brinton – Counsel for Respondent Boeing

- Heiskell, Michael P. – Counsel for Respondent Boeing

- Hendraningrum, Hendrarti – District court movant

- Hellberg Jr., Jeffrey W. – Counsel for district court movant

- Hilton, Chase – Counsel for Petitioners

- Husain, Herlina – District court movant

- Husman, Sri – District court movant

- Irianto LNU – District court movant

- Ishimichi, Siti Anbiya G. – District court movant

- Iskandar LNU – District court movant

- Juliasari, Myrna – District court movant

- Juwita, Winda – District court movant

- Kemp, Wanda – Amicus curiae
  (*individually and on behalf of the Estates of O. Lamar Allen and Ashton Allen*)

- Keyter, Anthony P. – District court movant

- Kodjovi, Glato – District court movant

- Komar, Epi Samsul – District court movant

- Krick, Christopher – Amicus curiae

- Krick, Margareta – Amicus curiae

- Krick, Ronald – Amicus curiae
  *(individually and on behalf of the Estate of Oliver Crick)*

- Kevorkian, Douglas – Amicus curiae
  *(individually and on behalf of the Estate of Ralph G. Kevorkian)*

- Kuria, Zipporah Muthoni – Petitioner

- Kusumaningsih, Ulfah – District court movant

- Kwarta, Evan – Counsel for district court movant

- Lausch, John R. – Counsel for Respondent Boeing

- Lewis, Alex – Counsel for Respondent USA

- Liyanah FNU – District court movant

- Lorenzoni, Sonia – District court movant

- Luis, Javier de – Petitioner

- Manfredi, Linda – District court movant

- Manfredi, Maurizio – District court movant

- Manik, M. – District court movant

- Manurung, Nursia – District court movant

- Marchino, Filippo – Counsel for district court movant

- Mardona LNU – District court movant

- Marlin, Jason Robert – Counsel for district court movant

- Mastiti, Bina Asta – District court movant

- Meacham, Chad E. – Counsel for Respondent USA

- Megali, Mohamed Farrag Mohamed – District court movant

- Merdekawati, Kiki – District court movant

- Michelson, Lisa – Amicus curiae
  (*individually and on behalf of the Estate of Yonatan Rojany*)

- Milleron, Nadia – Petitioner

- Moore, Chris – Petitioner

- Mu'Minah LNU – District court movant

- Nayiri, Umar – District court movant

- Nicholson, Darren Patrick – Counsel for Petitioners

- Nio, Oey Swan – District court movant

- Njoroge, Paul – Petitioner

- Novita, Petty – District court movant

- O'Connor, Hon. Reed C. – Judge for the U.S. District Court for the Northern District of Texas

- Ong, Siska – District court movant

- Oktaviana, Serly – District court movant

- Pelealu, Yuke Meiske – Petitioner

- Polskie Linie Lotnicze Lot S.A. – District court movant

- Prabowo, Endo – District court movant

- Pranata, Ferry – District court movant

- Primis, Craig Scott – Counsel for Respondent Boeing

- Puspawijayanti LNU – District court movant

- Purnama, Norman – District court movant

- Putra, Ferdian – District court movant

- Putri, Lutfiyani Eka – District court movant

- Putri, Tandina Sukarno – District court movant

- Quindos, John Karanja – Petitioner

- Rahman, Abdul – District court movant

- Rejeki, Endang Sri – District court movant

- Rhodes IV, C. Harker – Counsel for Respondent Boeing

- Rismayanti LNU – District court movant

- Riyani, Septi – District court movant

- Rohmiyatun, FNU – District court movant

- Rojany, Eric – Amicus curiae

- Roper III, Richard Bratton – Counsel for Respondent Boeing

- RR Ine Yunita SI – District court movant

- Ryan, Naoise Connolly – Petitioner

- Sanders, Jeremy Raymond – Counsel for Respondent USA

- Sandi, Wilson – District court movant

- Santos, Brandon Michael – Counsel for Respondent Boeing

- Shapiro, Diana Gurfel – Counsel for district court movant

- Sianturi, James – District court movant

- Siegel, Charles S. – Counsel for district court movant

- Singh, Sanjiv N. – Counsel for district court movant

- Smith, Kevin C. – Counsel for amicus curiae

- Soegiyono, Rini Rka A. – District court movant

- Stalcup, Thomas F. – Amicus curiae

- Stumo, Michael – Petitioner

- Subekti, Sri – District court movant

- Suharto FNU – District court movant

- Suratmi, Mimin – District court movant

- Suryani, Dian Anindita – District court movant

- Susanto, Edi – District court movant

- Syakban, Amri – District court movant

- Tahir, Tayeb – District court movant

- Talib, AM I. – District court movant

- United States of America – Respondent

- Vetri LNU – District court movant

- Vuckovich, Adrian – Counsel for district court movant

- Widodo, Dody – District court movant

- Wijaya, Handy – District court movant

- Wijaya, Wenny Sia – District court movant

- Winn, William Connor – Counsel for Respondent USA

- Wirawan, Adhitya – District court movant

- Zaharioudakis, Eileen – Amicus curiae
  (*individually and on behalf of the Estate of Donald Gough*)

- Zen S., Guy Daud Iskandar – District court movant

- Zuhri, M. Sholekhudin – District court movant

Respondent The Boeing Company ("Boeing") states that it is a corporation whose shares are publicly traded (NYSE: BA). Boeing does not have a parent corporation and no publicly held corporation owns 10% or more of Boeing's stock.

s/Paul D. Clement
Paul D. Clement
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Counsel for Respondent The Boeing Company*

## STATEMENT REGARDING ORAL ARGUMENT

Boeing respectfully submits that the petitions for mandamus should be denied without oral argument.  If, however, the Court determines that oral argument would aid its deliberation, Boeing respectfully requests the opportunity to participate.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ......................................... i

STATEMENT REGARDING ORAL ARGUMENT ................................. x

TABLE OF AUTHORITIES ................................................................ xiii

INTRODUCTION ................................................................................. 1

STATEMENT OF THE ISSUES ............................................................ 3

STATEMENT OF THE CASE ................................................................ 4

    A.    Factual Background .................................................................. 4

        1.    The 737 MAX, the Misrepresentations, the Crashes, and Boeing's Response ................................................ 4

        2.    The Government's Investigation ................................... 5

    B.    Procedural Background .......................................................... 6

        1.    The Government Charges Boeing and Enters the DPA ............ 6

        2.    The Prior Mandamus Proceedings ............................. 8

        3.    The Government Confers with Petitioners, Enters an NPA, and Moves to Dismiss ....................................... 9

        4.    The District Court's Decision ................................... 14

ARGUMENT ...................................................................................... 15

I.    The Government Did Not Violate The CVRA In Entering Into The NPA And Moving To Dismiss ........................................................ 16

    A.    Petitioners Were Afforded the Right to Confer With the Government and to Be Treated With Fairness ................................... 16

    B.    Petitioners' Objections to the Decision Below Lack Merit ................ 19

II.    This Court Should Deny Mandamus With Respect To The District Court's Order Granting The Government's Motion To Dismiss ................. 23

A.     The Court Lacks Jurisdiction to Review the District Court's
       Decision to Grant the Government's Motion to Dismiss ................... 24

B.     The District Court Did Not Err by Granting the Government's
       Motion to Dismiss ............................................................................... 28

III.   Petitioners' Challenge To The DPA Is Moot .................................................. 40

CONCLUSION ................................................................................................. 43

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## Cases

*ACLU v. U.S. Conf. of Catholic Bishops*,
  705 F.3d 44 (1st Cir. 2013) ................................................41

*Arizona v. Fulminante*,
  499 U.S. 279 (1991).........................................................41

*Cmty. for Creative Non-Violence v. Pierce*,
  786 F.2d 1199 (D.C. Cir. 1986)..........................................29

*Corey H. v. Bd. of Educ.*,
  528 F. App'x 666 (7th Cir. 2013).......................................41

*In re Dean*,
  527 F.3d 391 (5th Cir. 2008) ..............................................17

*In re J.H.*,
  138 F.4th 1347 (9th Cir. 2025)..........................................25

*In re Richards*,
  213 F.3d 773 (3d Cir. 2000) ..............................................35

*In re Ryan*,
  88 F.4th 614 (5th Cir. 2023)....................................... *passim*

*In re United States*,
  345 F.3d 450 (7th Cir. 2003)..............................................32

*Linda R.S. v. Richard D.*,
  410 U.S. 614 (1973).........................................................26

*McClure v. Ashcroft*,
  335 F.3d 404 (5th Cir. 2003)..............................................27

*Neder v. United States*,
  527 U.S. 1 (1999)............................................................41

*United States v. Adams*,
  777 F.Supp.3d 185 (S.D.N.Y. 2025) ....................... 30, 31, 32

*United States v. Aguirre-Gonzalez*,
    597 F.3d 46 (1st Cir. 2010) ...................................................................27

*United States v. Armstrong*,
    517 U.S. 456 (1996) ................................................................... 29, 30

*United States v. Arzate*,
    545 F.2d 481 (5th Cir. 1977) ...............................................................27

*United States v. Cowan*,
    524 F.2d 504 (5th Cir. 1975) ....................................................... *passim*

*United States v. Day*,
    806 F.2d 1240 (5th Cir. 1986) .............................................................27

*United States v. Fokker Servs. B.V.*,
    818 F.3d 733 (D.C. Cir. 2016) ................................................... 29, 30

*United States v. Greater Blouse, Skirt & Neckwear Contractors Ass'n*,
    228 F.Supp. 483 (S.D.N.Y. 1964) .......................................................32

*United States v. Hamm*,
    659 F.2d 624 (5th Cir. Unit A Oct. 1981) ................................... *passim*

*United States v. Hunter*,
    548 F.3d 1308 (10th Cir. 2008) ...........................................................27

*United States v. Jones*,
    664 F.3d 966 (5th Cir. 2011) ...................................................... 33, 34

*United States v. Martin*,
    682 F.2d 506 (5th Cir. 1982) ...............................................................27

*United States v. Nixon*,
    418 U.S. 683 (1974) ............................................................................29

*United States v. Salinas*,
    693 F.2d 348 (5th Cir. 1982) ........................................... 14, 32, 35, 37

*United States v. Schmick*,
    904 F.2d 936 (5th Cir. 1990) ...............................................................22

*United States v. Smith,*
    55 F.3d 157 (4th Cir. 1995) ................................................................. 37

*United States v. Welborn,*
    849 F.2d 980 (5th Cir. 1988) ..................................................... 15, 32

*Wayte v. United States,*
    470 U.S. 598 (1985) ............................................................................ 30

**Constitutional Provision**

U.S. Const. art. II, §3 ................................................................................ 29

**Statutes and Rule**

18 U.S.C. §3282(a) ................................................................................... 22

18 U.S.C. §3771(a) ................................................................................... 26

18 U.S.C. §3771(a)(5) ........................................................................ 16, 24

18 U.S.C. §3771(a)(8) .................................................................. 16, 18, 24

18 U.S.C. §3771(d)(3) ...................................................................... 24, 26

18 U.S.C. §3771(d)(6) ...................................................................... 17, 19

Fed. R. Crim. P. 48(a) ............................................................................... 30

## INTRODUCTION

These mandamus proceedings arise from a contemplated criminal prosecution against Boeing in connection with the development of training requirements for its new 737 MAX airplane model, following two tragic crashes.  After thoroughly investigating the matter and initially entering a deferred prosecution agreement ("DPA") that provided for hundreds of millions of dollars in fines and compensation and detailed corporate compliance requirements, the United States undertook substantial negotiations with Boeing and extensive consultation with petitioners, who are family members of the individuals who died in the crashes, and ultimately determined that the public interest supports dismissing the prosecution.  The government therefore entered into a non-prosecution agreement ("NPA") with Boeing under which Boeing agreed to pay hundreds of millions of dollars more in fines and compensation, invest hundreds of millions of dollars in compliance, safety, and quality programs, and retain an independent consultant to review Boeing's regulatory compliance efforts and report directly to the government regarding those efforts.  The government then moved to dismiss the prosecution.

Petitioners opposed the motion to dismiss, asserting that the government violated their rights under the Crime Victims' Rights Act ("CVRA") and that the government had not demonstrated its entitlement to dismissal under Federal Rule of Criminal Procedure 48(a).  The district court found no CVRA violation and granted

the government's motion to dismiss.  That decision was correct, and petitioners' efforts to overturn it misunderstand both the scope of the CVRA and the limited role that Rule 48(a) assigns to the judiciary.

First, the government did not violate petitioners' CVRA rights in entering into the NPA and moving to dismiss. The government convened lengthy conferral sessions between petitioners and senior officials, invited and reviewed extensive written submissions, and ensured that petitioners could present their views to the district court through briefing and statements at the Rule 48(a) hearing.  The extraordinary involvement that petitioners had in these proceedings leading up to the NPA plainly satisfies the CVRA.

That should resolve these mandamus proceedings.  The CVRA authorizes crime victims to seek mandamus only to vindicate the discrete rights that the CVRA itself confers; it does not supply a free-standing vehicle for appellate review of the district court's independent Rule 48(a) ruling.  Because petitioners' CVRA rights were not violated, this Court has no jurisdictional basis on which to review—let alone set aside—the district court's Rule 48(a) ruling.

In any event, that ruling was entirely correct.  Under settled legal principles, Rule 48(a) preserves the Executive Branch's primacy over charging and dismissal decisions in federal criminal law enforcement, and affords the judiciary only a narrow role in guarding against bad faith and harassment of criminal defendants.

Here, the government supplied detailed, non-conclusory reasons why the NPA and dismissal serve the public interest, and the district court—finding no bad faith and properly recognizing the limits of its own authority—correctly declined to second-guess that considered judgment by the Executive Branch.

Petitioners have also filed a second mandamus petition attempting to revive arguments against the long-expired DPA the government and Boeing reached back in 2021. That challenge has been overtaken by events. That DPA expired well before the government entered the NPA and moved to dismiss the criminal proceedings, and the DPA accordingly no longer has any relevance to this case. Petitioners' challenge to the DPA is therefore moot, and cannot provide a basis for disturbing the district court's dismissal order. This Court should deny the petitions for mandamus.

## STATEMENT OF THE ISSUES

1.      Whether the district court correctly held that the government did not violate petitioners' CVRA rights in entering the NPA and moving to dismiss.

2.      Whether this Court has appellate jurisdiction to review the district court's dismissal order, and if so, whether the district court correctly granted the government's motion to dismiss under Rule 48(a).

3.      Whether petitioners are entitled to mandamus for alleged CVRA violations with respect to a DPA that expired in January 2024 and has no continuing legal effect.

## STATEMENT OF THE CASE

**A.    Factual Background**

**1.    The 737 MAX, the Misrepresentations, the Crashes, and Boeing's Response**

In 2011, Boeing began developing a new version of its 737 aircraft called the 737 MAX, a process that took several years and required numerous design decisions and government approvals. *See* D.Ct.Dkt.312-1 at 24. That process included (among other things) an evaluation by the FAA to determine (i) whether the airplane met federal airworthiness standards and (ii) what minimum level of pilot training was required before a pilot could fly the airplane. *Id.* The FAA sub-group responsible for making the latter determination is the Aircraft Evaluation Group ("AEG"). *Id*.

In October 2018, a 737 MAX operating as Lion Air Flight 610 crashed shortly after take-off, claiming the lives of 189 passengers and crew. *Id.* at 35. Investigations following the crash revealed that a software function on the 737 MAX—the Maneuvering Characteristics Augmentation System ("MCAS")—had activated during flight, precipitating the issuance of an FAA Emergency Airworthiness Directive addressing appropriate pilot procedures (but not grounding the plane). *See id.*; D.Ct.Dkt.106 at 128-29, 224-25. Despite those measures, in March 2019, a 737 MAX operating as Ethiopian Airlines Flight 302 crashed in Ethiopia shortly after take-off, causing the death of 157 passengers and crew.

D.Ct.Dkt.312-1 at 36. Three days later, all 737 MAX aircraft operating in the United States were grounded. *See id.*

The two crashes led to myriad investigations and lawsuits, and to sweeping changes at Boeing. Boeing not only made "significant changes to its top leadership," but also took concrete steps to strengthen its safety and compliance mechanisms, including by creating a new "permanent aerospace safety committee of the Board of Directors," instituting a "Product and Services Safety organization" to "centralize the safety-related functions" previously located across Boeing, reorganizing its engineering department to have all engineers and the Flight Technical Team report through the chief engineer, and making "structural changes to the Company's Flight Technical Team" to ensure increased supervision. D.Ct.Dkt.4 at 5.

### 2.    The Government's Investigation

The resulting government investigation lasted over two years. That investigation concluded that two Boeing employees had misled regulators in 2015 and 2016 about certain MCAS characteristics in connection with the FAA's pilot-training determination, D.Ct.Dkt.185 at 4, and that in the aftermath of the Lion Air accident one employee misrepresented his prior MCAS knowledge and misleadingly represented that AEG agreed to remove MCAS from certain materials when in fact AEG lacked relevant information, D.Ct.Dkt.312-1 at 32-34. This misconduct was serious and unacceptable, but also specific and limited. In particular, the government

determined that the misconduct "was neither pervasive across the organization, nor undertaken by a large number of employees, nor facilitated by senior management." D.Ct.Dkt.4 at 6. Indeed, other Boeing employees had disclosed the relevant MCAS characteristics to the separate FAA division responsible for determining whether the 737 MAX met federal airworthiness standards. *Id.* The government's investigation did not result in any charge with respect to Boeing's design of MCAS or any finding that the training-related misrepresentations to AEG caused the accidents.

**B.    Procedural Background**

**1.    The Government Charges Boeing and Enters the DPA**

On January 7, 2021, the government filed a one-count criminal information charging Boeing with conspiracy to defraud the United States based on misrepresentations to AEG in connection with the 737 MAX. D.Ct.Dkt.1. Boeing and the government simultaneously entered into a DPA that required Boeing, among other things, to pay the government a $243.6 million monetary penalty, establish a $500 million compensation fund for the families of those who perished in the crashes (supplementing a $50 million fund Boeing previously voluntarily created for the families, and without foreclosing any further award in civil litigation), and implement significant corporate compliance requirements. In exchange, the government agreed to move to dismiss the information if Boeing complied with the DPA's conditions for the duration of its three-year term. D.Ct.Dkt.4 at 1-23.

Almost a year later, petitioners appeared in the district court and moved for relief under the CVRA, arguing that the government had violated the CVRA by failing to confer with them before entering the DPA. *See* D.Ct.Dkt.17. As remedies, petitioners asked the district court to arraign Boeing and to "withhold approval" of the DPA until it was "modified" to impose more stringent conditions. *Id.* at 13; D.Ct.Dkt.18 at 1, 11. The government and Boeing opposed those motions, arguing petitioners were not protected by the CVRA because they did not qualify as "crime victims" within the meaning of that provision, and that the district court lacked authority to disapprove or modify the DPA's terms. D.Ct.Dkt.58 at 8-18; D.Ct.Dkt.62 at 4-15.

The district court eventually held a truncated hearing to determine whether petitioners were "crime victims" under the CVRA. Petitioners presented testimony from two purported experts—neither of whom had worked for FAA's AEG—to attempt to prove that the charged misrepresentations in 2015 and 2016 were a direct and proximate cause of the crashes, such that petitioners would be "crime victims" under the CVRA. The government and Boeing objected, explaining that the expert testimony was unreliable and inadequate to prove causation. D.Ct.Dkt.106 at 203-04. Acting on a limited record that included expert testimony only from petitioners, the district court dismissed those objections and held that petitioners were "crime

victims" within the meaning of the CVRA, and that the government's contrary view was held in good faith but mistaken.  D.Ct.Dkt.116 at 2; *see* App'x.696-700.

In January 2023—more than two years into the three-year DPA—the district court granted petitioners' request for a public arraignment.  D.Ct.Dkt.185 at 8. Shortly thereafter, it denied petitioners' motion for further CVRA relief.  The district court refused to modify the DPA because it concluded that it did not have the power to do so, and it refused to provide the other relief petitioners requested as beyond the scope of its judicial authority.  *Id.* at 10-30.

### 2.    The Prior Mandamus Proceedings

After the district court denied their request for further relief, petitioners sought mandamus under the CVRA, reasserting the same arguments they had advanced in the district court.  This Court denied mandamus in *In re Ryan*, 88 F.4th 614 (5th Cir. 2023).  The Court agreed that federal courts "lack authority to exercise substantive review over DPAs," and accordingly refused to grant petitioners' request to make "substantive changes to the DPA."  *Id.* at 621-22 (emphasis omitted).  As for petitioners' other requests for relief, the Court concluded that granting mandamus would be "premature."  *Id.* at 627.  While the Court believed that petitioners "should have been notified of the ongoing DPA discussions and should have been allowed to communicate meaningfully with the government … before a deal was struck," it concluded that "the district court has demonstrated careful competence" in

recognizing that it "must uphold crime victims' statutory rights at every stage of the court's criminal proceedings," and expressed confidence that if the government moved to dismiss the prosecution, "the district court will assess the public interest according to caselaw as well as the CVRA," and would ensure that petitioners were adequately consulted before granting dismissal. *Id.* (brackets omitted).

> ### 3.    The Government Confers with Petitioners, Enters an NPA, and Moves to Dismiss

Less than a month after this Court issued its decision, in January 2024, the DPA expired. *See* D.Ct.Dkt.4 at 3. Several months later, the government notified the district court that it had determined that Boeing had breached its obligations under the DPA. D.Ct.Dkt.199 at 1. Although Boeing disputed that determination, it nevertheless negotiated a proposed plea agreement with the government in July 2024. The government conferred extensively with petitioners regarding those negotiations, but petitioners continued to object to a negotiated resolution of the case. *See* D.Ct.Dkt.221-1; D.Ct.Dkt.245-1 ¶¶40-66. After reaching agreement with Boeing, the government asked the district court to approve the proposed plea agreement under Federal Rule of Criminal Procedure 11(c)(1)(C). D.Ct.Dkt.221. The district court, however, refused to do so, and ordered the parties to update the court on how they planned to proceed in light of that decision. D.Ct.Dkt.282 at 12.

On the same day that the district court rejected the plea agreement, the government notified petitioners of the court's decision, announced that it would hold

a meeting to discuss next steps, and invited petitioners to attend that meeting and to submit their views in writing about how the prosecution should proceed. D.Ct.Dkt.312-2 at 7.  That meeting, which took place on December 9, 2024, lasted about two and a half hours and involved robust conversations between petitioners and high-ranking government officials.  *Id.* at 8-9.  At that meeting, the government "provid[ed] its preliminary views" about "the paths available to the government" moving forward, and emphasized that "it was important for the government to hear" petitioners' perspectives before deciding how to proceed.  *Id.* at 9.  And at that meeting, "[e]very [petitioner] and counsel who wanted to speak was able to do so." *Id*.

After "carefully and in good faith considering … all of the input previously provided by [petitioners] and their counsel," the government again decided to pursue a negotiated resolution of its criminal prosecution of Boeing.  *Id.* at 19-20.  That decision reflected the government's determination that a negotiated resolution could deliver substantial and immediate public benefits while avoiding the uncertainties of trial.  D.Ct.Dkt.312 at 13-20.  It also reflected the government's finding that Boeing made "meaningful enhancements to its compliance program to address the core concerns" underlying the government's breach determination, and that the company successfully implemented an FAA oversight program.  D.Ct.Dkt.312 at 17.  The

government promptly notified petitioners of its decision to negotiate with Boeing. D.Ct.Dkt.312-2 at 10.

On May 12, 2025, the government and Boeing reached a potential framework to resolve the proceedings against Boeing through a non-prosecution agreement. *Id.* at 12. At that point, the parties had not yet exchanged a draft agreement, and the government told Boeing that it could not agree to an NPA until it conferred with petitioners. *Id.* The next day, the government invited petitioners to attend a meeting "to discuss the status of the negotiations [with Boeing] and to hear [petitioners'] views on how the government should proceed." *Id.* at 14-15. Just as before, the government welcomed petitioners "to submit any questions, written documents, or other materials for consideration" before the meeting. *Id.* at 15.

The government hosted that second meeting with petitioners on May 16, 2025. At that meeting, the government updated petitioners about its negotiations with Boeing and discussed the "tentative framework" for a potential NPA. *Id.* at 17. The government explained that an NPA "is an agreement between the [government] and a defendant" in which "the defendant agrees to various undertakings" "in exchange for the [government] not prosecuting the defendant" and moving to dismiss the criminal proceedings. D.Ct.Dkt.318-1 at 105; D.Ct.Dkt.312-2 at 17. The government made clear that it had not yet decided whether to enter into an NPA with Boeing and that it would not make that decision until after considering petitioners'

feedback. D.Ct.Dkt.312-2 at 18. Once again, "[e]very [petitioner] and counsel who wanted to speak was able to do so." *Id.*

At the government's invitation, petitioners provided over a dozen written submissions further explaining their views about whether the government should enter into an NPA with Boeing. *Id.* at 18-19. Some of those submissions expressed support for, or did not oppose, an NPA, while other submissions were opposed. *Id.* at 19. The government carefully considered those submissions and the comments made by petitioners at the May 2025 meeting before deciding how to proceed. *Id.* at 20.

The government ultimately decided to enter into an NPA with Boeing. *Id.* Among other things, the NPA requires Boeing to pay $1.1 billion in fines, compensation for family members, including petitioners, and investments in improvements to its compliance, safety, and quality programs; retain an independent consultant to review its regulatory compliance efforts and report findings directly to the government; and arrange for Boeing's Board of Directors to meet with petitioners. D.Ct.Dkt.312-1 at 2-12. The government reached its decision to enter into the NPA based on its considered determination that the NPA "serves the public interest" by "guarantee[ing] further accountability and substantial benefits from Boeing immediately," "avoid[ing] the uncertainty presented by proceeding to trial," and recognizing the FAA's enhanced oversight of Boeing and the company's

substantial improvements in its compliance programs.   D.Ct.Dkt.312-2 at 20;

D.Ct.Dkt.312 at 7-8.

Consistent with its contractual obligations under the NPA, the government

moved to dismiss its case against Boeing under Federal Rule of Criminal Procedure

48(a).  D.Ct.Dkt.312.  The government's motion thoroughly explained its reasons

for entering into the NPA and moving to dismiss, and described in detail the views

that petitioners and other family members of individuals who died in the crashes had

expressed to the government with respect to its decision to seek dismissal, *id.* at 2-

19.  The motion was accompanied by the executed NPA.  D.Ct.Dkt.312-1.

Many family members of individuals who died in the crashes supported the

government's decision to enter into the NPA and seek dismissal.  *See* D.Ct.Dkt.358

("Op.") at 2.  Petitioners, however, opposed the NPA and the government's motion

to dismiss, and submitted hundreds of pages of arguments and evidence to the district

court to explain their opposition.  The district court proceeded to hold a three-hour

hearing on the motion to dismiss, during which petitioners made statements and their

counsel offered legal arguments opposing the government's motion.  App.897, 904,

994-1022, 1025; *see* Op.2 (noting that the court had "heard from all who wished to

speak" at the hearing).  Before and after the hearing, the district court also permitted

petitioners to provide supplemental filings expressing their opposition to the motion.

*See, e.g.*, D.Ct.Dkt.336; D.Ct.Dkt.350; D.Ct.Dkt.351.

### 4.    The District Court's Decision

Two months after holding its three-hour hearing on the motion, the district court granted the government's motion to dismiss.  The district court found that the government had complied with the CVRA in connection with its decision to enter the NPA and move to dismiss, noting that the government had "conferred with [petitioners] and their counsel on two separate occasions and considered written submissions from [petitioners] regarding the NPA."  Op.2; *see* Op.9.  Indeed, the district court noted, "counsel for more than 60 of the families" of individuals who died in the crashes agreed that "there's been reasonable conferral" between the government and the families, and "to say otherwise would be unfair."  Op.9.  Given that record, the court held, "the Government has satisfied its obligations under the CVRA."  *Id.*

The district court also granted the government's motion to dismiss.  As the court explained, "to 'preserve the essential functions' of the Executive and the Judicial branches, a court should only deny leave [under Rule 48(a)] when dismissal is 'clearly contrary to manifest public interest.'"  Op.3 (quoting *United States v. Cowan*, 524 F.2d 504, 512-13 (5th Cir. 1975)).  "A court may not 'substitute its judgment for the prosecutor's determination or second guess the prosecutor's evaluation' when making its public interest determination."  *Id.* (ellipsis omitted) (quoting *United States v. Salinas*, 693 F.2d 348, 351 (5th Cir. 1982)).  "Rather,

'unless the court finds that the prosecutor is clearly motivated by considerations other than his assessment of the public interest, it must grant the motion to dismiss.'" *Id.* (brackets omitted) (quoting *United States v. Hamm*, 659 F.2d 624, 630 (5th Cir. Unit A Oct. 1981) (en banc)). And in applying that standard, the district court noted, a court "must begin with the presumption that the prosecutor acted in good faith" in moving to dismiss. *Id.* (quoting *United States v. Welborn*, 849 F.2d 980, 983 (5th Cir. 1988) (per curiam)).

Under that appropriately narrow standard of review, the district court concluded that the government's motion to dismiss should be granted. While the district court found some of the objections raised by petitioners persuasive, *see* Op.5-7, it recognized that its "concerns about the Government's decision-making in this case" were "an insufficient reason to deny leave to dismiss." Op.8. Because the government had "not acted with bad faith," had "given more than mere conclusory reasons for its dismissal," and had "satisfied its obligations under the CVRA," the court granted the motion to dismiss. Op.9-10.

## ARGUMENT

None of petitioners' objections to the district court's order comes close to warranting mandamus. The district court correctly concluded that the government's extensive consultation with petitioners before entering into the NPA and moving to dismiss satisfied petitioners' CVRA rights. Protection of CVRA rights is the only

office of the extraordinary mandamus remedy afforded crime victims by the CVRA. Thus, because petitioners' CVRA rights were not violated, this Court has no jurisdictional basis for reviewing the district court's order granting the government's motion to dismiss.  But even if this Court were to conclude that it had jurisdiction to review that order, the district court correctly applied the appropriately narrow standard of review for Rule 48(a) motions and correctly found that the government's motion satisfied that standard.  Finally, petitioners' challenge to the DPA is moot, as that agreement expired nearly two years ago and has no continuing legal effect.  The petitions for mandamus should therefore be denied.

## I.    The Government Did Not Violate The CVRA In Entering Into The NPA And Moving To Dismiss.

The CVRA gives crime victims "[t]he reasonable right to confer with the attorney for the government in the case" and "[t]he right to be treated with fairness and with respect for the victim's dignity and privacy."  18 U.S.C. §§3771(a)(5), (8). The district court correctly determined that petitioners were afforded those rights here, and petitioners' challenge to that determination is meritless.

### A.    Petitioners Were Afforded the Right to Confer With the Government and to Be Treated With Fairness.

By granting crime victims "[t]he reasonable right to confer with the attorney for the Government in the case,"  18 U.S.C. §3771(a)(5), the CVRA requires the government to notify victims of discussions with the defendant regarding a potential

negotiated resolution to the prosecution, and to provide them with an opportunity "to communicate meaningfully with the government before a deal [is] struck," *Ryan*, 88 F.4th at 627 (ellipsis omitted). Those protections ensure that the government will "ascertain the victims' views" before "ultimately exercising its broad discretion." *In re Dean*, 527 F.3d 391, 394-95 (5th Cir. 2008) (per curiam). But neither that reasonable right to confer nor anything else in the CVRA gives crime victims the right to decide whether a prosecution should go forward. On the contrary, the CVRA explicitly confirms that "[n]othing" in the statute "shall be construed to impair the prosecutorial discretion of the Attorney General," including the discretion to decide whether to resolve a particular prosecution through a negotiated agreement. 18 U.S.C. §3771(d)(6).

The government's extensive consultation with petitioners before entering into the NPA and moving to dismiss the prosecution clearly satisfied any rights petitioners may have had to confer with the government here. After the district court rejected the proposed plea agreement, the government promptly notified petitioners, convened two lengthy meetings to discuss next steps in the case and a potential NPA, invited and reviewed more than a dozen written submissions that expressed a range of views about how the case should proceed, and postponed any prosecutorial decision until it had carefully considered all the input that petitioners had provided. *See supra* pp.9-13. Meanwhile, the government kept petitioners informed regarding

its negotiations with Boeing, and repeatedly afforded them meaningful opportunities to convey their views on how the prosecution should proceed.  In short, as counsel for more than sixty of the families whose relatives perished in the crashes acknowledged to the district court, "there's been reasonable conferral" and "to say otherwise would be unfair."  Op.9.

Both the district court and the government also afforded petitioners the right "to be treated with fairness and with respect for [their] dignity and privacy."  18 U.S.C. §3771(a)(8).  The government provided petitioners with fair and respectful treatment throughout the negotiation of the NPA and the process leading up to the motion to dismiss, including by promptly notifying them regarding material developments in the case and supporting their right to voice their objections to the NPA and the motion to dismiss.  The district court likewise afforded petitioners fair and respectful treatment, including by routinely granting them permission to file enlarged briefs and by allowing them to offer "victim impact statements" at the motion hearing.  *See supra* p.13.  Petitioners' robust participation in the proceedings below was plainly sufficient to satisfy the CVRA.

In the end, petitioners simply disagree with the government's decision to resolve its prosecution of Boeing through a negotiated agreement.   Boeing acknowledges and profoundly regrets the losses that petitioners have suffered, and fully respects petitioners' right to hold that view, and to seek justice as they see fit,

including through civil litigation against Boeing. But the CVRA entitles crime victims to confer with the government and to be treated with respect and fairness, not to exercise the Executive Branch's prosecutorial discretion for themselves. 18 U.S.C. §3771(d)(6). Petitioners' disagreement with the government's decisions does not create a CVRA violation.

### B.    Petitioners' Objections to the Decision Below Lack Merit.

Petitioners have no persuasive basis for challenging the district court's finding that the government "has satisfied its obligations under the CVRA." Op.9. They claim that the government "violated the CVRA by failing to disclose to [petitioners] two of the NPA's most important features," the "no-further-prosecution provision" and the "statute of limitations provision," and that those alleged failures infringed their rights to confer with the government and to be treated fairly. NPA.Pet.13-23. Those arguments are meritless.

1. First, the government did not fail to disclose the no-further-prosecution provision in the NPA. During its May 2025 meeting with petitioners, the government informed petitioners that it had discussed with Boeing the possibility of entering into an NPA. D.Ct.Dkt.318-1 at 104. The government explained that "an NPA is an agreement between the [government] and a defendant" in which "the defendant agrees to various undertakings" "in exchange for the government not prosecuting the defendant." *Id.* at 105. It also told petitioners that "if the

[government] entered an NPA with Boeing, that would require the [government] to move to dismiss the charge pending against Boeing." *Id.* at 106. The government thus made pellucidly clear that a critical provision of the potential NPA—which, again, stands for *non-prosecution agreement*—was that the government would agree not to prosecute Boeing.

Petitioners suggest that the government "deceptively creat[ed] the impression that [the NPA] would proceed through the normal course of judicial review" by telling petitioners that they could present their arguments against dismissing the case to the district court. NPA.Pet.16. But petitioners *were* able to present their arguments against dismissing the case to the district court. Nothing about that commitment by the government in any way implied that the *NPA*—which need not be approved by a court—was in fact contingent on judicial approval. On the contrary, by expressly telling petitioners that the district court would review the government's Rule 48(a) motion and that petitioners would be heard on the issue of whether that motion should be granted—while saying nothing to suggest that the court would pass on the validity of the NPA itself—the government underscored that only the former, not the latter, was subject to (limited) judicial review. *See* D.Ct.Dkt.318-1 at 8195, 8214.

Petitioners are also wrong to assert that the NPA rendered their "later objections to granting the motion to dismiss essentially meaningless." NPA.Pet.17.

Petitioners argued at length to the district court that dismissal of the prosecution under Rule 48(a) was not warranted. The district court considered those arguments, and despite its sympathy for petitioners' views, ultimately rejected the objections. Op.4-8. It reached that decision based on the merits of the motion to dismiss, not based on the existence of the NPA or its no-further-prosecution provision. *See id.*

In all events, petitioners had a full and fair opportunity to confer with the government before the government entered into the NPA. In both meetings between the government and petitioners after the court rejected the proposed plea agreement, and in their written submissions to the government, petitioners consistently expressed their strong support for proceeding to trial and their equally strong opposition to a negotiated resolution, and the government unquestionably heard and considered petitioners' views. *See, e.g.*, D.Ct.Dkt.318-1 at 111-22. Although petitioners are entitled to disagree with the government's decision to resolve its prosecution through a negotiated agreement, the record makes clear that the government extensively conferred with petitioners about the NPA and treated them fairly and with respect throughout those conferrals. Neither the government's decision to enter into the NPA nor its inclusion of the no-further-prosecution provision violated any rights petitioners may have had under the CVRA.

2. The government also did not mislead petitioners about the statute of limitations provision in the NPA or violate petitioners' rights by agreeing to that

provision. At its meeting with petitioners in May 2025, the government told petitioners that the government could reinitiate prosecution against Boeing "notwithstanding the passage of time" if Boeing breached the NPA. *Id.* at 106. Consistent with that description, the NPA extends the statute of limitations for one year beyond the NPA's expiration, and authorizes the government to pursue any charges that were "not time-barred by the applicable statute of limitations" on the date on which the parties executed the NPA, which was May 29, 2025. App.846. In other words, if Boeing were to breach the NPA before its expiration, the government would be able to bring any charge against Boeing that it could have brought on May 29, 2025, when the NPA was executed.

Petitioners object because they believe that the government's conspiracy charge *was* time-barred by May 29, 2025, and so (petitioners say) the government misinformed them as to whether it would be able to bring a new prosecution in the future if Boeing breached the NPA. *See* NPA.Pet.20-21. Petitioners are incorrect. The five-year limitations period began running once the relevant conduct ended, which, according to the information, occurred "in or around December 2018." D.Ct.Dkt.1 at 1; *see* 18 U.S.C. §3282(a). The government filed its information in January 2021, with several years left on the limitations clock. The filing of that information tolled the limitations period, *see, e.g.*, *United States v. Schmick*, 904 F.2d 936, 940 (5th Cir. 1990), and the limitations period remained tolled as of May 29,

2025, when the parties executed the NPA. As a result, if Boeing were to breach the NPA, the limitations period would not prevent the government from bringing its conspiracy charge against Boeing again, because the limitations period for that conspiracy charge had not expired as of May 29, 2025. Petitioners' claim that they were misinformed about the limitations period is therefore incorrect.

## II. This Court Should Deny Mandamus With Respect To The District Court's Order Granting The Government's Motion To Dismiss.

In addition to their CVRA arguments, petitioners ask this Court to grant mandamus because (they say) the district court erred on the merits in granting the government's motion to dismiss. NPA.Pet.24-31. That misunderstands the scope of CVRA mandamus proceedings. Once this Court concludes that there was no CVRA violation, the petitions for mandamus should be denied, and judicial review should end, as nothing in the CVRA or any other statute affords this Court appellate jurisdiction to consider whether the district court properly applied Rule 48(a). Regardless, even if this Court were to reach petitioners' challenge to the merits of the district court's order, that order correctly applied the narrow governing standard of review and correctly granted the government's motion to dismiss the prosecution under Rule 48(a). This Court should therefore deny mandamus.

### A.    The Court Lacks Jurisdiction to Review the District Court's Decision to Grant the Government's Motion to Dismiss.

Petitioners' challenge to the merits of the district court's order fails at the threshold, as nothing in the CVRA or any other statute entitles petitioners to seek mandamus on the theory that the district court erred on the merits in granting the government's motion to dismiss under Rule 48(a).  The CVRA provides crime victims with discrete procedural rights in connection with criminal proceedings—including, as discussed, the right to confer with the government and the right to be treated with fairness and respect.  18 U.S.C. §§3771(a)(5), (a)(8).  The CVRA also specifies how those rights are to be exercised:  they "shall be asserted in the district court," the district court "shall take up and decide any motion asserting a victim's right forthwith," and "[i]f the district court denies the relief sought, the movant may petition the court of appeals for a writ of mandamus."  *Id.* §3771(d)(3).  As that statutory text makes clear, the extraordinary mandamus proceedings authorized by the CVRA are limited to ensuring that crime victims are afforded the procedural rights that the CVRA itself guarantees; the statute does not extend the extraordinary remedy of mandamus to non-CVRA issues or give appellate courts free-ranging jurisdiction to review any other purported errors that a petitioner claims the district court may have made.  That precludes petitioners' challenge to the underlying merits of the district court's decision to grant the government's motion to dismiss.

24

The Ninth Circuit's recent decision in *In re J.H.*, 138 F.4th 1347 (9th Cir. 2025), illustrates the point. That case involved a criminal prosecution brought against a police officer who used excessive force against J.H. *Id.* at 1348. After the jury returned its verdict convicting the police officer of a felony, but before the court sentenced the officer, the government moved under Rule 48(a) "to dismiss the allegations in the indictment that made [the officer's] crime a felony, rather than a misdemeanor." *Id.* J.H. opposed the motion, presented "a victim impact statement that included objections to and legal arguments against the Government's Rule 48(a) motion," and spoke at the motion hearing. *Id.* at 1348-49. The court granted the motion over J.H.'s opposition, and J.H. sought mandamus under the CVRA.

The Ninth Circuit denied J.H.'s petition, explaining that "the CVRA's mandamus procedure does not permit victims to challenge—and does not empower a court of appeals to address—matters other than a district court's denial of the rights enumerated in that statute." *Id.* at 1349. Because J.H sought to challenge "the legal basis of the district court's order granting the Rule 48(a) motion," rather than any alleged denial of her rights under the CVRA itself, the CVRA did "not empower [the Ninth Circuit] to address" her challenge. *Id.* So too here: Like J.H., petitioners cannot seek mandamus under the CVRA to challenge the merits of the district court's decision to grant the government's motion to dismiss. They can only seek mandamus under the CVRA to assert purported violations of their rights under the

CVRA itself—and as already explained, the district court correctly concluded that no CVRA rights were violated here. *See supra* pp.16-23.

That rule makes perfect sense. As a general matter, a private citizen "lacks a judicially cognizable interest in the prosecution or nonprosecution of another." *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973). Congress has created a special exception to that general rule in the CVRA, granting crime victims specific procedural rights and authorizing them to seek appellate review by mandamus if a district court fails to respect those rights. *See* 18 U.S.C. §3771(a), (d)(3). But nothing in the CVRA gives a crime victim sweeping general authority to employ the truly extraordinary remedy of being able to seek mandamus under "ordinary standards of appellate review," *id.* §3771(d)(3), of a district court's order granting dismissal under Rule 48(a). Indeed, if mandamus is available to challenge an order of dismissal even in the absence of a CVRA violation, there is no limiting principle that would preclude a similar challenge to any and every decision that the district court may make in the course of the prosecution—a system that would permit crime victims to tie up criminal prosecutions indefinitely with countless interlocutory mandamus petitions. Instead, the CVRA authorizes mandamus only where "the district court denies" a "motion asserting a victim's right" under the CVRA itself, not where the victim believes the district court has committed some other error. *Id.* §3771(d)(3).

Courts have consistently held that crime victims cannot seek appellate review of criminal sentences or judgments of conviction. *See, e.g.*, *United States v. Hunter*, 548 F.3d 1308, 1311-16 (10th Cir. 2008); *see also McClure v. Ashcroft*, 335 F.3d 404, 412 (5th Cir. 2003) (noting that "victims lack standing to challenge a criminal sentence"). Although the CVRA gives crime victims the right to be heard at sentencing and various other rights in connection with criminal proceedings, crime victims cannot use alleged violations of those procedural rights to obtain review of the court's substantive judgment about what sentence to impose or whether to sustain a conviction. *See, e.g.*, *United States v. Aguirre-Gonzalez*, 597 F.3d 46, 52-55 (1st Cir. 2010). Petitioners here likewise cannot use the CVRA to seek mandamus review of the district court's substantive decision to grant the government's motion to dismiss under Rule 48(a).

Indeed, allowing petitioners to seek mandamus under the CVRA to challenge the merits of a decision to dismiss under Rule 48(a) would be particularly inappropriate. As numerous courts have held, even a criminal *defendant* generally cannot appeal a decision granting dismissal without prejudice under Rule 48(a), because that decision is considered an interlocutory order. *See United States v. Day*, 806 F.2d 1240, 1241-42 (5th Cir. 1986); *United States v. Martin*, 682 F.2d 506, 507-09 (5th Cir. 1982) (per curiam); *United States v. Arzate*, 545 F.2d 481, 481 (5th Cir. 1977) (per curiam). If even the defendant is not entitled to appeal a decision to

dismiss without prejudice under Rule 48(a), it is hard to see why a victim should be entitled to challenge the merits of that decision under the CVRA.

This Court's previous decision in this case in *Ryan* does not hold otherwise. 88 F.4th 614 (5th Cir. 2023). In that decision, petitioners asked the district court to modify or set aside the (now-expired) DPA because the government had entered it without first conferring with petitioners. *See id.* at 619. The district court denied that motion, and this Court denied mandamus. In doing so, this Court emphasized that if the government eventually moved to dismiss the proceedings under Rule 48(a), the district court should exercise its "obligation to uphold the public interest and apply the CVRA." *Id.* at 627. Nothing in *Ryan*, however, suggested that even if the government and the court respected petitioners' rights under the CVRA itself, petitioners could still seek mandamus under the CVRA to challenge the district court's assessment of the public interest under Rule 48(a). *Id.*

## B.    The District Court Did Not Err by Granting the Government's Motion to Dismiss.

Even if this Court had jurisdiction to review petitioners' substantive challenge to the district court's dismissal order, that challenge fails on the merits, as it disregards both the Constitution's assignment of charging authority to the Executive Branch and the properly limited judicial role in the charging, prosecution, and dismissal of criminal cases under Rule 48(a). The purpose of judicial review under Rule 48(a) is to guard against prosecutorial harassment of defendants, not to license

courts to second-guess reasoned judgments by the Executive Branch about whether pursuing or resolving a particular prosecution would be in the public interest. Applying that framework, the district court correctly concluded that the government acted in good faith and articulated more than conclusory reasons for its decision to dismiss the prosecution, and the court therefore properly granted the motion to dismiss. Nothing about that decision warrants mandamus.

1. The Constitution entrusts the Executive—and the Executive alone—with the duty to "take Care that the Laws be faithfully executed." U.S. Const. art. II, §3. That provision vests the Executive Branch with "exclusive authority and absolute discretion to decide whether to prosecute a case," *United States v. Nixon*, 418 U.S. 683, 693 (1974)—discretion that applies both when the Executive "initiate[s] charges" and when it "dismiss[es] charges once brought," *United States v. Fokker Servs. B.V.*, 818 F.3d 733, 741 (D.C. Cir. 2016). The authority to initiate and terminate criminal prosecutions is thus "one of the core powers of the Executive Branch." *United States v. Armstrong*, 517 U.S. 456, 467 (1996).

Because the Constitution assigns the Executive Branch "[t]he power … to prosecute," judicial authority is "at its most limited" when reviewing how the government has exercised its prosecutorial discretion. *Cmty. for Creative Non-Violence v. Pierce*, 786 F.2d 1199, 1201 (D.C. Cir. 1986). Deciding whether to initiate and whether to continue pursuing criminal charges involves delicately

balancing various (and often conflicting) factors, such as "the strength of the case, the prosecution's general deterrence value, the government's enforcement priorities, and the case's relationship to the government's overall enforcement plan." *Wayte v. United States,* 470 U.S. 598, 607 (1985). "The Executive routinely undertakes those assessments and is well equipped to do so." *Fokker*, 818 F.3d at 741. The judiciary, by contrast, "generally is not 'competent to undertake'" that balancing, *id.*, and allowing courts to second-guess prosecutorial discretion would "chill law enforcement" and "impair the performance of a core executive constitutional function." *Armstrong*, 517 U.S. at 465.

Federal Rule of Criminal Procedure 48(a) reflects that constitutional background. Under Rule 48(a), "[t]he government may, with leave of court, dismiss an indictment, information, or complaint." Fed. R. Crim. P. 48(a). As the plain text of that rule makes clear, the decision to "dismiss an indictment, information, or complaint" belongs to "[t]he government." *Id.* At the same time, Rule 48(a) provides a narrow and limited role for judicial oversight, by requiring the government to obtain "leave of court" to dismiss the prosecution—a requirement that exists primarily "to protect the defendant against [the] prosecutorial harassment" that could occur if prosecutors could freely charge, dismiss, and recharge an indictment over the defendant's objection. *Hamm*, 659 F.2d at 628 & n.14; *see United States v. Adams*, 777 F.Supp.3d 185, 206 (S.D.N.Y. 2025).

30

Rule 48(a) thus preserves the Executive's primacy over charging and dismissal decisions. In this Court's words, Rule 48(a) does not "confer on the Judiciary the power and authority to usurp or interfere with the good faith exercise of the Executive power to take care that the laws are faithfully executed." *Cowan*, 524 F.2d at 513. A court therefore "may not deny a government motion to dismiss a prosecution, consented to by the defendant, except in those extraordinary cases where it appears the prosecutor is motivated by considerations clearly contrary to the manifest public interest." *Hamm*, 659 F.2d at 628.

Moreover, the judicial role is principally focused on the ultimate judicial decision of whether to dismiss the indictment with or without prejudice. *See Adams*, 777 F.Supp.3d at 214. While the district court may in unusual circumstances determine that the proper course is to dismiss the indictment *with* prejudice, *see, e.g., id.* at 216-21, that generally would not be the disposition favored by crime victims who feel that the government is being too lenient, and who thus would presumably favor dismissal *without* prejudice. Giving a crime victim the right to appeal in a case like this where the district court exercises its very limited discretion to order dismissal *without* prejudice is thus a non sequitur.

The touchstone of the Rule 48(a) inquiry is accordingly whether there is any "affirmative reason to believe that the dismissal motion was motivated by considerations contrary to the public interest." *Hamm*, 659 F.2d at 631. In making

that determination, a court must heed the constitutional rule that the Executive is the "first and presumptively the best judge of whether a pending prosecution should be terminated." *Cowan*, 524 F.2d at 513. "Neither the trial court nor this Court on appeal can substitute its judgment for the prosecutor's determination or can second guess the prosecutor's evaluation." *Salinas*, 693 F.2d at 351. As such, a Rule 48(a) motion must be granted unless the court finds that the government has sought dismissal in bad faith or cannot articulate any non-conclusory reasons for dismissal. *See Welborn*, 849 F.2d at 983; *Salinas*, 693 F.2d at 352.

That deferential approach is not only a constitutional necessity, but a practical one as well. Given the constitutional separation of powers, a district court "could not possibly win a confrontation with the executive branch over its refusal to prosecute." *In re United States*, 345 F.3d 450, 454 (7th Cir. 2003); *see Adams*, 777 F.Supp.3d at 212-13. "Even were leave of Court to the dismissal of the indictment denied, the Attorney General would still have the right to … decline to move the case for trial," and the court "would be without power to issue a mandamus or other order to compel prosecution of the indictment." *United States v. Greater Blouse, Skirt & Neckwear Contractors Ass'n*, 228 F.Supp. 483, 489 (S.D.N.Y. 1964). Rule 48(a) does not contemplate or encourage that kind of futile interbranch conflict.

Consistent with those principles, this Court has steadfastly protected the Executive Branch's discretion to dismiss pending criminal charges. *See, e.g.*, *United*

*States v. Jones*, 664 F.3d 966, 973-74 (5th Cir. 2011) (affirming order granting motion to dismiss); *Hamm*, 659 F.2d at 633 (reversing order denying motion to dismiss); *Cowan*, 524 F.2d at 515 (same). Tellingly, this Court has *never* reversed a decision granting dismissal under Rule 48(a) when the defendant has consented to that motion.

This should not be the first. The government's motion explained to the district court in detail why the government had chosen to seek dismissal—namely, because the parties' negotiated resolution of the criminal charge against Boeing "secures tangible and significant benefits to the public immediately that further prosecution may not provide" while avoiding the "uncertainty attendant with proceeding to trial." D.Ct.Dkt.312 at 13. As the government explained, those "tangible and significant benefits" included payment by Boeing of the maximum statutory fine of $487.2 million, an additional $444.5 million in compensation to families of those who perished in the crashes (without prejudice to their recovery in civil suits), an investment by Boeing of an additional $445 million in its compliance, safety, and quality programs, the retention of an independent consultant to review Boeing's regulatory compliance efforts and report directly to the government regarding those efforts, and a meeting between Boeing's Board of Directors and the families—none of which could be guaranteed if the case were to proceed to trial. D.Ct.Dkt.312 at 13-16; *see* D.Ct.Dkt.312-1 at 2. The government's motion also details the substantial

progress that Boeing made in its compliance and ethics programs, as well as the FAA's increased oversight of the company, as additional justifications for dismissing the prosecution.  D.Ct.Dkt.312 at 3, 17; *see supra* pp.12-13.

After carefully considering both the government's reasons for seeking dismissal and petitioners' arguments, the district court granted the government's motion to dismiss, finding that "the government has not acted with bad faith" and "has given more than mere conclusory reasons for dismissal."  Op.9; *see, e.g.*, *Jones*, 664 F.3d at 973-74 (affirming dismissal because the government provided more than mere conclusory reasons for its motion).  That conclusion was plainly correct, and properly deferred to the government's exercise of prosecutorial discretion even though the court might have exercised that discretion differently itself.  *See* Op.8 (recognizing that "the Court's concerns about the government's decision-making in this case are an insufficient reason to deny leave to dismiss"); *see also Cowan*, 524 F.2d at 513-14 (district court's disagreement with the government as to whether "the best interest of justice" would be served by dismissal is "legally insufficient" to deny dismissal under Rule 48(a)).  Because the government properly advanced good-faith, legitimate reasons for its decision to seek dismissal, the district court correctly granted the motion to dismiss under Rule 48(a), and petitioners' challenge must fail.

2. Petitioners' contrary arguments are unavailing.  They begin by misunderstanding both the limited scope of judicial review under Rule 48(a) and the

district court's decision, claiming that the district court erred by failing to adequately "assess the public interest." NPA.Pet.26 (quoting *Ryan*, 88 F.4th at 627). But as this Court has repeatedly explained, a district court presented with a motion to dismiss under Rule 48(a) is neither authorized nor permitted to "substitute its judgment for the prosecutor's determination" or "second guess the prosecutor's evaluation" by deciding for itself whether dismissal would best serve the public interest. *Salinas*, 693 F.2d at 351; *see, e.g.*, *Hamm*, 659 F.2d at 631. Instead, a district court reviewing a motion to dismiss under Rule 48(a) must afford exceptional deference to the government's assessment of whether the public interest warrants continuing the prosecution: it "may not deny a government motion to dismiss a prosecution, consented to by the defendant, except in those extraordinary cases where it appears the prosecutor is motivated by considerations *clearly* contrary to the *manifest* public interest." *Hamm*, 659 F.2d at 628 (emphasis added). That occurs only in extreme circumstances, such as when the government moves to dismiss the case under Rule 48(a) for the purpose of obtaining a more favorable jury, *see, e.g.*, *Salinas*, 693 F.2d at 352-53, because of a bribe, or because of personal animus toward the defendant, *see In re Richards*, 213 F.3d 773, 787 (3d Cir. 2000).

The district court correctly applied that deferential standard here. As the district court explained, a court may deny leave to dismiss under Rule 48(a) only if dismissal is "clearly contrary to manifest public interest." Op.3. And while the

district court found some of petitioners' arguments that dismissal was contrary to public interest "persuasive" and even "compelling," Op.5, 8, it properly recognized that it could not deny leave to dismiss just because it "disagree[d] with the Government that dismissing the criminal information in this case is in the public interest." Op.9; *see, e.g.*, *Cowan*, 524 F.2d at 514 (mere disagreement on whether dismissal would best serve the public interest is "legally insufficient"). Instead, the court could only have denied the government's motion to dismiss under Rule 48(a) if it had found that the government was motivated by considerations "*clearly* contrary to the *manifest* public interest," meaning that the government had acted in bad faith or could not provide more than conclusory reasons for its dismissal—a finding that the district court recognized it could not make on this record. *Hamm*, 659 F.2d at 628 (emphasis added); *see* Op.9.

Petitioners fault the district court for relying on "older caselaw from this Circuit" to determine its standard of review under Rule 48(a), rather than this Court's previous decision in this case in *Ryan*. NPA.Pet.25-28. But *Ryan* did not break with decades of this Court's caselaw (and basic constitutional principles) and instruct district courts to decide for themselves under Rule 48(a) whether dismissal would be in the public interest; instead, it instructed district courts to "assess the public interest *according to caselaw*," and then cited and quoted four cases applying the "clearly contrary to manifest public interest" standard. *Ryan*, 88 F.4th at 627-28 &

n.12 (emphasis added); *see also United States v. Smith*, 55 F.3d 157, 159 (4th Cir. 1995) ("A motion that is not motivated by bad faith is not clearly contrary to manifest public interest, and it must be granted."). The district court did precisely what *Ryan* instructed: It assessed the public interest according to this Court's caselaw, and granted the motion to dismiss because it could not find that dismissal would be clearly contrary to manifest public interest (i.e., that the government had acted in bad faith or failed to provide any nonconclusory reasons for concluding that the public interest favored dismissal). Op.7-8, 9-10. *Ryan* thus confirms that the petitions for mandamus should be denied.

Nor do petitioners come anywhere near showing that the district court abused its discretion in refusing to find that dismissal would be clearly contrary to the manifest public interest. *Contra* NPA.Pet.28-31. None of petitioners' arguments even attempts to show that the government acted in bad faith or failed to provide nonconclusory reasons for its determination that dismissal was in the public interest; instead, petitioners simply ask this Court to revisit the government's balancing of the relevant considerations and find that the government got that balancing wrong. But as this Court has explained, like the district court, "this Court on appeal" cannot "substitute its judgment for the prosecutor's determination" as to whether to continue a prosecution. *Salinas*, 693 F.2d at 351.

Petitioners' arguments are also unpersuasive on the merits. Ignoring all of the benefits that the government's negotiated resolution of this case provides—including hundreds of millions of dollars in fines, hundreds of millions of dollars more in compensation to the families whose loved ones perished in the crashes, hundreds of millions of dollars beyond that in investment in compliance, safety, and quality programs, and an independent compliance consultant to review Boeing's regulatory compliance efforts and report findings directly to the government, all without forcing the government to prove its case at trial—petitioners point to the district court's statement that the NPA "fails to secure the necessary accountability to ensure the safety of the flying public," Op.6, as proof that dismissal undermines the public interest in resolving "high-stakes aviation safety issues." NPA.Pet.28. But that only underscores that it is for the Executive Branch, not the federal courts, to determine what measures are necessary to "ensure the safety of the flying public." Op.6. Needless to say, district courts have neither the institutional competence nor the constitutional prerogative to set aviation policy. Petitioners' efforts to rely on the district court's (incorrect) assessment of aviation safety requirements only confirm that courts are not the appropriate branch to evaluate whether a particular NPA serves the public interest.

Petitioners make the same mistake by invoking the district court's determination that the government faces little litigation risk in going to trial.

NPA.Pet.29.  It is for the government, not the court, to decide how heavily the risk that the government might not be able to prove its case at trial should weigh in favor of a negotiated resolution.  And here, the government had good reason to conclude (across several years and multiple Administrations) that the uncertainty it would face at trial made a negotiated resolution worthwhile.  After all, when the government tried to bring criminal charges against a Boeing employee for his role in testing the 737 MAX, in the only criminal case relating to the crashes that the government has taken to trial, the defendant was acquitted.  *See* Op.6 n.18.  And the misconduct that the government alleged in this case—indeed, the only misconduct that the government has represented it *can* allege against Boeing "consistent with [government] policy and its ethical and professional obligations"—focuses principally on the purported misconduct of that same acquitted employee.  D.Ct.Dkt.312 at 19.[1]  While the district court may have been confident that a jury

---

[1] The court disregarded the government's litigation-risk determination because the acquitted pilot argued that he "was a scapegoat for the broader and systematic failure of Boeing's corporate culture," and the court interpreted this case as targeting that "corporate culture."  Op.6 n.18.  But the government expressly determined that the charged misconduct "was neither pervasive across the organization, nor undertaken by a large number of employees, nor facilitated by senior management."  D.Ct.Dkt.4 at 4.  And if Boeing went to trial, the evidence would "overlap to a substantial degree" with the evidence against the pilot who was acquitted.  D.Ct.Dkt.312 at 19.

would have reached a different result here than it did in that previous trial, that is a risk for the government to evaluate, not the court.

Finally, petitioners repackage their CVRA arguments as arguments that the NPA and the government's motion to dismiss were contrary to the public interest. *See* NPA.Pet.29-31. Those arguments fail for the reasons already described. *See supra* pp.16-23. Applying proper deference to the government's determination that its negotiated resolution of this case is in the public interest, petitioners come nowhere near showing that dismissal of the charge against Boeing in exchange for hundreds of millions of dollars in fines, compensation to the families, and significant compliance investments is clearly contrary to the manifest public interest, let alone that the government acted in bad faith or failed to provide nonconclusory reasons for its motion to dismiss. This Court should accordingly deny mandamus.

## III. Petitioners' Challenge To The DPA Is Moot.

In addition to their petition for mandamus challenging the NPA and the government's motion to dismiss, petitioners also filed a second petition for mandamus challenging the proceedings that led to the DPA. That petition is moot, because the DPA expired long ago and has no continuing legal effect. Petitioners cannot convert any perceived flaws in the DPA into a challenge to the NPA or the district court's dismissal order.

Petitioners begin by arguing that the government violated the CVRA in negotiating the DPA.  DPA.Pet.17-20.  But the DPA expired in January 2024, and none of the provisions in that defunct agreement have any ongoing effect.  Petitioners' challenges to the government's actions in negotiating the DPA are therefore moot.  *See, e.g.*, *ACLU v. U.S. Conf. of Catholic Bishops*, 705 F.3d 44, 53 (1st Cir. 2013) (stating the general rule "that a challenge to a contract becomes moot upon that contract's expiration");  *Corey H. v. Bd. of Educ.*, 528 F. App'x 666, 667 (7th Cir. 2013) (challenge to a consent decree was moot after the consent decree expired).  Even if the government had violated the CVRA in entering into the DPA—which Boeing continues to maintain the government did not—neither the district court nor this Court could afford petitioners any relief with respect to the DPA, because that allegedly unlawful agreement no longer exists.

Petitioners argue that "[t]he Government's denial of [petitioners'] CVRA rights connected with the DPA … was a structural error requiring reversal" of the dismissal order even if the DPA has expired and had no effect on the dismissal order.  DPA.Pet.26-27.  That is incorrect.  The structural-error doctrine refers to "constitutional deprivations" that "affect[] the framework within which the trial proceeds," *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991), and thereby "render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence," *Neder v. United States*, 527 U.S. 1, 9 (1999).  Petitioners have not

alleged any constitutional violation, are not on trial, and cannot explain how any error with respect to the DPA could somehow render the subsequent proceedings with respect to the NPA and the government's motion to dismiss fundamentally unreliable or unfair. The structural-error doctrine therefore has no role to play here.

Petitioners have equally little support for their argument that the "illegally negotiated DPA" somehow tainted the NPA or the district court's dismissal order. DPA.Pet.27-33. Petitioners' assertions that the NPA repeatedly refers to the DPA and includes the same calculations under the Sentencing Guidelines do nothing to show that any flaws in the negotiations over the DPA somehow carried over to the NPA. On the contrary, as already explained, the government provided petitioners all the rights that the CVRA affords in the negotiations leading up to the NPA, including multiple opportunities for extensive consultation. *See supra* pp.16-23. Petitioners do not and cannot explain how any flaws in the negotiations leading up to the DPA could possibly have affected the negotiations leading up to the NPA, the substance of the NPA, or the district court's decision to grant the government's motion to dismiss. In short, the DPA has no continuing legal effect, and petitioners' challenges to any errors that may have occurred in the proceedings leading up to the DPA are moot. For that reason as well, the petitions for mandamus should be denied.

## CONCLUSION

This Court should deny the petitions for mandamus.

Respectfully submitted,

s/Paul D. Clement

BENJAMIN L. HATCH
BRANDON M. SANTOS
McGUIREWOODS LLP
888 16th Street NW, Suite 500
Washington, DC  20006

MARK R. FILIP
CRAIG S. PRIMIS
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue NW
Washington, DC  20004

JEREMY FIELDING
KIRKLAND & ELLIS LLP
1601 Main Street
Dallas, TX  75201

PAUL D. CLEMENT
C. HARKER RHODES IV
PHILIP HAMMERSLEY
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Counsel for Respondent The Boeing Company*

December 17, 2025

## CERTIFICATE OF SERVICE

I hereby certify that on December 17, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system.  I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

<u>s/Paul D. Clement</u>
Paul D. Clement

**CERTIFICATE OF COMPLIANCE**

I certify that:

1) This brief complies with the type-volume limitation of Fed. R. App. P. 21(d)(1), and this Court's order entered on December 11, 2025, Dkt. 77-1, because it contains 9,871 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32.2.

2) This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Circuit Rule 32.1 and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point font.

3) Any required privacy redactions have been made pursuant to Circuit Rule 25.2.13, the electronic submission is an exact copy of the paper submission, and the brief has been scanned for viruses using Windows Defender and is free of viruses.

December 17, 2025

s/Paul D. Clement<br>Paul D. Clement