Nos. 25-11253, 25-11254

*In the*

# United States Court of Appeals

*for the*

# Fifth Circuit

IN RE Naoise Connolly Ryan, Emily Chelangat Babu and Joshua Mwazo Babu, Catherine Berthet, Huguette Debets, Luca Dieci, Bayihe Demissie, Sri Hartati, Zipporah Kuria, Javier de Luis, Nadia Milleron and Michael Stumo, Chris Moore, Paul Njoroge, Yuke Meiske Pelealu, John Karanja Quindos, and Guy Daud Iskandar Zen S., Rini Soegiyono, Dayinta Anggana, Helda Aprilia, Serly Oktaviani, Wilson Sandi, Hendrarti Hendraningrum, Dody Widodo, Myrna Juliasari, Merdian Agustin, Adhitya Wirawan, M. Sholekhudin Zuhri, Siska Ong, Wenny Sia Wijaya, Suharto, Rohmiyatun, Sri Umi Anggraini, Permana Anggrimulja, Linda Manfredi, Sonia Lorenzoni, and Maurizio Manfredi — Crime Victim Rights Act Petitioners.

## CONSOLIDATED REPLY FOR VICTIMS' FAMILIES

**Mandamus from the**
**United States District Court for the**
**Northern District of Texas**
**Case No. 4:21-cr-005-O**

Warren T. Burns
Darren P. Nicholson
Chase Hilton
BURNS CHAREST LLP
900 Jackson Street, Suite 500
Dallas, Texas 75202
wburns@burnscharest.com
nicholson@burnscharest.com
chilton@burnscharest.com

Paul G. Cassell (Utah Bar No. 06078)
(Counsel of Record)
Utah Appellate Project
S.J. QUINNEY COLLEGE OF LAW
University of Utah
383 S. Univ. St.
Salt Lake City, UT 84112
Telephone: (801) 585-5202
cassellp@law.utah.edu
(no institutional endorsement implied)
*Additional counsel on signature page.*

*Attorneys for Crime Victims' Representatives-Petitioners*

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

In light of the importance of the issues to the proper administration of the Crime Victims' Rights Act, 18 U.S.C. § 3771, and Federal Rule of Criminal Procedure 48(a), petitioners requested oral argument on both of their petitions. The Court has set oral argument for February 5, 2026.

# **TABLE OF CONTENTS**

STATEMENT REGARDING ORAL ARGUMENT ...............................................i

TABLE OF CONTENTS ...........................................................................ii

TABLE OF AUTHORITIES ......................................................................iv

INTRODUCTION...................................................................................1

STANDARD OF REVIEW ........................................................................2

ARGUMENT .......................................................................................3

    I.     The District Court Failed to Protect the Victims' Families'
           CVRA Rights by Refusing to Set Aside the Illegally Negotiated
           DPA...................................................................................3

           A. This Court Previously Held that the District Court Was Required to
               Uphold the Victims' Families' CVRA Rights at "Every Stage" of
               the Proceedings.................................................................3

           B. The Victims' Families' Motion for Enforcement of their CVRA
               Rights Connected to the DPA Is Not Moot....................................4

           C. The Illegally Negotiated DPA Influenced the NPA and the District
               Court's Decision to Grant the Motion to Dismiss. ........................9

           D. The District Court Possessed the Power to Set Aside the DPA—
               and Was Required to Set Aside the DPA to Enforce the Families'
               CVRA Rights....................................................................13

           E. The Government's CVRA Violations Were Not "Harmless"
               Error……………………………………………………………..19

    II.    The District Court Failed to Protect the Victims' Families'
           CVRA Rights to Reasonably Confer and to be Treated with
           Fairness During the NPA's Negotiation. ...........................................22

           A. Because the Facts are Not in Dispute, This Court Reviews the Issue
                of the Government's CVRA Compliance *De Novo*. .....................22

            B. The Government Failed to Confer—and Even Misled the
               Families—About the NPA's No-Further-Prosecution Provision. .23

C. The Government Failed to Confer—and Even Misled the
Families—About the Sham Dismissal "Without Prejudice." ....... 30

1.  The Statute of Limitations on Boeing's Crime Has
Now Expired and Was Not Extended By the NPA. ....... 30

2.  The Government's Purportedly Negligent
"Drafting Error" Was Still a CVRA Violation and,
In Any Event, Renders the NPA Clearly Contrary
to the Public Interest ...................................................... 36

D. The Proper Remedy for the Government's CVRA Violations is to
Reverse the District Court's Approval of the Motion to Dismiss. 37

III.  The District Court Violated the Victims' Families CVRA Rights
to be Treated Fairly by Failing to Consider Their Objections to
the Motion to Dismiss Under the Correct Legal Standards. .............. 39

A. The CVRA Entitled the Families to Have Their Arguments Against
Dismissal Assessed on Proper Legal Standards. .......................... 39

B. In Granting the Motion to Dismiss, the District Court Applied
Incorrect Legal Standards. ........................................................... 42

CONCLUSION ................................................................... 49

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) ...................................... 51

CERTIFICATE OF SERVICE .............................................................. 52

APPENDIX A - Non-Prosecution Agreement ........................................ 53

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Abraham Watkins Nichols Agosto Aziz & Stogner v. Festeryga*,
   155 F.4th 456 (5th Cir. 2025) ................................................................6

*Arnesen v. Raimondo*,
   115 F.4th 410 (5th Cir. 2024) ................................................................6

*Batchelor v. Cain*,
   682 F.3d 400 (5th Cir. 2012) ...........................................................20, 21

*Chafin v. Chafin*,
   568 U.S. 165 (2013) ..............................................................................9

*Chardon v. Fumero Soto*,
   462 U.S. 650 (1983) ............................................................................33

*Dierlam v. Trump*,
   977 F.3d 471 (5th Cir. 2020) ................................................................6

*Does 1 & 2 v. United States*,
   359 F.Supp.3d 1201 (S.D. Fla. 2019) ..............................................9, 14

*Hall CA-NV, L.L.C. v. Old Republic Nat'l Title Ins. Co.*,
   990 F.3d 933 (5th Cir. 2021) ..............................................................35

*In re Allen*,
   701 F.3d 734 (5th Cir. 2012) ..............................................................15

*In re Davis*,
   146 F.4th 710 (9th Cir. 2025) ............................................................17

*In re Dean*,
   527 F.3d 391 (5th Cir. 2008) ..........................................................3, 17

*In re Doe*,
   57 F.4th 667 (9th Cir. 2023) ................................................................3

*In re J.H.*,
   138 F.4th 1347 (9th Cir. 2025) ..........................................................41

*In re Ryan*,
   88 F.4th 614 (5th Cir. 2023) ........................................................*passim*

*In re United States*,
   345 F.3d 450 (7th Cir. 2003) ..............................................................46

*Jane Does 1 & 2 v. United States*,
   950 F.Supp.2d 1262 (S.D. Fla. 2013) ................................................15

*Kenna v. U.S. Dist. Ct. for C.D. Cal.*,
   435 F.3d 1011 (9th Cir. 2006) ......................................................18, 20

*Legacy Hous. Corp. v. City of Horseshoe Bay, Texas*,
   158 F.4th 636 (5th Cir. 2025) ..............................................................4

*Lowery v. Mills*,
    157 F.4th 729 (5th Cir. 2025) ................................................................4
*Mid-S. Bottling Co. v. N.L.R.B.*,
    876 F.2d 458 (5th Cir. 1989) ..............................................................16
*McClain v. Lufkin Indus., Inc.*,
    649 F.3d 374 (5th Cir. 2011) ................................................................4
*McKaskle v. Wiggins*,
    465 U.S. 168 (1984) ............................................................................21
*Myers v. Gulf Oil Corp.*,
    731 F.2d 281 (5th Cir. 1984) ..............................................................30
*Students for Fair Admissions, Inc. v. Univ. of Texas at Austin*,
    142 F.4th 819 (5th Cir. 2025) ...........................................................7, 9
*Texas v. United States*,
    126 F.4th 392 (5th Cir. 2025) ................................................................4
*United States v. Age*,
    136 F.4th 193 (5th Cir. 2025) ..............................................................42
*United States v. Bird*,
    709 F.2d 388 (5th Cir. 1983) ..............................................................25
*United States v. Butler*,
    7 F.4th 408 (5th Cir. 2021) .................................................................35
*United States v. Cowan*,
    524 F.2d 504 (5th Cir. 1975) ..................................................28, 43, 46
*United States v. Davis*,
    285 F.2d 378 (5th Cir. 2002) .........................................................43, 46
*United States v. Gonzalez-Lopez*,
    548 U.S. 140 (2006) ............................................................................20
*United States v. Halverson*,
    897 F.3d 645(5th Cir. 2018) ...............................................................21
*United States v. Hamm*,
    659 F.2d 624 (5th Cir. 1981) .........................................................42, 28
*United States v. Jones*,
    664 F.3d 966 (5th Cir. 2011) ..............................................................28
*United States v. Lytle*,
    658 F. Supp. 1321 (N.D. Ill. 1987) .....................................................33
*United States v. McBride*,
    571 F. Supp. 596 (S.D. Tex. 1983) .....................................................25
*United States v. McMillan*,
    600 F.3d 434 (5th Cir. 2010) ..............................................................35
*United States v. Rafoi*,
    60 F.4th 982 (5th Cir. 2023) ...............................................................31

*United States v. Salinas*,
  904 F.2d 936 (5th Cir. 1982) .................................................................44
*United States v. Schmick*,
  904 F.2d 936 (5th Cir. 1990) .................................................................33
*United States v. Tarrant*,
  730 F. Supp. 30 (N.D. Tex. 1990) .........................................................35
*United States v. Welborn*,
  849 F.2d 980 (5th Cir. 1988) .................................................................43
*Vasquez v. Hillary*,
  474 U.S. 254 (1986) ..............................................................................20

**Statutes**
18 U.S.C. § 3282 .........................................................................................31
18 U.S.C. § 3288 .........................................................................................33
18 U.S.C. § 3711 ...........................................................................................i
18 U.S.C. § 3771(a)(5) ..........................................................................16, 34
18 U.S.C. § 3771(a)(8) ..........................................................................37, 38
18 U.S.C. § 3771(d)(5) .........................................................14, 15, 16, 18, 38
28 U.S.C. § 2072 .........................................................................................18

**Other Authorities**
150 Cong. Rec. 7303 (Apr. 22, 2004) .......................................................39
150 Cong. Rec. S4260-01, S4262, 2004 WL 867940 (Apr. 4, 2004)...............19, 22
Boeing 737 MAX Crash-Victim Beneficiaries Compensation Fund
  Protocol, at 1, (June 21, 2021), https://boeing737maxcrash-
  victimbeneficiariescompensationfund.com/. ......................................17
Douglas E. Beloof, Paul G. Cassell et al., Victims in Criminal
  Procedure 848 (5th ed. 2025)................................................................19
Paul G. Cassell, The Crime Victims' Rights Movement: Historical
  Foundations, Modern Ascendancy, and Future Aspirations, 56 U.
  Pac. L. Rev. 387, 435-37 (2025) ......................................................20, 23

**Rules**
Fed. R. App. P. 32(a)(6).............................................................................50
Fed. R. App. P. 32(a)(5).............................................................................50
Fed. R. App. P. 32(a)(7)(B) .......................................................................50
Fed. R. Crim. P. 52(a).................................................................................18
Federal Rule of Criminal Procedure 48(a) ...................................................i

**Regulations**
U.S.S.G. § 2B1.1(b)(16).............................................................................11
U.S.S.G. § 2B1.1(b)(2)(A)(i) .....................................................................11

U.S.S.G. § 8C2.5(b)(1) ........................................................................ 11

U.S.S.G. § 8C2.5(g)(2) ........................................................................ 11

U.S.S.G. § 8C4.2 ................................................................................ 11

## **INTRODUCTION**

The victims' families have filed two Crime Victims' Rights Act (CVRA) petitions. This Court should grant both.

The victims' families' first CVRA petition—concerning the illegally negotiated deferred prosecution agreement (the "DPA petition")—picks up where this Court left off in its 2023 decision, *In re Ryan*, 88 F.4th 614 (5th Cir. 2023). In *Ryan*, this Court denied any relief as "premature" because it was confident that the district court would uphold the families' CVRA "rights at every stage of the court's criminal proceedings." *Id.* at 627. This Court's confidence was misplaced. The Government long ago began violating the families' CVRA rights to confer when it orchestrated the secret DPA with Boeing. And the district court never even considered how to remedy that rights violation, much less uphold its duty to "ensure" that the families were "afforded" their CVRA rights when the DPA was negotiated. 18 U.S.C. § 3771(b)(1). Remedying that rights violation is long overdue, and this Court should now discharge *its* duty to protect the families' CVRA rights connected to the DPA.

This Court should also grant the families' second CVRA petition—concerning the non-prosecution agreement (the "NPA petition"). In their continued disregard of CVRA mandates, the Government and Boeing contrived to do an end-run around the district court's Rule 48(a) review of the proposed dismissal—agreeing in advance of

1

court review to an unprecedented no-further-prosecution provision. The parties also devised a sham dismissal ostensibly "without prejudice" through an ineffective statute of limitations waiver. These two provisions (among others) were concealed from the victims' families, violating their CVRA rights to reasonably confer.

Finally, by failing to apply the proper legal principles when considering whether to dismiss the charge, the district court violated the families' CVRA right to be "treated with fairness" (18 U.S.C. § 3771(a)(8)), committed an error of law, and necessarily abused its discretion. The district court ignored this Court's specific command in *Ryan* to "vigilantly enforce the public interest." 88 F.4th at 626. Through its crime, Boeing has killed 346 people. The district court incorrectly thought it was powerless to take this fact into account when considering whether to approve dismissal. This Court should reverse for this reason as well, remanding for the vigilant protection of the public interest that this high-stakes case demands.

## STANDARD OF REVIEW

As explained in the families' petitions, the district court's decision not to afford them their asserted CVRA rights is reviewed *de novo*, because it hinged on legal determinations. *See* DPA Pet.13-14; NPA Pet.13; *see also* Op.12 (noting that the principal disagreement is "over the scope" of the court's "judicial authority").

Because the district court failed to protect the victims' families' CVRA rights, that obligation now falls to this Court. And this Court must act. In 2015, Congress

2

changed the CVRA's appellate review provision from "largely prudential" mandamus review, *In re Dean*, 527 F.3d 391, 396 (5th Cir. 2008), to "ordinary standards of appellate review." 18 U.S.C. § 3771(d)(3) (discussed in *Ryan*, 88 F.4th at 621 (citing *In re Doe*, 57 F.4th 667, 672-73 (9th Cir. 2023)). Accordingly, Congress has now eliminated any discretionary options—options that were open to this Court in handling the *Dean* petition in 2008. Thus, this Court must decide the victims' families' petitions on their merits—meaning that this Court must determine whether the district court followed the CVRA's requirement that a district court "*shall ensure* that the crime victim is afforded the rights described" in the CVRA. 18 U.S.C. § 3771(b)(1) (emphasis added) (cited in *Ryan*, 88 F.4th at 621). This Court reviews *de novo* the legal issue of whether the district court properly discharged that statutory command. *See Ryan*, 88 F.4th at 621.

## ARGUMENT

### I. The District Court Failed to Protect the Victims' Families' CVRA Rights by Refusing to Set Aside the Illegally Negotiated DPA.

#### A. This Court Previously Held that the District Court Was Required to Uphold the Victims' Families' CVRA Rights at "Every Stage" of the Proceedings.

In its previous decision, this Court ruled that the district court "must uphold crime victims' statutory rights *at every stage* of the court's criminal proceedings." *Ryan*, 88 F.4th at 627 (emphasis added). And it stressed that the district court must

"uphold victims' CVRA rights *throughout* the instant criminal proceedings." *Id.* at 629 (emphasis added).

District courts are strictly bound to follow appellate court instructions through what this Court calls "the rule of orderliness." *See Texas v. United States*, 126 F.4th 392, 405 n.12 (5th Cir. 2025). And this Court too follows this "frequently applied" rule, *id.*, which "require[es] a later panel to adhere to the published opinion of an earlier one …." *Legacy Hous. Corp. v. City of Horseshoe Bay, Texas*, 158 F.4th 636, 651 (5th Cir. 2025). The rule of orderliness is "strict and rigidly applied." *Lowery v. Mills,* 157 F.4th 729, 742 (5th Cir. 2025). And when combined with the law-of-the-case doctrine, the result is that "an issue of law or fact decided on appeal may not be reexamined either by the district court on remand or by the appellate court on a subsequent appeal." *McClain v. Lufkin Indus., Inc.*, 649 F.3d 374, 385 (5th Cir. 2011). Thus, the district court was required to enforce the families' CVRA rights at "every stage" of this case—and this Court must ensure that it did so.

### B. The Victims' Families' Motion for Enforcement of their CVRA Rights Connected to the DPA Is Not Moot.

Perhaps the single most important stage of this case was its first: The Government's simultaneous filing of a criminal information charging Boeing with conspiracy (ECF No. 1) and then entering into a remarkable deferred prosecution agreement in which Boeing received generous concessions (ECF No. 4). It is indisputable that, at this first stage, the Government violated the families' CVRA

rights, as both the district court and this Court have held. *See* DPA Pet. 19-20 (citing, e.g., *Ryan*, 88 F.4th at 626-27).

The core problem in this case is that the Government—and its negotiating collaborator, Boeing—have been unwilling to put things right by setting aside the illegally negotiated DPA. Several years ago, when the victims' families pressed this same argument before this Court, the Government and Boeing escaped by delaying the reckoning. This Court found that the victims' families' request was "premature" and thus denied relief "without prejudice." 88 F.4th at 627-29. In subsequent proceedings below, the victims' families repeatedly asked the district court to "declare the DPA invalid[]." ECF No. 340 at 20; *accord* ECF No. 318 at 40-41; DPA Appx. 1016 ("I want to make clear on the record, we're asking[] not only for you to deny the motion to dismiss, we're also asking … for you to invalidate the DPA ….").

Now the CVRA bill has come due—and, indeed, is overdue. It is no longer "premature" for this Court to decide whether the district court "ensured" (18 U.S.C. § 3771(b)(1)) that the victims' families were afforded their CVRA rights at "every stage" of the proceedings below. 88 F.4th at 627. Truth be told, the district court did nothing to enforce the families' CVRA rights concerning the DPA—most notably, by leaving the DPA in full force and effect for years. So the parties end up resorting to handwaving to deflect from the undeniable fact that, in a prosecution for the "deadliest corporate crime in U.S. history" (DPA Appx. 705), the victims' families

were never able to confer with the Government about the DPA and potentially alter the course of the criminal proceedings.

The parties' first diversion is their claim that the families' request for setting aside the DPA has become "moot." *See* Gov't Resp. 30-35; Boeing Resp. 40-42. Yet neither the Government nor Boeing argued mootness below. Against this backdrop, it is perhaps unsurprising, but nonetheless unfortunate, that the district court did not rule on the issue.

This Court "generally prefer[s] to adhere to [its] policy of being a court of review, not first view." *Arnesen v. Raimondo*, 115 F.4th 410, 414 (5th Cir. 2024) (internal quotation omitted). When a complicated, fact-intensive, jurisdictional issue arises for the first time in this Court, this Court's standard approach is to remand to the district court. *See, e.g., Abraham Watkins Nichols Agosto Aziz & Stogner v. Festeryga,* 155 F.4th 456, 462 (5th Cir. 2025). Given the district court's deep familiarity with the years-long litigation below, a remand is a particularly wise approach here.

If this Court nonetheless decides to determine the mootness issue in the first instance, the victims' families' motion for setting aside the DPA is not moot. To be sure, "if an intervening event renders the [trial] court unable to grant the litigant any effectual relief whatever, the case is moot." *Dierlam v. Trump*, 977 F.3d 471, 476 (5th Cir. 2020) (internal quotation omitted). But "being able to imagine an alternative

form of relief is all that's required to keep a case alive." *Id.* at 476-77. So long as "a concrete interest" remains, "however small, in the outcome of the litigation, the case is not moot." *Students for Fair Admissions, Inc. v. Univ. of Texas at Austin,* 142 F.4th 819, 824 (5th Cir. 2025). Nor is a case "moot because it's uncertain whether the court's relief will have any practical impact on the [movant]. Courts often adjudicate disputes where the practical impact of any decision is not assured." *Dierlam,* 977 F.3d at 476–77 (internal quotation omitted).

This Court should also assess the parties' newly presented mootness argument in light of the fact that the families have continuously sought this remedy for years. In February 2023, the district court concluded that, despite its "immense sympathy" for the victims' families, it lacked any authority "to remedy the incalculable harm" the families had suffered. ECF No. 185 at 29. In December 2023, this Court held that the district court's conclusion was "inconsistent with the statute, the criminal rules, and court authority to resolve criminal proceedings commenced in court." *Ryan,* 88 F.4th at 623. While this Court denied the families their requested relief of setting aside the DPA, it did so "without prejudice" because it was "confident that the district court [would] uphold victims' CVRA rights *throughout* the instant criminal proceedings, above all when, how, and if judicial approval is sought to resolve this case." *Id.* at 627, 629 (emphasis added). Judge Clement concurred, explaining that this Court's "decision should not be read as holding that the district

court was prohibited from setting aside the DPA at an earlier stage of these proceedings ….” *Id.* at 629 (Clement, J., concurring).

As the passage from *Ryan* quoted above envisioned, if Boeing had *complied* with its DPA obligations leading to a follow-on Government motion to dismiss, then presumably, at that time, the district court would have considered setting aside the DPA as a means of enforcing the families’ rights to confer. After all, this Court made clear that the victims’ families’ motion was only “premature.” But because of Boeing’s bad behavior—i.e., its deliberate failure to follow its DPA obligations—the Government in 2024 chose, in its “sole discretion” (Gov’t Resp. 8) to find that Boeing was “subject to prosecution by the United States.” ECF No. 199 at 1. Then, having decided that Boeing was “subject” to prosecution, in 2025 the Government suddenly announced that it no longer wanted to prosecute—entering into the NPA. And, because of the Government’s own decisions to declare the DPA had been breached in 2024 and then to negotiate an NPA in 2025, the Government and wrongdoer Boeing now argue in 2026 that this Court lacks jurisdiction to even consider whether the district court should have set aside the DPA earlier. Their reason: the agreement “no longer exists.” Boeing Resp. 41.

This attempted vanishing act would make Houdini proud. But the parties’ mootness argument founders on its failure to even acknowledge this Court’s direction that the district court was required to “uphold crime victims’ statutory

rights *at every stage* of the court's criminal proceedings." *Ryan*, 88 F.4th at 627 (emphasis added). Neither the Government nor Boeing even mentions this Court's "every stage" mandate in their briefs, much less attempts to show that the victims' families were afforded their rights to confer about the DPA at this case's crucial first stage.

Finally, and in any event, the parties' mootness claim "'confuse[s] mootness with the merits.'" *Students for Fair Admissions, Inc. v. Univ. of Texas at Austin*, 142 F.4th 819, 827 (5th Cir. 2025) (quoting *Chafin v. Chafin*, 568 U.S. 165, 174 (2013)). The parties argue that the district court lacked the power to set aside the DPA. Gov't Resp. 35-41; Boeing Resp. 42-43. But that is an argument about the scope of the district court's remedial authority (which is incorrect, as explained below), not proof that the victims' families' request for that relief has become moot.

### C. The Illegally Negotiated DPA Influenced the NPA and the District Court's Decision to Grant the Motion to Dismiss.

Because the victims' families' argument for setting aside the DPA is not moot, the Court should instruct the district court to invalidate the DPA and conduct further proceedings free from the influence of that agreement. Directing the district court to invalidate the DPA would allow the victims' families the "unfettered" opportunity to confer with the Government about appropriate next steps in this case. *See* Appx. 591-92 (discussing *Does 1 & 2 v. United States*, 359 F.Supp.3d 1201, 1218 (S.D. Fla. 2019) (quoting 950 F.Supp.2d at 1267)). This direction would necessarily mean

9

reversing the district court's decision to grant the motion to dismiss, as the course of the new proceedings after the DPA is invalidated could alter whether (or how) the district court would need to review any motion to dismiss.

The Government seeks to conjure the illusion that the DPA has become irrelevant because the Government determined that Boeing breached the agreement. But inconveniently for the Government, the DPA refuses to remain buried in its grave. As the victims' families explained in their DPA petition (DPA Pet. 27-28), the Government's NPA and its incorporated attachments contain dozens of references to the DPA. *See* NPA, ECF No. 312-1 *passim*.[1] As one illustration of how the DPA controlled the NPA, on its face, the NPA relied on the DPA's Guidelines calculations to calculate Boeing's financial penalty:

> … *pursuant to Paragraph 26 of the **DPA***, the Offices have determined that the appropriate resolution of this case is for the Offices to dismiss the Information … and enter into a non-prosecution agreement with the Company with a two-year term; payment by the Company of an overall criminal monetary penalty amount of $487,200,000, *which reflects a fine at the top of the applicable Sentencing Guidelines fine range* and the maximum fine allowable under Title 18, United States Code, Sections 371 and 3571(c), *including credit for the $243,600,000 previously paid by the Company **pursuant to the DPA**,* resulting in a remaining criminal penalty owed by the Company of $243,600,000 ….

NPA, ¶ 3 (emphases added).

---

[1] For ease of reference, the NPA is attached as Appendix A.

As the NPA itself makes clear, the $243.6 million monetary penalty figure came directly from DPA calculations, where the Government and Boeing worked together to secretly derive what they deemed to be the appropriate financial penalty[2] for Boeing to pay through an "application of the Sentencing Guidelines to determine the applicable fine range." DPA ¶ 9, DPA Appx. 12. The parties' DPA Guidelines calculations ultimately produced a low-end fine range of $243.6 million with multipliers of 1.0 (minimum) to 2.0 (maximum). The Government and Boeing then agreed for Boeing to pay a penalty of $243.6 million, at the "low end" of the fine range. *See* DPA ¶ 4(j), DPA Appx. 9.

These Guidelines calculations were, to be blunt, bogus. As the victims' families have explained both here and below, these calculations:

> • Failed to include a multiple-victim specific offense characteristic under U.S.S.G. § 2B1.1(b)(2)(A)(i);

> • Failed to recognize that Boeing's offense involved a conscious or reckless risk of death under U.S.S.G. § 2B1.1(b)(16);

> • Failed to mention the possibility of an upward departure for hundreds of deaths under U.S.S.G. § 8C4.2 (policy statement);

> • Erroneously gave Boeing credit for accepting responsibility under U.S.S.G. § 8C2.5(g)(2); and

> • Deceptively concealed Boeing's C-suite's culpability under U.S.S.G. § 8C2.5(b)(1).

---

[2] The payment was not a "fine" after a criminal conviction at trial and, accordingly, was described as "payment of [a] criminal monetary penalty." *See* DPA, ECF No. 4 at 9-10.

*See* DPA Pet. 28-30 (citing ECF No. 318 at 32-40 (discussing ECF No. 268-1 at 30-35; ECF No. 268-2 at 22-24)).

The Court will immediately understand why the victims' families find the Government's continuing reliance in the NPA on the DPA Guidelines calculations to be so offensive. The DPA calculations assume that Boeing's deadly crime was victimless and conceal the role Boeing's corporate leadership played in the deaths of the families' loved ones. *See* ECF No. 254 at 8-17. And while the families have been pressing these points for years, the Government has even tried to defend the calculations. Instead, at purported "conferral" sessions, the Government has refused to answer the families' questions about the calculations. *See* ECF No. 318-1 at 6-12.[3] In court, the Government has deceptively "swallowed the gun" by concealing relevant facts disproving its Guidelines calculations. *See* ECF No. 254 at 8-17. And now, to add insult to injury, the NPA gives Boeing a gratuitous "credit," offsetting the alleged "statutory maximum" penalty[4] in the NPA with a $243.6 million payment Boeing made earlier under the DPA. *See* NPA, ¶ 3.

---

[3] The Government has also refused to produce even a single document to the families in related FOIA litigation seeking the Government's correspondence with Boeing when it secretly orchestrated the DPA. *See* Status Report, ECF No. 29, Ryan v. Dept. of Justice, No. 1:23-cv-3815-SLS (D.D.C. Dec. 8, 2025).

[4] This penalty is not, in fact, the statutory maximum. *See* ECF No. 254 at 17-30.

Because the DPA obviously shaped the NPA, the families are not pressing a "moot point" (Gov't Resp. 32) in asking that the DPA be set aside. Voiding the DPA would, as a corollary, set aside its Guidelines calculations—which the NPA claims reflect "a fine at the top of the applicable Sentencing Guidelines fine range." NPA, ¶ 3. The victims' families would then be free to make their case for using the appropriate Guidelines calculation—both to the Government and, if necessary, in later proceedings before the district court.

The victims' families asked the district court to set aside the DPA in their first CVRA motion in December 2021. *See* ECF No. 15. They pressed this point through years of CVRA litigation before the district court and, later, before this Court, only to be told that in 2023 that their request was "premature." 88 F.4th at 627. At some juncture, the CVRA entitles the victims' families to obtain this relief. That time is now. This Court should direct the district court to set aside the DPA and allow the victims' families a fair opportunity to influence the Guidelines calculations and related aspects of the prosecution of the "deadliest corporate crime in U.S. history" (Appx. 705).

### D. The District Court Possessed the Power to Set Aside the DPA—and Was Required to Set Aside the DPA to Enforce the Families' CVRA Rights.

Presumably recognizing that setting aside the DPA is the obvious way to enforce the victims' families' CVRA rights, the Government retreats to the fallback

position that the district court "lack[ed] that power." Gov't Resp. 36. But the central premise of this Court's earlier *Ryan* decision was that, once the Government chose to charge Boeing in the district court, the Judiciary was necessarily involved at various points in the process. Because the Government lodged its case on the district court's docket, any later case resolution "receives judicial imprimatur," and thus the "public and crime victims, not to mention the government and defendants, necessarily and correctly see accountability with Article III from start to finish." *Ryan*, 88 F.4th at 625 n.9.

In the CVRA, Congress directed that district courts "shall ensure" that crime victims are afforded their rights. 18 U.S.C. § 3771(b)(1). This power allows courts to set aside DPAs and other similar agreements when necessary to enforce victims' rights, as courts that have reached this issue have held.

Most notably, the U.S. District Court for the Southern District of Florida considered how to enforce victims' CVRA rights where prosecutors illegally negotiated a secret non-prosecution agreement with notorious sex trafficker Jeffrey Epstein. That district court held that, to afford Epstein's victims their CVRA right to confer about the NPA, an appropriate remedy was rescission of relevant provisions in the NPA, thereby giving the victims an "unfettered" opportunity to confer about prosecuting Epstein. Appx. 591-92 (discussing *Does 1 & 2 v. United States*, 359 F.Supp.3d 1201, 1218 (S.D. Fla. 2019) (quoting 950 F.Supp.2d at 1267)). As that

district court explained, Congress included in the CVRA a narrow "limitation on relief" provision. *See* 18 U.S.C. § 3771(d)(5) (entitled "limitation on relief"). That provision restricts the circumstances in which victims can seek the relief of "re-open[ing] a plea or sentence." 18 U.S.C. § 3771(d)(5). The district court held that, in situations outside the scope of this limitation-on-relief provision, this CVRA language was "properly interpreted impliedly to authorize a 're-opening' or setting aside of pre-charge prosecutorial agreements made in derogation of the government's CVRA conferral obligations." *Jane Does 1 & 2*, 950 F.Supp.2d at 1267. *Cf. In re Allen*, 701 F.3d 734, 735 (5th Cir. 2012) (finding the limitation-on-relief provision inapplicable because petitioning crime victims were "not seeking to reopen a plea or sentence"); *In re Davis*, 146 F.4th 710, 722-28 (9th Cir. 2025) (finding the limitation-on-relief provision inapplicable and allowing crime victims to reopen restitution proceedings).

In their opening brief, the victims' families presented this argument for an "unfettered conferral" through exercise of the district court's CVRA enforcement power—and discussed the limitation-on-relief provision, § 3771(d)(5), and the *Jane Does* case. *See* DPA Pet. 22-25. Neither the Government nor Boeing specifically responded. Instead, the Government knocked down a strawman, arguing that "courts sitting in equity" or exercising the "judiciary's supervisory powers over prosecutorial activities" would lack authority to set aside a DPA. Gov't Resp. 37.

These arguments, whether correct or not, fail to answer the victims' families' argument (based on § 3771(d)(5) and the *Jane Does* holding) that the CVRA confers statutory authority on district courts to set aside prosecutorial agreements to enforce victims' rights.

When this case was previously before this Court, Judge Clement helpfully clarified that "our decision should not be read as holding that the district court was prohibited from setting aside the DPA at an *earlier stage* of these proceedings." 88 F.4th at 629 (Clement, J., concurring) (emphasis rearranged). That observation obviously suggested that, at a *later stage* of these proceedings, the district court could, in fact, "set aside" the DPA to prevent any lingering influence on the proceedings. Judge Clement also cited the *Restatement (Second) of Contracts*, which provides that "contracts entered in violation of public policy are void and unenforceable." *Id.* (citing RESTATEMENT (SECOND) OF CONTRACTS § 178). The district court failed to take the obvious and necessary step of declaring the DPA to be "void" to vindicate the families' CVRA rights.

The Government also spends six pages in its response arguing that setting aside the DPA would be a "moot point." Gov't Resp. 30-35. Then, without even the slightest recognition of the irony, the Government switches to presenting five pages cataloguing all the (allegedly) deleterious consequences that would follow from such a step! Gov't Resp. 35-40.

16

The Government has failed to accurately describe how the case would proceed if the DPA were unwound. Setting aside the DPA—and, as a corollary, reversing the district court's dismissal of the conspiracy charge—would end the prejudice that the victims' families have suffered as a direct result of the Government's CVRA violations. By voiding the illegally negotiated DPA, the CVRA would finally be enforced, allowing the families to freely confer with prosecutors about how to move forward against the backdrop of an unresolved criminal charge—unfettered by bogus Sentencing Guidelines calculations and other encumbrances from the DPA. *Cf. In re Dean*, 527 F.3d 391, 396 (5th Cir. 2008) ("The victims do have reason to believe that their impact on the eventual sentence is substantially less where, as here, their input is received after the parties have reached a tentative deal."). Under the CVRA, the prosecutors would then finally be required to afford the families "[t]he reasonable right to confer" (18 U.S.C. § 3771(a)(5)) about the appropriate next steps.

Restoring innocent parties to the position that they were in before a violation of the law is a standard remedy that courts award in many contexts. *See, e.g., Mid-S. Bottling Co. v. N.L.R.B.*, 876 F.2d 458, 460 (5th Cir. 1989) ("restoration of the status quo ante … [is] prima facie the appropriate remedy" for unfair labor practices). And reopening previous decisions in a criminal case is the standard enforcement mechanism for CVRA violations. *See, e.g., In re Davis*, 146 F.4th 710, 722 (9th Cir. 2025) (concluding that the CVRA "explicitly contemplates that crime

victims may bring 'motion[s] to reopen'" prior proceedings" (quoting 18 U.S.C. § 3771(d)(5)); *Kenna v. U.S. Dist. Ct. for C.D. Cal.*, 435 F.3d 1011, 1017 (9th Cir. 2006) ("the only way to give effect to [the crime victim's] right to speak [at sentencing] as guaranteed to him by the CVRA is to vacate the sentence and hold a new sentencing hearing"). While Boeing might complain that it would not receive a refund of compensation money it paid to the families,[5] it is hardly an innocent party. To the contrary, the victims' families have repeatedly alleged—and sought an evidentiary hearing to prove—that "Boeing was aware that the victims' families had not been conferred with and that the DPA was being kept secret from them." ECF No. 72-1, ¶ 277. Despite years of litigation with multiple opportunities to present

---

[5]    If the DPA is set aside, that decision would not trigger any obligation by 346 victims' families to repay the limited funds already provided by Boeing. Most obviously, the families were never a party to the DPA, which is an agreement between only the Government and Boeing. The victims' families have assumed no obligations under the DPA.

Moreover, the DPA specifically required Boeing to promptly pay funds into an "escrow account." *See* DPA, ¶ 13. The escrow account was obviously designed to preclude Boeing from unfairly attempting to later seek repayment from victims' families located around the globe from Addis Ababa to Jakarta. Indeed, the funds' distribution protocol specifically stated that "no money from the Compensation Fund will be returned to Boeing." Boeing 737 MAX Crash-Victim Beneficiaries Compensation Fund Protocol, at 1, (June 21, 2021) (available from fund administrator). In addition, the victims' families were told that accepting the money would never be used against them by Boeing. *Id.*

The reason why Boeing chose to pay money into a victim compensation fund is clear: Boeing was attempting to create a "poison pill" that would preclude victims from challenging the DPA. Boeing should not be allowed to use its wealth to construct a DPA less susceptible to judicial review than other, less wealthy defendants.

contrary evidence on this point, Boeing has never denied the victims' families' assertion, which is consistent with the reality that Boeing was represented by a highly sophisticated legal team and had every incentive to conceal the negotiations from the grieving families.

### E. The Government's CVRA Violations Were Not "Harmless" Error.

As a final argument against remedying the CVRA violations connected to the DPA, the Government asserts "harmless error" under Fed. R. Crim. P. 52(a). *See* Gov't Resp. 40. Rule 52(a) is a court-created rule, which must give way in the face of a contrary congressional command. *See* 28 U.S.C. § 2072. In the CVRA, Congress legislated without including any such harmless error exception, requiring that the district court "shall ensure" enforcement of CVRA rights. Indeed, regarding this Court's appellate review under the CVRA, Congress has eliminated discretion by directing, without exception, that "[t]he courts of appeals s*hall take up and decide such application forthwith …*." 18 U.S.C. § 3771(d)(3) (emphasis added). It was not Congress's intent that the CVRA's "significance be whittled down or marginalized by the courts or the executive branch." 150 Cong. Rec. S4260, S4269, 2004 WL 867940 (Apr. 22, 2004) (statement of CVRA co-sponsor Sen. Feinstein, agreed with by co-sponsor Sen. Kyl).

If the Government's sweeping harmless error position is accepted, then virtually all CVRA violations will go unaddressed, because it would be difficult for

crime victims to trace through the precise consequences of deprivations of their rights. For example, how would a victim demonstrate that being afforded the right to deliver a victim impact statement at sentencing would have changed the judge's sentence? It is for this reason that appellate courts reopen criminal proceedings upon proof that the victim's right was violated—not that the violation substantively changed the outcome. *See, e.g., Kenna v. U.S. Dist. Ct. for C.D. Cal.*, 435 F.3d 1011, 1017 (9th Cir. 2006) (reopening sentencing proceedings even where district judge stated "[t]here just isn't anything else that could possibly be said" because victims have "an indefeasible right to speak"). In other words, appellate courts protect procedural rights, not substantive outcomes—by ordering a "do-over." *See generally* DOUGLAS E. BELOOF, PAUL G. CASSELL ET AL., VICTIMS IN CRIMINAL PROCEDURE 848 (5th ed. 2025) ("The voiding remedy is the superior remedy because, upon voiding, victims are able to exercise their right in the rehearing, or a 'do-over.'").

Presumably the reason that the CVRA contains no harmless error loophole is that some errors "undermine[] the structural integrity of the criminal tribunal itself" and are therefore "not amenable to harmless-error review." *Vasquez v. Hillary*, 474 U.S. 254, 263-64 (1986). Appellate courts address these structural errors without requiring any individualized showing of prejudice. *See, e.g., United States v. Gonzalez-Lopez*, 548 U.S. 140, 148-50 (2006); *Batchelor v. Cain*, 682 F.3d 400, 405-06 (5th Cir. 2012). The rationale is that a structural right unconnected to a case

outcome "is either respected or denied; its deprivation cannot be harmless." *Batchelor*, 682 F.3d at 405-06 (quoting *McKaskle v. Wiggins*, 465 U.S. 168, 177 n.8 (1984)).

Boeing claims that the structural error doctrine does not apply because the families have not explained how the earlier CVRA violations rendered the government's "motion to dismiss fundamentally unreliable or unfair." Boeing Resp. 42. But the issues the victims' families are presenting for this Court's review are not linked to the case's outcome—a substantive issue—but rather whether the victims were afforded the rights promised by the CVRA—a procedural issue. *See Kenna*, 435 F.3d at 1016; *cf.* Paul G. Cassell, *The Crime Victims' Rights Movement: Historical Foundations, Modern Ascendancy, and Future Aspirations*, 56 U. PAC. L. REV. 387, 435-37, 453-57 (2025) (explaining how critics of the crime victims' rights movement conflate protecting procedural rights with obtaining punitive outcomes). The CVRA requires this Court to step in to protect the integrity of the process.

Finally, if this Court chooses to read into the CVRA a novel "harmless error" escape hatch, the Government could escape its CVRA obligations only by shouldering a "heavy burden" of affirmatively proving harmlessness. *See, e.g., United States v. Halverson*, 897 F.3d 645, 652 (5th Cir. 2018). At the very least, determining whether such a showing could be made would require remanding to the district court to trace out all the factual consequences of the Government's CVRA

violations. As just explained, however, a remand is unnecessary, because the Government's proven CVRA violations harmed the families by denying them promised rights in the process.

## II. The District Court Failed to Protect the Victims' Families' CVRA Rights to Reasonably Confer and to be Treated with Fairness During the NPA's Negotiation.

The Court should also grant the victims' families' second petition—the NPA petition. The Government failed to reasonably confer and treat them with fairness when negotiating the NPA. And then it obtained a motion to dismiss based on this illegally negotiated agreement.

### A. Because the Facts are Not in Dispute, This Court Reviews the Issue of the Government's CVRA Compliance *De Novo*.

This Court set out the standard of review in CVRA cases in *Ryan*: "we review the district court's legal conclusions de novo, its factual conclusions for clear error, and its discretionary judgments for abuse of discretion." 88 F.4th at 621. Here, the facts surrounding the NPA are not in dispute. For example, the critical May 2025 "conferral" session was transcribed (over the Government's objection), so there is no doubt about what was said. *See* ECF No. 318-1 (Ex. 5). And neither the Government nor Boeing has challenged the victims' families' counsel's affidavit recounting the relevant events. *See* ECF No. 340 at 4.

Nor does this case concern any "discretionary judgments" by the district court. The district court was obligated to enforce the CVRA rights of the victims' families.

*See Ryan*, 88 F.4th at 621. The Government either complied with its CVRA obligations or it did not, in which case the CVRA required the district court to step in to protect the families' rights.

By process of elimination, then, the only issues present for this Court's review on CVRA compliance were legal conclusions—which this Court reviews *de novo*. But remarkably, the Government stakes out the radical position that this Court should only review "for abuse of discretion whether the government complied with the CVRA." Gov't Resp. 42. The Government made no such claim in its briefing during the earlier litigation before this Court. *See* Consolidated Resp. for the U.S., No. 23-10168 at 17-18 (5th Cir. Mar. 27, 2023). And adopting the Government's sweeping position would convert CVRA "rights" into mere hortatory suggestions that the Government would be free to ignore in its "discretion." But the CVRA's very purpose was to supersede earlier, discretionary victims' rights legislation by "provid[ing] mechanisms to enforce the set of rights provided to victims of crime." 150 CONG. REC. S4260, S4262, 2004 WL 867940 (Apr. 22, 2004) (statement of Sen. Feinstein). *See generally* Cassell, *supra*, 56 U. PAC. L. REV. at 457-70 (reviewing CVRA's history). The Government's novel position has never been adopted by any court in the country in the two decades since the CVRA's enactment. The Government offers no reason why this case should be the first.

### B. The Government Failed to Confer—and Even Misled the Families— About the NPA's No-Further-Prosecution Provision.

The Government failed to reasonably confer about the NPA's no-further-prosecution provision. The provision had already gone into effect before the victims' families knew about it, effectively rendering the families' later objections to the motion to dismiss meaningless. *See* Families' NPA Pet. 15-20 (citing, e.g., ECF No. 318-1 at 16).

The Government responds to this argument by, first, distorting the record below. The Government claims it discussed both a potential NPA and a motion to dismiss with the families—but then asserts that "[n]o one questioned, at or after the conferral, these two separate promises or their sequences." Gov't Resp. 48. Not true. The victims' families lead argument—briefed extensively below (*see, e.g.,* ECF No. 340 at 3)—was that the Government deceived them about the sequence. Specifically, as set out below in the (uncontested) sworn declaration of the families' counsel:

> If I had been made aware that the Government was considering entering into such an agreement before the Court had ruled on any motion to dismiss, I would have, on behalf of my clients, made my strenuous objection known to the Government and sought to swiftly present the issue to the Court before the Government entered into such a binding agreement. …

ECF No. 318-1 at 15.

The Government's concealment was particularly misleading against the backdrop of the Government's decades-long practice of presenting a motion to dismiss to the district court before entering a formal agreement not to prosecute. As counsel for the petitioning victims' families stated, based on extensive experience

24

with the federal criminal justice system, "it was a clear and substantial deviation from normal criminal justice processes" for the Justice Department to take such a step. *Id.*

In the proceedings in the district court, the victims' families repeatedly called the Government's approach "unprecedented." *See* NPA Pet. 18 (collecting record citations). Neither the Government nor Boeing offered any precedent below. But now, the Government's Criminal Division has scoured its files to try to unearth an example—any example—of this approach. The Government fails.

In the main text of its brief, the Government dredges up one decades-old case—*United States v. Bird*, 709 F.2d 388 (5th Cir. 1983)—which it cites as demonstrating that when the Government makes a non-prosecution "promise after filing charges, as here, it does not necessarily (if ever) tie that promise to a Rule 48(a) dismissal." Gov't Resp. 51. But *Bird* hardly proves a "default rule." *Id.* at 52. In that exceptional case, the Government was coerced into rapidly entering into a generous non-prosecution agreement, because extortionists were threatening to blow up chemical processing facilities within hours. *See generally United States v. McBride*, 571 F. Supp. 596 (S.D. Tex. 1983). Understandably acting with haste, the Government drafted a one-off agreement with one of the arrested extortionists "in order to save thousands of lives and billions of dollars from the imminent destruction." *Id.* at 610. Later, after the crisis passed, the district court refused to

enforce the non-prosecution provision for the arrested extortionist's girlfriend, finding that the prosecutor had been forced to agree under duress. *Id.* at 617-18. And then this Court declined interlocutory review. 709 F.2d at 388. *Bird*'s extraordinary facts involving a coerced and void non-prosecution agreement fail to demonstrate a standard practice.

The Government also drops a footnote to five other cases involving NPAs. Gov't Resp. 51 n.14. But none of the five NPAs contains the no-further-prosecution language that the Boeing NPA contains—language specifically blocking Boeing's prosecution *during* the NPA's term even if the district court denied the motion to dismiss the pending charge. *See* Boeing NPA, ¶ 2, ECF No. 312-1. For example, the Government's first cited NPA provides that the Government had agreed to file a motion to dismiss and if the defendant was "in full compliance with all of its obligations under this Agreement *at the conclusion of the term of the Agreement*, the USAO will not *refile* charges or seek to prosecute [the defendant] for any alleged violations of federal criminal laws …." Cap. Ship Mgmt. NPA at 1-2 (emphases added). The Government's other four cited NPAs similarly do not contain—and, in fact, work carefully to avoid—the naked assault on the Rule 48(a) judicial-approval requirement that the Boeing NPA contains.[6]

---

[6]   The second cited NPA is from the Northern Mariana Islands, where a corporate resolution attached to the NPA made clear, in its first "whereas" clause, that the Government and the Corporation had "agreed *upon a dismissal* of the

That the Government has scoured its files from Mississippi to the Northern Marianas in an (ultimately unsuccessful) effort to find even a single precedent for the no-further-prosecution provision is itself a remarkable testament to the singularity of the Boeing NPA. Given Rule 48(a)'s eighty-year history, if the agree-not-to-prosecute-first-then-ask-the-Court-later maneuver were as common as the Government claims, presumably it would be a simple matter to prove the point. The

---

Criminal Charges" to various provisions in the NPA. *See* Hong Kong Entm't NPA, No. 1:13-cr-0002, ECF No. 193 at 14 (D. N. Mar. I. 2015). In addition, the NPA was apparently presented to the district court in chambers for approval. *See* ECF Nos. 192-94 (reflecting in-chambers conference, motion to dismiss, first amended NPA, and order of dismissal—all on July 23, 2015).

The third cited NPA is similar to the first NPA discussed above (Cap. Ship Mgmt.) in that it only provided that the Government would file "a motion to dismiss without prejudice" the charges and that, further, if the defendant was in full compliance with its obligations "at the conclusion of the [NPA's] term," then the Government would not prosecute for specified offenses. Advanced Cosmetic Rsch. Labs, Inc. NPA at 3-4.

The fourth cited NPA explicitly contains a provision conditioning dismissal on approval of the court. *See* Facility Grp. NPA at 3, No. 3:08-cr-14 (N.D. Miss. Aug. 21, 2008) ("the United States Attorney's Office for the Northern District of Mississippi agrees to dismiss the Superseding Indictment (*upon approval of the Court*) and not to … seek indictment or otherwise prosecute or pursue the aforementioned claims set forth in the Superseding Indictment …." (emphasis added)). The NPA was also "wired" to the district court's later acceptance of a guilty plea by an individual defendant, providing another opportunity for judicial review. *Id.* at 3-4.

The fifth cited NPA also includes a specific provision "expressly" conditioning the agreement on district court approval of the motion to dismiss. *See* Milberg NPA at 13-14 (defendant "agrees that such dismissal shall be without prejudice to any subsequent restating of the charges … in accordance with this Agreement, *which is expressly conditioned upon such dismissal*" (emphasis added)).

Government has, quite literally, tens of thousands of dismissal cases available to choose from—and yet, it fails to find even a single example.

Moreover, narrowing the focus to this Court's Rule 48(a) jurisprudence, the Boeing NPA departs from ordinary federal criminal practice. In *United States v. Cowan*, 524 F.2d 504, 507 (5th Cir. 1975), this Court described the settled sequence: the Government files a motion to dismiss; the district court rules; and if the court denies the motion, the Government then reassesses its position and decides whether to proceed or to abandon the prosecution. *Id.* at 507. Similarly, in *United States v. Hamm*, 659 F.2d 624, 628–29 (5th Cir. 1981), this Court reversed a district court's decision denying a motion to dismiss—analysis that necessarily presupposed a live prosecution during that judicial review. *Id.* at 628–29. Likewise, in *United States v. Jones*, 664 F.3d 966 (5th Cir. 2011), the Government moved to dismiss, the district court ruled, and this Court reviewed that ruling—reflecting that dismissal requires judicial approval. *Id.* at 973–74.

In *Ryan*, this Court summed up decisions such as these, noting the "settled sequence of federal courts' authority to resolve criminal prosecutions submitted to them." *Id.* at 625. This Court again treated Rule 48(a) review as a meaningful checkpoint, not a ministerial step that could be rendered irrelevant by a no-further-prosecution provision or any similar scheme. *See id.* at 625–26.

The Government might respond that these Circuit cases do not specifically involve NPAs. But that absence reflects the very practice these cases describe. When criminal charges are pending and a Rule 48(a) motion is before the court, the prosecution remains live, and the Government's ultimate decision whether to proceed or abandon the case comes only *after* judicial review. A no-further-prosecution provision—put into effect before the court rules on dismissal and binding even if the court denies dismissal—is incompatible with this established framework.

But even if the Government (or Boeing) could locate an example that resembles this exceptional NPA, that discovery would not refute the victims' families' uncontested sworn declaration that their counsel understood—quite reasonably—that the Government was proposing to follow standard Rule 48(a) practice of waiting for a district court decision before entering a binding agreement. *See* ECF No. 318-1 at 15-16. To be sure, the CVRA's "reasonable right to confer" does not require prosecutors to explore every jot and jiggle of an agreement with victims. But neither the Government nor Boeing has ever disputed that the provision in question was "perhaps the single most important provision in the Boeing NPA." ECF No. 318-1 at 15.

At a minimum, this Court should remand to the district court for specific findings on the reasonableness of the Government's conferral on this provision.

While it is true that the district court ruled against the victims' families by concluding that the Government had complied with the CVRA (*see* Op.9), the district court never discussed the no-further-prosecution provision, much less explained how the Government had properly conferred about it. In cases where the district court's "reasoning is vague or was simply left unsaid, there is little opportunity for effective [appellate] review." *Myers v. Gulf Oil Corp.*, 731 F.2d 281, 284 (5th Cir. 1984). If the Court does not believe the record is clear enough already to reverse the decision below, then this Court should remand to the district court for a reasoned decision on this important issue.

### C. The Government Failed to Confer—and Even Misled the Families— About the Sham Dismissal "Without Prejudice."

#### 1. The Statute of Limitations on Boeing's Crime Has Now Expired and Was Not Extended By the NPA.

The Government also misled the victims' families when it told them that "if the Department entered an NPA," it would contain a provision that, if Boeing breached, then "the Department could refile the charge and prosecute the case, notwithstanding the passage of time." *See* NPA Pet. 20 (citing, e.g., ECF No. 318-1 at 16). In fact, the Government's dismissal was effectively "with prejudice," because the applicable statute of limitations blocks the Government from refiling the charge in the event of a Boeing breach. *Id.* at 20-23.

Once again, the district court failed to substantively analyze this important CVRA issue (*see* NPA Pet. 23), warranting at least a remand. Indeed, the district court remarkably assumed that the families' interpretation of the provision, "even if valid" (Op.7n.19), was insufficient to deny the motion to dismiss. It is hard to understand how the district court could have reached this conclusion in a case involving aviation safety where Boeing's criminal conduct had killed 346 people. The Government's dismissal motion was predicated on "an appropriate tradeoff for the certain, guaranteed, and substantial benefits the [NPA] provides"—adding that the NPA, "importantly, will allow the Government to refile if Boeing does not satisfy its obligations." ECF No. 312 at 13. But if the victims' families' interpretation is "valid," then the NPA is unenforceable. Consequently, no "certain" and "guaranteed" benefits could stem from Boeing's unenforceable promise to perform and the dismissal "without prejudice" was a sham.

In response, the Government declines to defend the district court's decision not to decide whether the NPA is unenforceable. Instead, the Government disputes the legal issue of how the statute of limitations operates in this case. *See* Gov't Resp. 52-54. Because the facts surrounding the NPA are not in dispute, if the district court had made an "ultimate decision that the statute of limitations was properly tolled," that would be "a legal conclusion reviewed *de novo.*" *United States v. Rafoi*, 60 F.4th 982, 999 (5th Cir. 2023).

31

If this Court reaches the issue in the first instance, it should conclude that the Boeing NPA is unenforceable. The NPA contains unusually restrictive language on reprosecuting Boeing if it breaches the NPA. Commonly, the Government will put language directly into an NPA that allows it to file contemplated new charges or reinstitute previously filed charges against a defendant. *See, e.g.,* Gov't Resp. 51 n.14 (citing Advanced Cosmetic Rsch Labs, Inc. NPA at Appx. B (NPA containing detailed language explaining how the charge would be "re-institut[ed]") (C.D. Cal. 2008)). In contrast to this straightforward approach, the Boeing NPA contains unusual language (not found in any of the five exemplar NPAs cited by the Government) that only allows for a prosecution relating to conduct "that is not time-barred by the statute of limitation" on the date of the signing of the agreement. Boeing NPA, ¶ 16, ECF No. 312-1 (attached as Appendix A).

In the district court, the Government argued that the fact that it had filed the Criminal Information against Boeing in January 2021 "tolled" the statute of limitations, in the sense that the information "stopped the clock" from running for years. *See* ECF No. 334 at 11. But the victims' families effectively refuted that argument below. *See* ECF No. 340 at 16-19.

The "applicable statute of limitations" referred to in the NPA—18 U.S.C. § 3282—allows a prosecution to proceed only if "the indictment is found or the information is *instituted* within five years next after such offense shall have been

committed." 18 U.S.C. § 3282 (emphasis added). In the district court, the Government misconstrued certain cases, which state that the "return of a timely indictment *tolls* the statute of limitations as to the charges alleged therein." *E.g., United States v. Schmick*, 904 F.2d 936, 940 (5th Cir. 1990) (emphasis added). The Government failed to acknowledge that the term "toll" can have different meanings: a stops-the-clock meaning and a suspend-while-a-condition-is-in-effect meaning. *See Chardon v. Fumero Soto*, 462 U.S. 650, 652 n.1 (1983) (offering different meanings for "tolling" and "tolling effect"). Section 3282 only provides for a suspension while a condition is in effect. The statute requires a charge to be "instituted" within the five-year limitations period. So long as that condition of a timely charge remains in effect, prosecution can proceed on that particular charge. But, as the text provides, for situations where a timely charge is no longer "instituted," then the five-year limit applies. The victims' families also cited the only published case to squarely address this issue—which rejected the Government's stops-the-clock theory. *See* ECF No. 340 at 17-18 (citing *United States v. Lytle,* 658 F. Supp. 1321, 1324–25 (N.D. Ill. 1987)).

Before this Court, the Government now (*sub silencio*) abandons its atextual and dubious stops-the-clock argument. In its brief, the Government claims only that the fact that the Criminal Information was pending against Boeing in May 2025 means that "the charge was not then time barred." Gov't Resp. 53. Accordingly, the

Government asserts that it "makes no difference" (*id.*) which of the two readings the district court (or this Court) give to the statute.

The Government's new position is also wrong. The five-year time period to prosecute Boeing's conspiracy had elapsed when the NPA was signed—and thus a prosecution was "time-barred" but allowed to proceed only because a charge had already been "instituted." But any new prosecution cannot now be "instituted" within the applicable period and thus would be "time-barred."

This reading is the only way to make any sense of the exclusionary language in the Boeing NPA. If the Government's argument were correct, then there would be no effect given to the curious provision specifying that prosecution is allowed only for "any *such prosecution that is not time-barred* on the date of the signing of the Agreement." NPA, ¶ 16. The victims' families have repeatedly pressed the Government explain what "such prosecution" that *is* time-barred could mean. *See, e.g.*, NPA Pet. 20-21. The Government has never explained what this language covers.[7] Of course, NPAs are interpreted like any other contract. *See, e.g., United*

---

[7] Likewise, Boeing has never clearly explained what this language means. In its briefing and argument below, Boeing refused to state whether it agreed with the Government. *See* NPA Pet. 22-23. Now, in its briefing to this Court, Boeing briefly states that it agrees with the Government's stops-the-clock tolling theory. *See* Boeing Resp. 22-23. But that statement of Boeing's current view cannot alter the NPA's legal meaning. *See* NPA, ¶ 23 (no "modifications or additions to this Agreement shall be valid unless they are in writing …."). Thus, Boeing remains free to change its view and inject a statute of limitations defense into the case at any time of its choosing,

*States v. Tarrant*, 730 F. Supp. 30, 32 (N.D. Tex. 1990). And a standard rule of contract interpretation is to avoid reading language to render it surplusage. *See, e.g., Hall CA-NV, L.L.C. v. Old Republic Nat'l Title Ins. Co.*, 990 F.3d 933, 937 (5th Cir. 2021). This Court "strictly constru[es] the terms" of plea agreements (and presumably, non-prosecution agreements) "against the Government as the drafter," *United States v. Butler,* 7 F.4th 408, 411 (5th Cir. 2021). Here, once the Criminal Information was dismissed and therefore that prosecution was no longer "instituted" against Boeing, the conspiracy was outside the statute's five-year term and NPA's restrictive language bars a new prosecution of Boeing.[8] Thus, the dismissal "without prejudice" was sham.

---

*see Musacchio v. United States*, 577 U.S. 237, 247 (2016), rendering the agreement effectively unenforceable.

[8] As the victims' families explained in their opening brief (NPA Pet. 22), by operation of a separate grace-period statute, the Government is permitted to refile the conspiracy charge for six months after the district court granted the motion to dismiss. *See* 18 U.S.C. § 3288. But by its own terms, this grace period statute does not alter the fact that the statute of limitations had previously expired. *See* 18 U.S.C. § 3288 ("[w]henever an indictment or information charging a felony is dismissed for any reason *after the period prescribed by the applicable statute of limitations has expired*, a new indictment may be returned … within six calendar months of the date or the dismissal of the indictment or information …." (emphasis added)); *see United States v. McMillan*, 600 F.3d 434, 444 (5th Cir. 2010) (describing § 3288 as involving situations "after an original indictment has been dismissed and *the limitations period has passed*") (emphasis added)). And Boeing's NPA obligations do not come due until the NPA's two-year term expires. *See* ECF No. 318 at 24 n.14—well after § 3288's six-month grace period lapses in May 2026.

### 2. The Government's Purportedly Negligent "Drafting Error" Was Still a CVRA Violation and, In Any Event, Renders the NPA Clearly Contrary to the Public Interest.

Presumably recognizing that its interpretation of the NPA is dubious, the Government ultimately retreats to the position that "if a *drafting error* had cost the government its right to bring this case anew, that error would not show a CVRA violation." Gov't Resp. 54 (emphasis added). This Court should not simply accept the Government's new, negligent "drafting error" claim. The Court should either remand to the district court for further consideration or simply reject the Government's argument out of hand.

The Government seems to think that it should not be held accountable for its purportedly negligent "drafting error"[9] because it "believed (and still does) that it signed an agreement permitting" refiling of the charge if Boeing breaches. Gov't Resp. 54. But the CVRA entitled the victims' families to the "*reasonable* right to confer" with the Government. 18 U.S.C. § 3771(a)(5). Typically, the term "reasonable" is used to identify non-negligent conduct. *See, e.g.*, *Negligence*, BLACK'S LAW DICTIONARY 1196 (10th ed. 2014). The victims' families were entitled to discuss how the NPA would actually work, not how the Government negligently hoped it would work.

---

[9] The Government bears the burden of establishing the new, factual proposition that its error was due to negligence and not some other reason.

Even more important, the district court never considered the NPA's unenforceability when approving the Government's motion to dismiss. *See* Op.7n.19 (assuming the families' statute of limitation concern was "valid"). In *Ryan*, this Court held that "[p]ublic perception and confidence in the criminal justice system assume that when criminal charges are submitted for judicial resolution, the courts vigilantly will enforce the public interest, including Congress' command that crime victims are heard and protected." 88 F.4th at 626. Put simply, the district should have decided whether the NPA was unenforceable before approving a dismissal predicated on it being enforceable.

### D. The Proper Remedy for the Government's CVRA Violations is to Reverse the District Court's Approval of the Motion to Dismiss.

As with the victims' families' DPA petition, the proper remedy under their NPA petition is to "ensure" the victims' families' rights (18 U.S.C. § 3771(b)(1)) by reversing the district court and directing that the Government must reasonably confer with the families about the NPA's no-further-prosecution provision and its statute of limitations provision.

The Government attempts to defeat this commonsense conclusion with two flawed claims. First, the Government raises (once again) a "harmless error" argument. Gov't Resp. 54-55. But, as explained earlier (*see* Part I.E, *supra*) procedural violations like those at issue here are "structural errors" not susceptible to harmless error review. The Government cannot say for certain how its conferral

would have proceeded if it had reasonably conferred. Or, put another way, if the Government is arguing that it would intransigently refuse to even consider the victims' families' reasonable ideas, the Court should give no weight to such a position—which would, in and of itself, violate the Government's CVRA obligation to reasonably confer. For example, the Government cannot truly represent that, in good faith, it would continue to stick with an unenforceable agreement, particularly where the agreement has important aviation safety implications. Such a position would be plainly contrary to the manifest public interest.

The Government's position seems to ultimately devolve to the claim that the district court lacked any power to void the NPA. *See* Gov't Resp. 55. But for the same reasons the victims' families explained in connection with the DPA, the district court possessed the power—and, indeed, was required—to "ensure" that the victims' families were afforded their CVRA rights, such as their right to confer about an NPA. *See* Part I.D, *supra* (discussing how the CVRA impliedly gives district courts the power to set aside illegally negotiated agreements). And this Court (or the district court on remand) can ensure that the victims' families are afforded their CVRA right to reasonably confer by setting aside the district court's dismissal decision to allow proper and "unfettered" conferrals to proceed about the key NPA provisions. *See Does 1 & 2*, 359 F.Supp.3d at 1218 (citing 18 U.S.C. § 3771(d)(5)).

**III.    The District Court Violated the Victims' Families CVRA Rights to be Treated Fairly by Failing to Consider Their Objections to the Motion to Dismiss Under the Correct Legal Standards.**

Because the CVRA conferred on the victims' families a right to be "treated with fairness," 18 U.S.C. § 3771(a)(8), they had the (seemingly obvious) right to have the district court consider their objections to dismissal under the proper legal standards. Because the district court applied incorrect legal standards, this Court should also reverse on this ground.

**A. The CVRA Entitled the Families to Have Their Arguments Against Dismissal Assessed on Proper Legal Standards.**

The victims' families have argued that the district court violated its obligations under the CVRA by applying the wrong legal standards in evaluating the Government's motion to dismiss. *See* NPA Pet. 24-31. As families' counsel explained below, "The victims that came today to be heard are entitled to be heard by Your Honor in light of a correct understanding of the background legal principles." ECF No. 353 (Tr. Sept. 3, 2025) at 124. The district court took such a narrow view of its duties when assessing the Government's Rule 48(a) motion that the families were never treated with fairness, nor reasonably heard, as the CVRA requires. *See* 18 U.S.C. § 3771(a)(8) & (a)(4).

The Government and Boeing attempt to obscure the families' claim by arguing that "nothing in the CVRA or any other statute affords this Court appellate jurisdiction to consider whether the district court properly applied Rule 48(a)."

Boeing Resp. 23. But the CVRA allows crime victims to assert their rights—including rights to be treated with fairness and to be reasonably heard. Here, the district court did not properly consider the victims' families' objections to the motion to dismiss. Because of that *procedural* failure by the district court, this Court must reverse. *See Ryan*, 88 F.4th at 626 (noting courts "retain adjudicatory responsibility, including an obligation to apply the CVRA," when criminal cases are submitted for resolution).

A simple illustration will demonstrate that this Court possesses the authority to evaluate the background legal standards. Consider a case where the victim of a violent crime delivers a victim impact statement at sentencing, arguing that the appropriate sentence for a defendant is ten years in prison. But the district court erroneously believes that the maximum possible sentence is only one year in jail. In such circumstances, the victim could come to this Court and obtain an order correcting the district court's legal error, followed by a remand to the district court to consider the victim's arguments under a proper understanding of the law. Any other conclusion would deprive the victim of the right (among other rights) to be "treated with fairness," because a fundamental component of fairness is applying the law properly. *See* 150 CONG. REC. 7303 (Apr. 22, 2004) (statement of Sen. Kyl describing the CVRA's right to fair treatment in broad terms).

To be sure, situations where a crime victim can come to this Court seeking correction of a legal error will be rare. District judges in this country are well versed in the legal principles that apply at sentencing and other hearings where victims are commonly heard. But the legal standards governing a Rule 48(a) dismissal motion are poorly defined. Indeed, the Government in its brief to this Court has dropped a footnote preserving its challenge to this Court's existing caselaw giving district courts authority to consider public interest concerns. *See* Gov't Resp. 56 n.15. This is one of those rare cases where appellate guidance on the legal standard is required to protect the victims' families' rights to be treated fairly and to be reasonably heard.

Because the victims' families have asserted—and are continuing to assert—a violation of their CVRA rights to fairness and to be reasonably heard, this case is immediately distinguishable from *In re J.H.*, 138 F.4th 1347 (9th Cir. 2025). In that case, a crime victim argued in the district court against the dismissal of certain allegations in the indictment making the charged crime a felony rather than a misdemeanor. Disappointed with the court's substantive decision to dismiss those allegations, the victim filed a challenge in the Ninth Circuit. The Circuit denied the victim's challenge, explaining that the CVRA "does not permit victims to challenge—and does not empower a court of appeals to address—matters other than a district court's denial of the rights enumerated in that statute." *Id.* at 1349.

The victim in *J.H.* never argued to the Court of Appeals that the district court reached its decision in violation of her specific CVRA procedural rights. Of course, here the victims' families are vigorously pressing exactly such claims. Thus, *J.H.* is inapplicable.[10]

## B. In Granting the Motion to Dismiss, the District Court Applied Incorrect Legal Standards.

As the victims' families explained at length in their NPA petition, in granting the Government's motion to dismiss, the district court viewed its authority too narrowly. *See* NPA Pet. 24-31. This Court reviews this legal issue *de novo*, as a trial court necessarily "abuses its discretion when its ruling is based on an erroneous view of the law …." *United States v. Age*, 136 F.4th 193, 227 (5th Cir. 2025).

As much as the parties attempt to wriggle out of the relevant caselaw, this Court has repeatedly held that the trial court can reject a motion to dismiss where it "has an affirmative reason to believe that the dismissal motion was motivated by considerations contrary to the public interest." *United States v. Hamm,* 659 F.2d 624, 631 (5th Cir. en banc 1981). To be sure, the district court could begin its review of this issue by presuming that the prosecutors acted in good faith. *See United States v.*

---

[10] In later proceedings, the district court denied a Government motion to dismiss under Rule 48(a), relying on "public interest" concerns. *See United States v. Kirk*, No. 2:24-cr-527-SVW, ECF No. 134 at 11 (C.D. Cal. Aug. 8, 2025). In the current appeal, the Ninth Circuit has granted J.H. permission to file an amicus brief in the case and also appointed an amicus to defend the judgment below. *See United States v. Kirk*, No. 25-3607, Dkt. 16 (9th Cir. Aug. 25, 2025).

*Cowan*, 524 F.2d 504, 514 (5th Cir. 1975). But the ultimate question for the district court was whether that presumption was "overcome by 'an affirmative reason to believe that the dismissal motion was motivated by considerations contrary to the public interest.'" *United States v. Welborn*, 849 F.2d 980, 984 (5th Cir. 1988) (quoting *Hamm*, 659 F.2d at 631).

Here, such affirmative reasons abounded. The district court found—as a finding of fact—that the families have made a "compelling" argument that the NPA "is contrary to the public interest." Op.8. Among other things, the district court found that the families were "correct that this agreement fails to secure the necessary accountability to ensure the safety of the flying public." Op.6. That chilling conclusion—standing alone—should have led the district court to deny dismissal.

But the district court also found that the Government had advanced an "unserious" argument that it needed to resolve the case rather than go to trial. Op.6. While the Government claimed "litigation risk," the district court observed that the Government possesses "a confession from Boeing, signed by the CEO and Chief Legal Officer," admitting the conspiracy charge. *Id.* And while an individual Boeing test pilot was acquitted in connection with the conspiracy, the trial court judge—who presided over that trial—noted that the defendant's central defense was that he "was a scapegoat for the broader and systematic failure of Boeing's corporate culture which led to the crashes." Op.6n.18.

On top of these already strong arguments, the district court should have also weighed in the balance two of the victims' families' strongest arguments: the no-further-prosecution provision argument and the dismissal purportedly "without prejudice" argument. *See* NPA Pet. 29-31. The Government's unprecedented ploy of contracting with Boeing for no-further-prosecution—even before the district court had ruled—was clearly contrary to the manifest public interest. Perhaps the district court thought that it could avoid this vital issue, because it was not allowed to "substitute its judgment for the prosecutor's determination" of the public interest. Op.7 (citing *United States v. Salinas*, 904 F.2d 936, 351 (5th Cir. 1982) (dicta, as discussed in NPA Pet. 27 n.9)). But the district court would not have been substituting *its* judgment on this point, but rather Rule 48(a)'s. The rule presupposes that the district court will have the opportunity to deny the motion to dismiss before the Government makes a binding agreement with the defendant—the "settled sequence of federal courts' authority" that *Ryan* relied on. 88 F.4th at 625. The parties do not respond to the victims' families' obvious point: That if this Court approves the no-further-prosecution stratagem here, then it will become the roadmap for all subsequent Rule 48(a) dismissal motions, essentially repealing Rule 48(a)'s "leave of court" requirement.

Nor would the district court have been "substituting" its judgment for the Government in rejecting the motion to dismiss because of the ineffective statute of

limitations waiver. As explained above (*see* Part II.C., *supra*), the district court proceeded on the assumption that the families' objection was "valid." Op.7n.19. This means that the district court assumed that the NPA was unenforceable. But proceeding on that assumption, it would have been entirely *consistent* with the Government's judgment about how to properly resolve this case for the district court to have rejected the motion to dismiss, thereby allowing the dangerous "drafting error" to be corrected.

In their petitions, the families are not asking for this Court to hold that the district court was *required* to deny the motion to dismiss. Rather, the families ask for a holding that the district court was *allowed* to reach such a conclusion. In granting the motion to dismiss, the district court summarized its holding as "acknowledg[ing] that it does not have the *authority* to deny leave" on the facts of this case. Op.9 (emphasis added). In earlier proceedings, this Court reversed the district court's conclusion that, "despite its 'immense sympathy' for the crime victims here, it lack[ed] legitimate authority 'to remedy the incalculable harm' those victims have suffered." *Ryan*, 88 F.4th at 623. This Court should likewise instruct the district court that, under the relevant caselaw, it possessed the "authority" to reject the Government's motion to dismiss.

The parties also argue that the Judiciary has been excluded from any meaningful role in reviewing dismissal motions for public interest considerations

because a district court "could not possibly win a confrontation with the executive branch over its refusal to prosecute." Boeing Resp. 32 (quoting *In re United States*, 345 F.3d 450, 454 (7th Cir. 2003)).[11] But in the proceedings below, the victims' families briefed at length why the district court possessed the power to appoint a special prosecutor, if necessary, to ensure an appropriate resolution of the case. *See, e.g.,* ECF No. 340 at 9-16.

Interestingly, in the proceedings below, the Government cited this Court's decision in *United States v. Davis*, 285 F.2d 378 (5th Cir. 2002), calling it this Court's "most recent discussion on the appointment of special prosecutors." ECF No. 334 at 23. But *Davis* recognized that the Judiciary possesses the power to appoint special prosecutors in appropriate situations. *Davis* specifically distinguished between initiating a prosecution (a decision within the control of the Executive Branch) and terminating one already initiated (a decision subject to judicial review). *See Davis*, 285 F.3d at 383 n.3 (distinguishing *United States v. Cowan*, 524 F.2d 504 (5th Cir. 1975), as involving a situation where a district judge was attempting to "effectuate the denial [of a motion to dismiss] by appointing special prosecutors"). *Davis* did

---

[11] The Seventh Circuit reached its conclusion only because "the President has plenary power to pardon a federal offender" after conviction. But the pardon power has not been deployed in this case. And, in any event, the persuasiveness of the Seventh Circuit's analysis in this Circuit is dubious, because the Seventh Circuit criticized this Court's "public interest" caselaw. *See* 345 F.3d at 453 (deriding as "speculation" various Fifth Circuit holdings).

not hold that such appointments were forbidden, but rather that "exacting appellate scrutiny" must be applied to judicial appointment of special prosecutors. *Davis*, 285 F.3d at 383, discussed in ECF No. 340 at 11-13. Given that *Davis* specifically approved the practice, it is unsurprising that the Government (and Boeing) both fail to even cite the case in their briefs.

But, at this juncture, this Court need not decide how the victims' families' motion for appointment of a special prosecutor might ultimately play out if the district court denies dismissal below. Instead, the only issue now is whether this Court should approve the district court's grant of the motion to dismiss.

On this issue, the victims' families cannot help but think that the parties are asking this Court to approve an enormous bait-and-switch. In 2023, the families came to this Court, asking for it to immediately protect their CVRA right to confer. This Court denied their request while promising them their time would come—that when the criminal charges were "submitted for judicial resolution, the courts *vigilantly* will enforce the public interest." 88 F.4th at 626 (emphasis added). But, having dodged immediate intervention by this Court in 2023, the parties now ask this Court to tell the families that the district court could discharge its duty without anything approaching "vigilant" enforcement. Indeed, the parties ask this Court to affirm a district court decision that it lacked the authority to do anything after finding that the families had established "compelling" grounds against dismissal. Op.8.

This Court should make good on its promise to the families. This Court should "vigilantly" enforce the public interest. The Court should reverse the district court's decision granting the motion to dismiss and remand for a more fulsome consideration of the issues under a proper understanding of the legal standards.

## <u>CONCLUSION</u>

This Court should grant the victims' families' DPA petition, reverse the district court's dismissal order, and remand with instructions that the district court must set aside the DPA (including its sentencing guidelines calculations)—at long last giving the families their promised, unfettered opportunity to confer with prosecutors about holding Boeing criminally accountable for its deadly crime.

This Court should also grant the victims' families' NPA petition, reverse the district court's dismissal order, set aside the NPA's no-further-prosecution provision and ineffective statute of limitations waiver as clearly contrary to the manifest public interest, and remand with instructions that the court must vigilantly protect the public interest in any future resolution of the criminal case.

Dated: January 13, 2026               Respectfully submitted,

/s/ Darren P. Nicholson               /s/ Paul G. Cassell

Warren T. Burns                       Paul G. Cassell (Utah Bar No. 06078)
(Texas Bar No. 24053119)              (Counsel of Record)
Darren P. Nicholson                   Utah Appellate Project
Chase Hilton                          S.J. QUINNEY COLLEGE OF LAW
BURNS CHAREST LLP                     University of Utah
900 Jackson Street, Suite 500         383 S. Univ. St.
Dallas, Texas 75202                   Salt Lake City, UT 84112
Telephone: (469) 904-5002             Telephone: (801) 585-5202
wburns@burnscharest.com               cassellp@law.utah.edu
nicholson@burnscharest.com            (no institutional endorsement implied)
chilton@burnscharest.com

Erin R. Applebaum                     Robert A. Clifford
KREINDLER & KREINDLER                 Tracy A. Brammeier
LLP                                   CLIFFORD LAW OFFICES PC
485 Lexington Avenue, 28th Floor      120 North LaSalle Street, 36th Floor
New York, New York 10017              Chicago, Illinois 60602
Telephone: (212) 687-8181             Telephone: (312) 625-6192
eapplebaum@kreindler.com              rac@cliffordlaw.com
                                      tab@cliffordlaw.com

Charles S. Siegel                     Sanjiv N. Singh
Waters & Kraus LLP                    Sanjiv N. Singh, A Professional Law
siegel@waterskraus.com                Corp
                                      ssingh@sanjivnsingh.com

                                      Filippo Marchino
                                      The X-Law Group PC
                                      fm@xlawx.com

*Attorneys for Crime Victims' Representatives-Petitioners*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains fewer than 12,000 words, as provided in Court's order of January 2, 2026.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced Time New Roman typeface using 14-point Times New Roman type.

*/s/ Paul G. Cassell*
Paul G. Cassell

*Attorney for Crime Victims' Representatives-Petitioners*

## **CERTIFICATE OF SERVICE**

I certify that on January 13, 2026, the foregoing document and Appendix A was served on the parties to the proceedings below (i.e., the Government and The Boeing Company) through their counsel of record, and on the U.S. District Court for the Northern District of Texas (O'Connor, J.), via the Court's CM/ECF filing system or the email addresses below.

*Counsel for the United States*

William.Winn@usdoj.gov

*Counsel for The Boeing Company*

Paul.clement@clementmurphy.com

*U.S. District Court for the Northern District of Texas*

O'Connor_Orders@txnduscourts.gov

*/s/ Darren P. Nicholson*
Darren P. Nicholson

*Attorney    for    Crime    Victims'
Representatives-Petitioners*

**APPENDIX A – NON-PROSECUTION AGREEMENT**

**EXHIBIT 1**

U.S. Department of Justice
Criminal Division

U.S. Attorney's Office for the
Northern District of Texas

May 29, 2025

Mark Filip
John Lausch
Kirkland & Ellis LLP
333 West Wolf Point Plaza
Chicago, IL 60654

Benjamin L. Hatch
Brandon M. Santos
McGuireWoods LLP
888 16th Street NW, Suite 500
Washington, D.C. 20006

Re:    *United States v. The Boeing Company*, 4:21-cr-00005-O
       Non-Prosecution Agreement

Dear counsel:

1.  The United States Department of Justice, Criminal Division, Fraud Section and the United States Attorney's Office for the Northern District of Texas (collectively, the "Offices") and The Boeing Company (the "Company"), a corporation organized under the laws of Delaware and headquartered in Virginia, pursuant to the authority granted by its Board of Directors, enter into this Non-Prosecution Agreement ("Agreement"). On the understandings specified below, and with the Company's consent, as reflected in Attachment B to this Agreement, the Offices will move under Federal Rule of Criminal Procedure 48(a) to dismiss without prejudice the one-count Criminal Information pending against the Company in the United States District Court for the Northern District of Texas, 4:21-cr-00005-O, ECF No. 1 ("Information"), and not further criminally prosecute the Company for any crimes relating to any of the conduct described in the Statement of Facts attached hereto as Attachment A-2 (except for criminal tax violations, as to which the Offices do not make any agreement). The Company is subject to prosecution for this conduct following the determination by the Offices that the Company breached the Deferred Prosecution Agreement, ECF No. 4 ("DPA"), which the Company entered into with the Offices on January 7, 2021. Specifically, as described in the Offices' Factual Basis for Breach attached to this Agreement as Attachment A-1, the Offices determined that the Company breached the terms of the DPA by failing to sufficiently design, implement, and enforce a compliance and ethics program to prevent and detect violations of the U.S. fraud laws throughout its operations, ECF No. 199 ("May 2024 Breach Notice"). To the extent there is conduct disclosed by the Company that is not set forth in the attached Statement of Facts, such conduct will not be exempt from prosecution and is not within the scope of or relevant to this Agreement.

2. The Offices enter into this Non-Prosecution Agreement based on the individual facts and circumstances presented by this case and the Company, including:

(a) the Offices' determination that the Company breached the terms of the DPA by failing to design, implement, and enforce a compliance and ethics program, including failing to sufficiently integrate its ethics and compliance program with its safety and quality programs, as necessary to prevent and detect violations of the U.S. fraud laws throughout its operations, as described in the Offices' Factual Basis for Breach attached to this Agreement as Attachment A-1;

(b) the nature and seriousness of the offense conduct, as described in the Statement of Facts attached to this Agreement as Attachment A-2, which involved the Company, through its employees, deceiving the Federal Aviation Administration's Aircraft Evaluation Group ("FAA AEG") about the Boeing 737 MAX's Maneuvering Characteristics Augmentation System ("MCAS") that impacted its flight control system. Through this deception, the Company interfered with the FAA AEG's lawful function to evaluate MCAS and determine whether to include information about MCAS in the 737 MAX FSB Report, and fraudulently obtained from the FAA AEG a differences-training determination for the 737 MAX that was based on incomplete and inaccurate information about MCAS;

(c) although the Company had inadequate anti-fraud controls and an inadequate anti-fraud compliance program during the period of conduct charged in the Information, the Company took considerable steps during the DPA period and continuing through the present to enhance its compliance program through structural and leadership changes, including but not limited to steps to enhance the independence, capability, and effectiveness of its compliance program; steps to enhance its annual Compliance Risk Management process; and steps to integrate compliance efforts across its business, and has committed to continuing to implement and test further enhancements to ensure that its compliance program satisfies the minimum elements set forth in Attachment C to this Agreement;

(d) the Offices have continued to review the Company's ongoing compliance program enhancements since the Offices' determination that the Company breached the DPA, and to engage with the FAA about the same, including enhancements made under the increased and sustained oversight of the FAA since January 2024 that pertain to the Company's anti-fraud compliance program; based on the state of the Company's compliance program and the meaningful improvements made, and the FAA's commitment to continued enhanced oversight of the Company, where necessary and appropriate, the Company agrees to modify its existing compliance program to ensure that it maintains a rigorous compliance program that incorporates relevant internal controls, as well as policies and procedures, designed to effectively detect and deter violations of U.S. federal fraud laws, including the integration of its ethics and compliance program with its safety and quality programs as necessary to reasonably prevent violations of U.S. fraud laws or policies. The compliance program will include, but not be limited to, the minimum elements set forth in

2

Attachment C. In addition, the Company agrees that it will engage an Independent Compliance Consultant to assess the Company's progress regarding remediation and implementation of the compliance measures described in Attachment C ("Independent Compliance Consultant"). The Company and the Independent Compliance Consultant will report to the Offices during the Term (as defined in Paragraph 5 below), in accordance with Attachment D to this Agreement;

(e) the Company has agreed to continue to cooperate with the Offices as described in Paragraphs 6 and 7, below;

(f) the Company has agreed to pay victim compensation to the heirs, relatives, and/or legal beneficiaries of the crash victims of Lion Air Flight 610 and Ethiopian Airlines Flight 302 (collectively, "Crash Victim Families") in the amount of $444.5 million, in accordance with Paragraph 11, below; and

(g) the Company has agreed to ensure that its Board of Directors holds a meeting with the Crash Victim Families, should they wish to attend, and their legal representatives, in accordance with Paragraph 14, below.

3. Accordingly, after considering sub-parts (a) through (g) in Paragraph 2 above, and pursuant to Paragraph 26 of the DPA, the Offices have determined that the appropriate resolution of this case is for the Offices to dismiss the Information, with the consent of the Company in accordance with Attachment B, and enter into a non-prosecution agreement with the Company with a two-year term; payment by the Company of an overall criminal monetary penalty amount of $487,200,000, which reflects a fine at the top of the applicable Sentencing Guidelines fine range and the maximum fine allowable under Title 18, United States Code, Sections 371 and 3571(c), including credit for the $243,600,000 previously paid by the Company pursuant to the DPA, resulting in a remaining criminal penalty owed by the Company of $243,600,000; the retention by the Company of an Independent Compliance Consultant in accordance with Attachment D to this Agreement; and a sustained monetary investment by the Company in its compliance and safety programs of at least $455,000,000.

4. The Company admits, accepts, and acknowledges that it is responsible under United States law for the acts of its officers, directors, employees, and agents as set forth in the Statement of Facts attached hereto as Attachment A-2 and incorporated by reference into this Agreement, and that the facts described in the Statement of Facts are true and accurate. As set forth in Attachment A-2, the Company also admits, accepts, and acknowledges that the facts described in the Statement of Facts constitute a violation of law, specifically Title 18, United States Code, Section 371. The Company expressly agrees that it shall not, through present or future attorneys, officers, directors, employees, agents or any other person authorized to speak for the Company make any public statement, in litigation or otherwise, contradicting the acceptance of responsibility by the Company set forth above or the facts described in the Statement of Facts attached hereto as Attachment A-2. The Company shall be permitted to raise defenses and to assert affirmative claims in other proceedings relating to matters set forth in the Statement of Facts, provided that such defenses and claims do

not contradict, in whole or in part, a statement contained in the Statement of Facts. The Company agrees that if it, or any of its direct or indirect subsidiaries or affiliates, issues a press release or holds any press conference in connection with this Agreement, the Company shall first consult the Offices to determine (a) whether the text of the release or proposed statements at the press conference are true and accurate with respect to matters between the Offices and the Company; and (b) whether the Offices have any objection to the release.

5. The Company's obligations under this Agreement shall have a term of two years from the later of the date on which the Agreement is executed or the date on which the Independent Compliance Consultant is retained by the Company, in accordance with Attachment D to this Agreement, as described below (the "Term"). The Company agrees, however, that, in the event the Department determines, in its sole discretion, that the Company has knowingly violated any provision of this Agreement or has failed to completely perform or fulfill each of the Company's obligations under this Agreement an extension or extensions of the Term may be imposed by the Offices, in their sole discretion, for up to a total additional time period of one year, without prejudice to the Offices' right to proceed as provided in the breach provisions of this Agreement below. Any extension of the Agreement extends all terms of this Agreement, including the terms of the reporting requirement in Attachment D, for an equivalent period. Conversely, in the event the Offices find, in their sole discretion, that there exists a change in circumstances sufficient to eliminate the need for the reporting requirement in Attachment D and that the other provisions of this Agreement have been satisfied, the Agreement may be terminated early.

6. The Company shall cooperate fully with the Offices in any and all matters relating to the conduct described in this Agreement and the Statement of Facts attached hereto as Attachment A-2 and other conduct under investigation by the Offices or any other component of the Department of Justice at any time during the Term of this Agreement, subject to applicable law and regulations, until the later of the date upon which all investigations and prosecutions arising out of such conduct are concluded, or the Term. At the request of the Offices, the Company shall also cooperate fully with other domestic or foreign law enforcement and regulatory authorities and agencies in any investigation of the Company, or its affiliates, or any of its present or former officers, directors, employees, agents, and consultants, or any other party, in any and all matters relating to the conduct described in this Agreement and the Statement of Facts attached hereto as Attachment A-2 and other conduct under investigation by the Offices or any other component of the Department of Justice at any time during the Term. The Company agrees that its cooperation shall include, but not be limited to, the following:

(a) The Company represents that it has timely and truthfully disclosed all factual information with respect to its activities, those of its affiliates, and those of its present and former directors, officers, employees, agents, and consultants relating to the conduct described in this Agreement and the attached Statement of Facts and other conduct under investigation by the Offices at any time about which the Company has any knowledge and that it shall promptly and truthfully disclose all factual information with respect to its activities, those of its affiliates, and those of

its present and former directors, officers, employees, agents, and consultants about which the Company shall gain any knowledge or about which the Offices may inquire. This obligation of truthful disclosure includes, but is not limited to, the obligation of the Company to provide to the Offices, upon request, any document, record or other tangible evidence about which the Offices may inquire of the Company including evidence that is responsive to any requests made prior to the execution of this Agreement.

(b) Upon request of the Offices, the Company shall designate knowledgeable employees, agents or attorneys to provide to the Offices the information and materials described above on behalf of the Company. It is further understood that the Company must at all times provide complete, truthful, and accurate information.

(c) The Company shall use its best efforts to make available for interviews or testimony, as requested by the Offices, present or former officers, directors, employees, agents and consultants of the Company. This obligation includes, but is not limited to, sworn testimony before a federal grand jury or in federal trials, as well as interviews with domestic or foreign law enforcement and regulatory authorities. Cooperation shall include identification of witnesses who, to the knowledge of the Company, may have material information regarding the matters under investigation.

(d) With respect to any information, testimony, documents, records or other tangible evidence provided to the Offices pursuant to this Agreement, the Company consents to any and all disclosures, subject to applicable law and regulations, to other governmental authorities, including United States authorities and those of a foreign government of such materials as the Offices, in their sole discretion, shall deem appropriate.

7. In addition, during the Term of the Agreement, should the Company learn of any evidence or allegation of a violation of U.S. fraud laws committed by the Company's employees or agents upon any domestic or foreign government agency (including the FAA), regulator, or any of the Company's airline customers, the Company shall promptly report such evidence or allegation to the Offices. No later than thirty (30) calendar days after the Term expires, the Company, by the Chief Executive Officer of the Company and the Chief Financial Officer of the Company, will certify to the Offices, in the form of executing the document attached as Attachment E to this Agreement, that the Company has met its disclosure obligations pursuant to this Agreement. Such certification will be deemed a material statement and representation by the Company to the executive branch of the United States for purposes of 18 U.S.C. § 1001.

8. The Company represents that it has endeavored to implement and will continue to implement a compliance and ethics program reasonably designed, implemented, and enforced to prevent and detect violations of U.S. fraud laws throughout its operations, including those of its affiliates, agents, and joint ventures, and those of its contractors and subcontractors whose responsibilities relate to the Company's interactions with any

domestic or foreign government agency (including the FAA), regulator, or any of its airline customers, including, but not limited to, the minimum elements set forth in Attachment C, which is incorporated by reference into this Agreement. No later than thirty (30) calendar days after the Term expires, the Company, by its Chief Executive Officer and Chief Compliance Officer, will certify to the Offices, in the form of executing the document attached as Attachment F to this Agreement, that the Company has met its compliance obligations pursuant to this Agreement. Such certification will be deemed a material statement and representation by the Company to the executive branch of the United States for purposes of 18 U.S.C. § 1001.

9. In order to address any deficiencies in its internal controls, policies, and procedures, the Company represents that it has undertaken, and will continue to undertake in the future, in a manner consistent with all of its obligations under this Agreement, a review of its existing internal controls, policies, and procedures regarding compliance with U.S. federal fraud laws, including the adequacy of the controls, compliance policies, and procedures to address safety related fraud risks. Where necessary and appropriate, the Company agrees to modify its existing compliance program to ensure that it maintains a rigorous compliance program that incorporates relevant internal controls, as well as policies and procedures, designed to effectively detect and deter violations of U.S. fraud laws or policies, including the integration of its ethics and compliance program with its safety and quality programs as necessary to reasonably prevent violations of U.S. fraud laws or policies. The compliance program will include, but not be limited to, the minimum elements set forth in Attachment C.

10. In addition, the Company agrees that it will engage an Independent Compliance Consultant to assess the Company's progress regarding remediation and implementation of the compliance measures described in Attachment C. The Company and the Independent Compliance Consultant will report to the Offices during the Term, in accordance with Attachment D to this Agreement. The Independent Compliance Consultant's duties and authority, and the obligations of the Company with respect to the Independent Compliance Consultant and the Offices, are set forth in Attachment D.

11. The Company agrees to pay additional victim compensation in the amount of $444.5 million to the heirs, relatives, and/or legal beneficiaries of the crash victims of Lion Air Flight 610 and Ethiopian Airlines Flight 302 (the "Crash-Victim Beneficiaries Compensation Amount"). No later than five (5) business days after the Agreement is executed, the Company shall deposit the full Crash-Victim Beneficiaries Compensation Amount into an escrow account ("Crash-Victim Beneficiaries Escrow Account") that it shall establish for that purpose. No monies will be paid out of the Crash-Victim Beneficiaries Escrow Account until after the entry of a final Order of the Court dismissing the Information, and only then with the prior approval of the Offices.

    (a) The Estate of each Crash-Victim will be entitled to an equal pro rata share of the $444.5 million fund. The parties agree that the appointment of a Crash-Victim Beneficiaries Compensation Claims Administrator (the "Administrator") is

appropriate and necessary to determine the proper administration and disbursement of the Crash-Victim Beneficiaries Compensation Amount.

(b) The Administrator shall make recommendations to the Offices regarding the individuals who should receive payments from the Crash-Victim Beneficiaries Compensation Amount. Only the Offices shall be empowered to make final decisions regarding the individuals who should receive the victim payments from the Crash-Victim Beneficiaries Compensation Amount.

(c) The parties agree that the Administrator should be the Crash-Victim Beneficiaries Compensation Claims Administrator selected and engaged under the DPA. The Company agrees to pay for all costs, fees, and expenses incurred by the Administrator. The Company shall execute an engagement letter with the Administrator that must be approved, in advance of execution, by the Offices. The Offices and the Company will use their best efforts to complete the engagement within thirty (30) calendar days of the execution of this Agreement.

(d) The Company agrees that it will not employ or be affiliated with the Administrator for a period of not less than two years from the date on which the Administrator's term expires. Nor will the Company discuss with the Administrator the possibility of further employment or affiliation during the Administrator's term. Upon agreement by the parties, this prohibition will not apply to other claims administration responsibilities that the Administrator may undertake in connection with resolutions with foreign or other domestic authorities.

(e) The Company agrees that it will not use the fact that any beneficiary of the crash victims of Lion Air Flight 610 and Ethiopian Airlines Flight 302 seeks or receives any compensation from the Crash-Victim Beneficiaries Compensation Amount to seek to preclude such beneficiary from pursuing any other lawful claim that such beneficiary might have against the Company.

12. As provided in Paragraph 3, the Company agrees to pay an additional criminal monetary penalty in the amount of $243,600,000. The Company shall pay the additional criminal monetary penalty of $243,600,000 into an escrow account (separate from the Crash-Victim Beneficiaries Escrow Account) within five (5) business days of the execution of this Agreement, which $243,600,000 shall be paid  to the United States Treasury no later than five (5) business days after the entry of a final Order of the Court dismissing the Information. The Company acknowledges that no tax deduction may be sought in connection with the payment of any part of this $243,600,000 penalty. The Company shall not seek or accept directly or indirectly reimbursement or indemnification from any source with regard to the penalty amount that the Company pays pursuant to this Agreement or any other agreement entered into with an enforcement authority or regulator concerning the facts set forth in the Statement of Facts attached hereto as Attachment A-2.

13. The Company shall invest in its compliance, quality, and safety programs a total of at least $455,000,000, measured from July 24, 2024 (the date the parties proposed a plea agreement

with the same investment requirement) through the end of the Term. The Company shall at the start of the Term, and thereafter no less than semi-annually, provide proof of the accumulated investment amounts to the Offices. Expenditures the Company makes to implement internal support to, or the recommendations of, the Independent Compliance Consultant are qualifying investments, but not the fees and costs the Company pays for the services of the Independent Compliance Consultant and the Independent Compliance Consultant's team.

14. The Company will ensure that its Board of Directors holds a meeting with the Crash Victim Families, should they wish to attend, and their legal representatives within six (6) months after the entry of a final Order of the Court dismissing the Information. The purpose of the meeting is for the Board of Directors and the Crash Victim Families to discuss, among other things, the Company's conduct and the impact on the Crash Victim Families as well as the Company's compliance, safety, and quality programs. The Company shall meet and confer with the representatives of the Crash Victim Families in a good faith effort to select a mutually agreeable date and location for the meeting. To facilitate the in-person attendance of the greatest number of attendees practicable, the meeting will be scheduled to occur near in time with a regularly scheduled meeting of the Board of Directors. The meeting will be held in person with an option for Crash Victim Families and their legal representatives located outside the United States to join virtually if they choose not to attend in person, though at least 80 percent of Boeing Board members must attend in person. The Company shall arrange and pay for interpreters to provide translation services during the meeting if needed. The Boeing Board members shall be present for the entirety of the meeting. Within three (3) business days after the meeting, the Company shall confirm to the Offices that the meeting took place.

15. The Offices agree, except as provided herein, that, with the Company's consent and agreement that the Company is not a "prevailing party" for purposes of the Hyde Amendment according to Attachment B, they will move under Federal Rule of Criminal Procedure 48(a) to dismiss the Information without prejudice and to not further criminally prosecute the Company for any crimes relating to any of the conduct described in the attached Statement of Facts. The Offices agree, except as provided herein, that they will not bring any criminal or civil case against the Company or any of its present or former subsidiaries relating to any of the conduct described in the Statement of Facts, attached hereto as Attachment A-2.  The Offices, however, may use any information related to the conduct described in the attached Statement of Facts against the Company: (a) in a prosecution for perjury or obstruction of justice; (b) in a prosecution for making a false statement; (c) in a prosecution or other proceeding relating to any crime of violence; or (d) in a prosecution or other proceeding relating to a violation of any provision of Title 26 of the United States Code. This Agreement does not provide any protection against prosecution for any future conduct by the Company. In addition, this Agreement does not provide any protection against prosecution of any individuals, regardless of their affiliation with the Company.

16. If, during the Term of this Agreement, the Company (a) commits any felony under U.S. federal law; (b) provides in connection with this Agreement deliberately false, incomplete,

or misleading information, including in connection with its disclosure of information about individual culpability; (c) fails to cooperate as set forth in this Agreement; (d) fails to implement a compliance program as set forth in this Agreement and Attachment C; or (e) otherwise fails specifically to perform or to fulfill completely each of the Company's obligations under the Agreement, regardless of whether the Offices become aware of such a breach after the Term of the Agreement is complete, the Company shall thereafter be subject to prosecution for any federal criminal violation of which the Offices have knowledge, including, but not limited to, the conduct described in the attached Statement of Facts, which may be pursued by the Offices in the U.S. District Court for the Northern District of Texas or any other appropriate venue. Determination of whether the Company has breached the Agreement and whether to pursue prosecution of the Company shall be in the Offices' sole discretion. Any such prosecution may be premised on information provided by the Company or its personnel. Any such prosecution relating to the conduct described in the attached Statement of Facts or relating to conduct known to the Offices prior to the date on which this Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against the Company, notwithstanding the expiration of the statute of limitations, between the signing of this Agreement and the expiration of the Term plus one year. Thus, by signing this Agreement, the Company agrees that the statute of limitations with respect to any such prosecution that is not time-barred on the date of the signing of this Agreement shall be tolled for the Term plus one year. In addition, the Company agrees that the statute of limitations as to any violation of federal law that occurs during the Term will be tolled from the date upon which the violation occurs until the earlier of the date upon which the Offices are made aware of the violation or the duration of the Term plus five years, and that this period shall be excluded from any calculation of time for purposes of the application of the statute of limitations.

17. In the event the Offices determine that the Company has breached this Agreement, the Offices agree to provide the Company with written notice prior to instituting any prosecution resulting from such breach. Within thirty days of receipt of such notice, the Company shall have the opportunity to respond to the Offices in writing to explain the nature and circumstances of the breach, as well as the actions the Company has taken to address and remediate the situation, which the Offices shall consider in determining whether to pursue prosecution of the Company.

18. In the event that the Offices determine that the Company has breached this Agreement: (a) all statements made by or on behalf of the Company to the Offices or to the Court, including the attached Statement of Facts, and any testimony given by the Company before a grand jury, a court, or any tribunal, or at any legislative hearings, whether prior or subsequent to this Agreement, and any leads derived from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings brought by the Offices against the Company; and (b) the Company shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule that any such statements or testimony made by or on behalf of the Company prior or subsequent to this Agreement, or any leads derived therefrom, should be suppressed or are otherwise inadmissible. The decision

whether conduct or statements of any current director, officer or employee, or any person acting on behalf of, or at the direction of, the Company, will be imputed to the Company for the purpose of determining whether the Company has violated any provision of this Agreement shall be in the sole discretion of the Offices.

19. Except as may otherwise be agreed by the parties in connection with a particular transaction, the Company agrees that in the event that, during the Term, the Company undertakes any change in corporate form, including if it sells, merges, or transfers business operations that are material to the Company's consolidated operations, or to the operations of any subsidiaries or affiliates involved in the conduct described in the attached Statement of Facts, as they exist as of the date of this Agreement, whether such sale is structured as a sale, asset sale, merger, transfer, or other change in corporate form, it shall include in any contract for sale, merger, transfer, or other change in corporate form a provision binding the purchaser, or any successor in interest thereto, to the obligations described in this Agreement. Any purchaser or successor in interest must also agree in writing that the Offices' ability to breach under this Agreement is applicable in full force to that entity. The Company shall provide notice to the Offices at least thirty (30) calendar days prior to undertaking any such sale, merger, transfer, or other change in corporate form. The Offices shall notify the Company prior to such transaction (or series of transactions) if they determine that the transaction(s) will have the effect of circumventing or frustrating the enforcement purposes of this Agreement. If at any time during the Term the Company engages in a transaction(s) that has the effect of circumventing or frustrating the enforcement purposes of this Agreement, the Offices may deem it a breach of this Agreement pursuant to Paragraphs 16-18. Nothing herein shall restrict the Company from indemnifying (or otherwise holding harmless) the purchaser or successor in interest for penalties or other costs arising from any conduct that may have occurred prior to the date of the transaction, so long as such indemnification does not have the effect of circumventing or frustrating the enforcement purposes of this Agreement, as determined by the Offices.

20. This Agreement is binding on the Company and the Offices but specifically does not bind any other component of the Department of Justice, other federal agencies, or any state, local or foreign law enforcement or regulatory agencies, or any other authorities, although the Offices will bring the cooperation of the Company and its compliance with its other obligations under this Agreement to the attention of such agencies and authorities if requested to do so by the Company. This Agreement does not provide any protection against prosecution for any future conduct by the Company or any of its present or former parents or subsidiaries.

21. It is further understood that the Company and the Offices may disclose this Agreement to the public.

22. The parties acknowledge and agree that in the event a final Order of the Court is entered that dismisses the Information with prejudice, this Agreement and all of its provisions will continue in force to bind the Company and the Offices through the end of the Term, including the Offices' ability to extend the Term, as defined in Paragraph 5. The parties

further acknowledge and agree that in the event a final Order of the Court is entered that denies the Offices' Motion to Dismiss, because the Offices remain bound by the terms of this Agreement not to further criminally prosecute the Company for any crimes related to any of the conduct in the Statement of Facts, this Agreement and all of its provisions will continue in force to bind the Company and the Offices through the end of the Term, including the Offices' ability to extend the Term, as defined in Paragraph 5.

23. This Agreement sets forth all the terms of the agreement between the Company and the Offices. No amendments, modifications or additions to this Agreement shall be valid unless they are in writing and signed by the Offices, the attorneys for the Company, and a duly authorized representative of the Company.

Sincerely,

Lorinda I. Laryea
Acting Chief, Fraud Section
United States Department of Justice
Criminal Division

Date: May 29, 2025    By:

Sean P. Tonolli
Senior Deputy Chief, Fraud Section
United States Department of Justice
Criminal Division

Date: May 29, 2025

Chad E. Meacham
Acting United States Attorney
Northern District of Texas

AGREED AND CONSENTED TO:
THE BOEING COMPANY

Date: 5/29/2025                    BY:

Kelly Ortberg
President and Chief Executive Officer
The Boeing Company

Date: 5/29/2025                    BY:

Brett C. Gerry
Chief Legal Officer and Executive Vice
President, Global Compliance
The Boeing Company

Date: 5/29/2025                    BY:

Mark Filip
John Lausch
Kirkland & Ellis LLP

Date: 5/29/2025                    BY:

Benjamin L. Hatch
Brandon M. Santos
McGuireWoods LLP

**ATTACHMENT A-1**

**FACTUAL BASIS FOR BREACH**

1.      The United States' Factual Basis for the Breach of the January 7, 2021 Deferred Prosecution Agreement (the "DPA"), which DPA was between the United States Department of Justice, Criminal Division, Fraud Section (the "Fraud Section") and the United States Attorney's Office for the Northern District of Texas (the "USAO-NDTX") (collectively, the "Offices"), and the Defendant, The Boeing Company ("Defendant," "Boeing," or the "Company") is incorporated by reference as part of the non-prosecution agreement, dated May 29, 2025, between the Offices and Boeing. The parties stipulate that the representations and views herein belong to the Offices.

**I.      Background and Relevant DPA Obligations**

2.      On January 7, 2021, the United States filed a one-count criminal Information (the "Information") in the United States District Court for the Northern District of Texas, charging Boeing with one count of conspiracy to defraud the United States, in violation of Title 18, United States Code, Section 371, that is, knowingly and willfully, and with the intent to defraud, conspired and agreed together with others to defraud the United States by impairing, obstructing, defeating, and interfering with, by dishonest means, the lawful function of a United States government agency, to wit, the Federal Aviation Administration Aircraft Evaluation Group ("FAA AEG") within the United States Department of Transportation, in connection with the FAA AEG's evaluation of the Boeing 737 MAX airplane's Maneuvering Characteristics Augmentation System, including for purposes of the 737 MAX Flight Standardization Board Report and the 737 MAX differences-training determination. *See United States v. The Boeing Company*, 21-cr-00005-O (ECF No. 1).

3.      The same day, the United States also filed the DPA between the United States and Boeing. *See* ECF No. 4. In exchange for Boeing agreeing, among other things, "to implement a compliance and ethics program designed, implemented, and enforced to prevent and detect violations of the U.S. fraud laws throughout its operations," the United States agreed to defer prosecution of Boeing for the conduct set forth in the Statement of Facts attached to the DPA, including the conspiracy charged in the Information, for the three-year term of the DPA. *Id*. ¶¶ 21, 22, 24. The United States further agreed that, if Boeing complied fully with the terms of the DPA, the United States would move to dismiss the Information described in Paragraph 1 of the DPA six months after the term of the DPA expired. *Id*. ¶ 25. The DPA provided, however, that if the United States determined during the six-month period following the end of the term of the DPA that Boeing had breached the DPA during the DPA term, the United States could pursue remedies for the breach, including by prosecuting the Company for any federal criminal violation of which the Offices have knowledge, including, but not limited to, the charges in the Information. *Id*. ¶¶ 25–26. As part of the DPA, the Company also agreed, among other things, to pay a criminal monetary penalty of $243,600,000, an Airline Compensation Amount of $1,770,000,000, and a Crash-Victim Beneficiaries Compensation Amount of $500,000,000 to the heirs, relatives, and/or legal beneficiaries of the crash victims of Lion Air Flight 610 and Ethiopian Airlines Flight 302. *Id*. ¶¶ 10, 12, 13.

4.      Relevant to the United States' breach determination, Paragraphs 21 and 22 of the DPA state:

> 21.      The Company represents that it has implemented and will continue to implement a compliance and ethics program designed, implemented, and enforced to prevent and detect violations of the U.S. fraud laws throughout its operations, including those of its subsidiaries, affiliates, agents, and joint ventures, and those of its contractors and subcontractors whose responsibilities relate to the

Company's interactions with any domestic or foreign government agency (including the FAA), regulator, or any of its airline customers, including, but not limited to, the minimum elements set forth in Attachment C.

22.     In order to address any deficiencies in its internal controls, policies, and procedures, the Company represents that it has undertaken, and will continue to undertake in the future, in a manner consistent with all of its obligations under this Agreement, a review of its existing internal controls, policies, and procedures regarding compliance with U.S. fraud laws, focusing on the Company's interactions with domestic or foreign government agencies (including the FAA), regulators, and any of its airline customers. Where necessary and appropriate, the Company agrees to adopt a new compliance program, or to modify its existing one, including internal controls, compliance policies, and procedures in order to ensure that it maintains an effective compliance program, including a system of internal controls, designed to effectively detect and deter violations of U.S. fraud laws. The compliance program, including the internal controls system, will include, but not be limited to, the minimum elements set forth in Attachment C [which outlined the requirements for the Company's compliance program].

## II.    The United States' Breach Determination

5.     At the time of the conduct described in Attachment A-2, Boeing did not have a centralized compliance function. Boeing appointed its first Global Chief Compliance Officer ("CCO") and established its Global Compliance function ("Global Compliance" or "Compliance") in May of 2020. During the term of the DPA, Boeing took considerable steps to enhance the independence, capability, and effectiveness of its compliance program. Among other things, Boeing enhanced its annual Compliance Risk Management process, including in ways that strengthened compliance controls with respect to potential safety and quality risks, and took steps to integrate compliance efforts across its business. As direct remediation of the charged misconduct, Boeing implemented policies and procedures to manage and coordinate the formal communication of information between Boeing and its regulators and customers and mandatory training regarding transparency in interactions with regulators and customers. Despite these

enhancements, in the Offices' view, Boeing failed to sufficiently extend its anti-fraud ethics and compliance program over its quality and manufacturing process before the end of the DPA term. As a result, the Department determined that Boeing's anti-fraud compliance program still has significant gaps.

6.    The United States, in an exercise of the discretion conferred upon it by the agreed upon terms of the DPA (namely, Paragraph 26 of the DPA), has determined that Boeing violated Paragraphs 21 and 22 and Attachment C of the DPA and declared a breach of the DPA on May 14, 2024. Relevant considerations in arriving at that determination and making that declaration include the following:

- Boeing failed to fully satisfy the requirement to "create and foster a culture of ethics and compliance with the law in its day-to-day operations," Attachment C ¶ 1, by failing to mitigate known manufacturing and quality risks;

- Boeing failed to fully satisfy the requirement to implement "compliance policies and procedures designed to reduce the prospect of violations of U.S. fraud laws and the Company's compliance code," Attachment C ¶ 3, by failing to design a compliance and ethics program that included sufficient anti-fraud oversight of Boeing's quality and safety processes;

- Boeing failed to fully satisfy the requirement to implement "compliance policies and procedures designed to reduce the prospect of violations of U.S. fraud laws and the Company's compliance code," Attachment C ¶ 3, by failing to implement sufficient controls concerning the risk that Boeing's airworthiness certifications to the FAA could be incomplete, inaccurate, false and/or fraudulent;

- Boeing failed to fully satisfy the requirement to implement "compliance policies and procedures designed to reduce the prospect of violations of U.S. fraud laws and the Company's compliance code," Attachment C ¶ 3, by failing to implement sufficient controls concerning the risk of incomplete, inaccurate, false and/or fraudulent statements in Boeing's manufacturing records; and

- Boeing failed to fully satisfy the requirement to appropriately develop and adjust "compliance policies and procedures on the basis of a periodic risk assessment addressing the individual circumstances of the Company," Attachment C ¶ 4, and to review and update such policies "as appropriate to ensure their continued effectiveness," Attachment C ¶ 5, in light of known manufacturing and quality risks,

and the attendant risks of incomplete, inaccurate, false, and/or fraudulent statements to the FAA.

III.    **Failure to Extend Anti-Fraud Compliance Program Over Quality and Manufacturing Processes**

7.      Before delivering a 737 MAX aircraft to a U.S. customer, Boeing must apply to the FAA for a U.S. Airworthiness Certificate for each aircraft. In so doing, Boeing certifies to the FAA "that the aircraft has been inspected and is airworthy," meaning, "the aircraft conforms to its type design and is in a condition for safe operation." FAA Form 8130-6; 14 C.F.R. § 3.5. A Boeing employee makes this certification in reliance on the completeness, accuracy, and truthfulness of the Company's build records and the effectiveness of related manufacturing and quality processes. Although Boeing knew about manufacturing, quality, safety, and anti-fraud risks capable of undermining the completeness, accuracy, and truthfulness of those records, Boeing did not implement additional or sufficient controls concerning the risk that its certifications of airworthiness to the FAA could be incomplete, inaccurate, false and/or fraudulent and that aircraft delivered to its customers "conforms to its type design and is in a condition for safe operation." The Department has determined that these failures breached the DPA, as set forth above and below.

A.      **Out-of-Sequence Work**

8.      Boeing's instructions for aircraft assembly require assembly to occur in a particular sequence. When a sequenced step is performed inadequately or not completed, it may be discovered and corrected at a later stage. Correction of the inadequate or incomplete work must then be done "out-of-sequence." Out-of-sequence work is more difficult to perform, increases the risk that defects in manufacturing will occur, and may require installed parts to be removed and later re-installed.

9.      Between 2021 and 2023, Boeing conducted several Safety Risk Management assessments that identified out-of-sequence work as a risk factor that could cause the delivery of

an "unairworthy" or non-conforming aircraft to Boeing's customers. Despite the acknowledgement of this risk, the Safety Risk Management assessments did not sufficiently consider measures to reduce out-of-sequence work. Boeing senior executives prioritized the movement of aircraft through Boeing's factories over reducing out-of-sequence work to ensure production quality. Boeing did not implement sufficient policies or procedures to mitigate the risk posed by out-of-sequence work.

10.    Moreover, although fraud is an inherent risk in production and quality compliance activities, Boeing's Safety Risk Management assessments also failed to identify out-of-sequence risk as a fraud risk or consider enhanced production procedures, or preventive or detective controls, to mitigate the risk. Boeing's Global Compliance function, which is responsible for Boeing's anti-fraud ethics and compliance program, was not involved in the Safety Risk Assessments. Compliance therefore did not evaluate fraud risks associated with out-of-sequence work, including the risk of incomplete, inaccurate, false, and/or fraudulent statements to the FAA.

11.    The United States has determined that Boeing's failure to identify and adjust its ethics and compliance program to address the anti-fraud risks attendant to out-of-sequence work violated its obligation to meet the compliance program standards required by DPA Attachment C, including Paragraphs 1, 4, and 5.

### B.    Completeness of Records

12.    Boeing's airworthiness certifications to the FAA rely on the completeness and accuracy of Boeing's build records and the effectiveness of related manufacturing and quality processes. If installed parts are later removed during manufacturing, Boeing policy requires Boeing employees to document the removal in certain written records. The creation of a removal record initiates a process to ensure proper reinstallation of the part and record the individuals involved in removal, reinstallation, and reinspection. If a removal record was not completely

resolved in Boeing's computer systems, including reinstallation and reinspection, a Boeing employee would not certify an aircraft as airworthy to the FAA.

13.     A failure to create a removal record prevents Boeing from verifying that parts are correctly or completely re-installed and that its certification stating that the plane is "airworthy" is accurate. This recordkeeping failure could also undermine Boeing's processes for effectively responding to, investigating, and remediating potential allegations of violations of the U.S. fraud laws or the Company's compliance code, policies, and procedures, in part because Boeing could lack records of who was involved in removing, reinstalling, and reinspecting disturbed installations and what they did. *See* DPA Attachment C ¶ 10.

14.     Boeing received numerous reports of incidents of non-compliance with its policy governing removals throughout the DPA term. In addition, since 2019, the FAA has issued numerous formal or informal actions to Boeing related to Boeing's policy governing removals. Compliance was not sufficiently involved in root cause analysis, remediation, or risk mitigation related to this process, notwithstanding the (1) impact non-compliance with Boeing's policy governing removals could have on Boeing's representations regarding its aircraft, and (2) recordkeeping consequences. Boeing failed to meet the compliance program standards required by DPA Attachment C, including Paragraphs 3, 4, and 5.

### C.     Stamping Issues in Build Records

15.     Throughout the build process, Boeing mechanics and inspectors affirm (or "stamp") that they have completed work in conformance with requirements. Stamped manufacturing and quality records are important for Boeing's certification to the FAA that an aircraft is airworthy. All build plans and required inspections must be stamped by Boeing employees as complete to requirements before a Boeing employee certifies an aircraft as airworthy to the FAA. Boeing relies on those build and quality stamping records to certify to the FAA that an aircraft is airworthy. False

statements in Boeing's build records pose a fraud risk because they could undermine the completeness, accuracy, and truthfulness of Boeing's representations and certifications to the FAA regarding its aircraft, among other issues. Boeing received hundreds of reports of stamping non-compliance through its internal reporting channels. Boeing Compliance identified this anti-fraud risk during the DPA term and issued training and communications throughout the Company in response to the risk. Despite awareness of stamping non-compliance reports, Boeing did not conduct sufficient testing to evaluate whether its stamping integrity communications and training efforts were effective in practice and stamping issues persisted.

16.     In or around April 2024, Boeing disclosed to the Fraud Section false stamping during the DPA term at the Boeing 787 manufacturing facility in Charleston, South Carolina. The false stamps caused Boeing's quality management systems to reflect that all required steps were complete, when they were not. Employees involved in the false stamping did not understand Boeing's stamping policy, were not familiar with its requirements, and were not effectively trained on it. Because the build and quality records are the cornerstone of Boeing's certification that aircraft conform to their approved type design, the lack of understanding by Boeing employees of the importance of and requirements for stamping integrity calls into question the effectiveness of Boeing's anti-fraud compliance program with respect to the certifications.

17.     These reported stamping issues highlighted several shortcomings in Boeing's anti-fraud compliance program with respect to stamping integrity, including the following weaknesses:

- Boeing did not effectively evaluate its stamping policy to ensure it was effective. Specifically, Boeing failed to measure employee understanding of the policy, including whether employees understood that stamping, build, and quality records were the basis for Boeing's certification to the FAA of airworthiness.

- Boeing did not effectively ensure compliance with its stamping policy.

- Boeing did not implement enhanced or remedial controls to prevent or detect stamping policy violations. Rather, Boeing continued to rely on its existing build

and inspection record process to support its certification to the FAA of aircraft airworthiness.

18.    Complete, accurate, and truthful build records are the basis for Boeing's certification of airworthiness to the FAA. In the face of known manufacturing, quality, safety, and anti-fraud risks which undermine the completeness, accuracy, and truthfulness of those records, Boeing failed to implement additional or sufficient controls concerning the risk that certifications of airworthiness to the FAA could be incomplete, inaccurate, false and/or fraudulent and that aircraft delivered to its customers "conform[] to its type design and is in a condition for safe operation," in violation of the compliance program standards required by DPA Attachment C, including Paragraphs 3, 4, and 5.

## ATTACHMENT A-2

## STATEMENT OF FACTS

1.      The following Statement of Facts is incorporated by reference as part of the Non-Prosecution Agreement between the United States Department of Justice, Criminal Division, Fraud Section (the "Fraud Section"), the United States Attorney's Office for the Northern District of Texas (the "USAO-NDTX") and The Boeing Company ("Boeing" or the "Company").  The Company hereby agrees and stipulates that the following information is true and accurate.  The Company admits, accepts, and acknowledges that it is responsible for the acts of its officers, directors, employees, and agents as set forth below.  The following facts establish beyond a reasonable doubt the offense with which Boeing is charged in the criminal Information, Conspiracy to Defraud the United States, in violation of Title 18, United States Code, Section 371, as well as the pecuniary gross gain the Company derived from committing the offense:

### Background

At all times relevant to this Statement of Facts, with all dates being approximate and inclusive:

*Boeing's New Airplane:  The 737 MAX*

2.      Boeing was a U.S.-based multinational corporation that designed, manufactured, and sold commercial airplanes to airlines worldwide.  Boeing operated from various locations, including in and around Seattle, Washington.

3.      Boeing's airline customers included major U.S.-based airlines headquartered in the Northern District of Texas and elsewhere.

4.      The Boeing 737 was a commercial airplane that could seat approximately 200 passengers and was one of Boeing's best-selling airplane models.  Boeing began designing,

manufacturing, and selling the Boeing 737 in the 1960s. Over time, Boeing designed, manufactured, and sold new versions of the Boeing 737 to its airline customers, including major U.S.-based airlines.

5.      In or around June 2011, Boeing began developing and marketing a new version of its Boeing 737 called the 737 MAX. The 737 MAX was designed by Boeing as a competitive answer to a new version of an airplane developed by one of Boeing's top rivals in commercial airplanes, Company-1. Like the new version of Company-1's airplane, the 737 MAX promised increased fuel efficiency over its prior version, the 737 Next Generation ("737 NG"). With this increased efficiency, the 737 MAX offered fuel-cost savings for airlines.

_The FAA AEG's Role in Determining Pilot "Differences Training" for New Airplanes_

6.      Before any U.S.-based airline could operate a new commercial airplane, U.S. regulations required the Federal Aviation Administration ("FAA"), an organization within the United States Department of Transportation, to evaluate and approve the airplane for commercial use. Without this approval, a U.S.-based airline would not be permitted to operate the airplane.

7.      As part of this evaluation and approval process, the FAA had to make two distinct determinations: (i) whether the airplane met U.S. federal airworthiness standards; and (ii) what minimum level of pilot training would be required for a pilot to fly the airplane for a U.S.-based airline. These two determinations were made by entirely different groups within the FAA that were composed of different personnel with different organizational structures and different reporting lines.

8.      The FAA Aircraft Evaluation Group ("AEG") was principally responsible for determining the minimum level of pilot training required for a pilot to fly the airplane for a U.S.-based airline. To make that determination, the FAA AEG compared the new version of the

airplane (such as the 737 MAX) to a similar, prior version of the airplane (such as the 737 NG). After evaluating the differences between the new and prior versions of the airplane, the FAA AEG mandated the minimum level of pilot training, known as "differences training," for the new version.

9.      Based on the nature and extent of the differences between the new and prior version of the airplane, the FAA AEG assigned a level of differences training ranging from "Level A" through "Level E."  These levels of differences training ranged in rigor, with "Level A" being the least intensive and "Level E" being the most intensive.  As relevant here, "Level B" differences training generally included computer-based training ("CBT") training, and "Level D" differences training generally included full-flight simulator training.

10.      At the conclusion of the FAA's evaluation of the new version of the airplane, the FAA AEG published a Flight Standardization Board Report ("FSB Report").  Among other things, the FSB Report contained relevant information about certain airplane systems and parts that the airplane manufacturer was required to incorporate into airplane manuals and pilot-training materials for all U.S.-based airlines that would fly the airplane.  The FSB Report also contained the FAA AEG's differences-training determination.

### Boeing's 737 MAX Chief Technical Pilots

11.      Boeing's 737 MAX Flight Technical Team was principally responsible for identifying and providing to the FAA AEG all information that was relevant to the FAA AEG in connection with the FAA AEG's publication of the 737 MAX FSB Report.  The 737 MAX Flight Technical Team was separate and distinct from another group within Boeing that was responsible for providing information to the FAA for certification of whether the airplane met U.S. federal airworthiness standards.

12.    From in or around early 2012 until in or around early 2014, Boeing Employee-1 was a Technical Pilot for Boeing's 737 MAX Flight Technical Team. In or around early 2014, Boeing Employee-1 became Boeing's 737 MAX Chief Technical Pilot. In that role, Boeing Employee-1 led the 737 MAX Flight Technical Team. In or around July 2018, Boeing Employee-1 left Boeing to work for a major U.S.-based airline.

13.    From in or around mid-2014 until in or around July 2018, Boeing Employee-2 was a Technical Pilot for Boeing's 737 MAX Flight Technical Team. In or around July 2018, after Boeing Employee-1 left Boeing, Boeing Employee-2 became Boeing's 737 MAX Chief Technical Pilot. In that role, Boeing Employee-2 led the 737 MAX Flight Technical Team.

14.    Boeing Employee-1 and Boeing Employee-2 understood that the FAA AEG relied on them, as members of Boeing's 737 MAX Flight Technical Team, to identify and provide to the FAA AEG all information that was relevant to the FAA AEG in connection with the FAA AEG's publication of the 737 MAX FSB Report, including information that could impact the FAA AEG's differences-training determination.

15.    Boeing Employee-1 and Boeing Employee-2 also understood that, because flight controls were vital to flying modern commercial airplanes, differences between the flight controls of the 737 NG and the 737 MAX were especially important to the FAA AEG for purposes of its publication of the 737 MAX FSB Report and the FAA AEG's differences-training determination.

### Overview of the Conspiracy to Defraud the FAA AEG

16.    From at least in and around November 2016 through at least in and around December 2018, in the Northern District of Texas and elsewhere, Boeing, through Boeing Employee-1 and Boeing Employee-2, knowingly, and with intent to defraud, conspired to defraud the FAA AEG.

17.     At all times during the conspiracy, Boeing Employee-1 and Boeing Employee-2 were acting within the scope of their employment and with the intention, at least in part, to benefit Boeing. The purpose of the conspiracy was to defraud the FAA AEG by impairing, obstructing, defeating, and interfering with the lawful function of the FAA AEG by dishonest means in connection with its publication of the 737 MAX FSB Report and its differences-training determination for the Boeing 737 MAX, in order to bring about a financial gain to Boeing and to benefit Boeing Employee-1 and Boeing Employee-2 in connection with the Boeing 737 MAX.

**Lead-Up to the Conspiracy and Scheme to Defraud**

*Boeing's Financial Incentive to Secure No Greater than "Level B" Differences Training in the 737 MAX FSB Report*

18.     As Boeing knew, "Level B" differences training was significantly less expensive for airlines to complete than "Level D." For example, a pilot could complete "Level B" differences training from anywhere in the world in a matter of hours using a computer or tablet. In contrast, a pilot could complete "Level D" differences training only by appearing in person wherever the pilot's airline operated a full-flight simulator. Apart from the cost of acquiring one or more multimillion-dollar simulators and other related expenses, airlines that were required by the FAA AEG to train pilots on a full-flight simulator could also lose revenue that the pilot might otherwise have generated from flying airline passengers during that time. Accordingly, if the FAA AEG required a less rigorous level—such as "Level B"—of differences training for the 737 MAX in the 737 MAX FSB Report, the 737 MAX would be a more attractive option for Boeing's airline customers already flying the 737 NG than switching to an entirely new airplane, such as the new version of Company-1's airplane, as such customers would save significant money in pilot-training costs by transitioning to the 737 MAX.

19.     Principally for this reason, Boeing's stated objectives in designing the 737 MAX included securing the FAA AEG's determination to require no greater than "Level B" differences training in the 737 MAX FSB Report. Boeing Employee-1 and Boeing Employee-2 understood as much. For example, in or around November 2014, Boeing Employee-2 wrote in an internal Boeing electronic chat communication to Boeing Employee-1 that "nothing can jepordize [sic] level b[.]" In or around December 2014, Boeing Employee-1 wrote in an email to another Boeing employee that "if we lose Level B [it] will be thrown squarely on my shoulders. It was [Boeing Employee-1], yes [Boeing Employee-1]! Who cost Boeing tens of millions of dollars!"

*The Maneuvering Characteristics Augmentation System ("MCAS")*

20.     To achieve its promised fuel efficiency, the 737 MAX used larger engines than the 737 NG. These larger engines, and their placement under the airplane's wings, meant that the aerodynamics of the 737 MAX differed from those of the 737 NG.

21.     These different aerodynamics created a new handling characteristic for the 737 MAX that caused the 737 MAX's nose to pitch up during a certain flight maneuver called a high-speed, wind-up turn. A high-speed, wind-up turn generally involved sharply turning the airplane at high speed (approximately Mach 0.6-0.8) in a corkscrew-like pattern.

22.     A high-speed, wind-up turn was a "certification" maneuver, that is, a maneuver outside the limits of what the 737 MAX would be expected to encounter during a normal commercial passenger flight. Nevertheless, if Boeing did not fix the 737 MAX's pitch-up characteristic in high-speed, wind-up turns, the FAA could determine that the 737 MAX did not meet U.S. federal airworthiness standards.

23.     To fix this pitch-up characteristic, Boeing created MCAS and incorporated it as a part of the 737 MAX's flight controls. In operation, MCAS would automatically cause the

airplane's nose to pitch down by adjusting the 737 MAX's horizontal stabilizer (a horizontal tail located near the rear of the airplane).  As originally designed, MCAS could only activate during a high-speed, wind-up turn.

*Boeing Employee-1 and Other Boeing Employees Told the FAA AEG that MCAS was Limited to High-Speed, Wind-Up Turns*

24.     In or around June 2015, Boeing Employee-1 and other Boeing employees briefed the FAA AEG on MCAS.  During this briefing, Boeing described MCAS as a system that could only activate during a high-speed, wind-up turn.  After the briefing, Boeing Employee-1 and another Boeing employee further discussed MCAS with an FAA AEG employee ("FAA AEG Employee-1") and reiterated to FAA AEG Employee-1 the limited operational scope of MCAS.

*Boeing Subsequently Expanded MCAS's Operational Scope Beyond High-Speed, Wind-Up Turns*

25.     Subsequently, Boeing expanded MCAS's operational scope, including the speed range within which MCAS could activate, significantly altering its original design.  Among other things, when the airplane registered a high angle of attack, the change expanded the speed range within which MCAS could activate from approximately Mach 0.6-0.8 to approximately Mach 0.2-0.8—that is, from only high-speed flight to nearly the entire speed range for the 737 MAX, including low-speed flight, which generally occurs at a lower altitude and in and around takeoff and landing.  Boeing disclosed this expansion to FAA personnel, but only to those personnel who were responsible for determining whether the 737 MAX met U.S. federal airworthiness standards.  Boeing did not disclose the expansion to the FAA AEG personnel responsible for publishing the 737 MAX FSB Report and making the training-related determination.

*Boeing Advocated for the FAA AEG to Publish the 737 MAX FSB Report with No Greater Than "Level B" Differences Training*

26.     On or about August 16, 2016, before the FAA AEG published the 737 MAX FSB Report, the FAA AEG issued a provisional "Level B" differences-training determination for the 737 MAX.  At the time of this provisional determination, the FAA AEG was unaware that Boeing had expanded MCAS's operational scope.

27.     On or about the same day, Boeing Employee-1 recognized Boeing's achievement in an email to Boeing employees, including Boeing Employee-2, and wrote that the FAA AEG's provisional determination "culminates more than 3 years of tireless and collaborative efforts across many business units" and that the 737 MAX program management "is VERY happy."

28.     As Boeing Employee-1 and Boeing Employee-2 knew, the FAA AEG based its provisional "Level B" differences training for the 737 MAX in part on its understanding that MCAS could only activate during the limited operational scope of a high-speed, wind up turn.

29.     Boeing Employee-1 and Boeing Employee-2 also understood, as Boeing Employee-1 acknowledged in his email on or about August 16, 2016, that the FAA AEG's "Level B" differences determination for the 737 MAX was only a "provisional approval [. . .] assuming no significant systems changes to the airplane."

30.     For example, in an email to Boeing employees including Boeing Employee-2 discussing a potential change to another part of the 737 MAX's flight controls on or about November 10, 2016, Boeing Employee-1 emphasized that "[o]ne of the Program Directives we were given was to not create any differences [. . .].  This is what we sold to the regulators who have already granted us the Level B differences determination.  To go back to them now, and tell them there is in fact a difference [. . .] would be a huge threat to that differences training determination."

## The Conspiracy Begins

*"Shocker Alert": Boeing Employee-1 and Boeing Employee-2 Discovered MCAS's Expanded Operational Scope*

31.     On or about November 15, 2016, during a test flight of the 737 MAX in a simulator, Boeing Employee-1 experienced what Boeing Employee-1 recognized as MCAS operating at lower speed. Boeing Employee-1 further recognized that this lower-speed operation was different from what Boeing had briefed and described to the FAA AEG.

32.     On or about that same day, Boeing Employee-1 and Boeing Employee-2 discussed MCAS in an internal Boeing electronic chat communication, writing in part:

> Boeing Employee-1:  Oh shocker alerT! [sic] / MCAS is now active down to [Mach] .2 / It's running rampant in the sim on me / at least that's what [a Boeing simulator engineer] thinks is happening
>
> Boeing Employee-2:  Oh great, that means we have to update the speed trim description in vol 2
>
> Boeing Employee-1:  so I basically lied to the regulators (unknowingly)
>
> Boeing Employee-2:  it wasn't a lie, no one told us that was the case

33.     At this point, Boeing Employee-1 and Boeing Employee-2 recognized that the FAA AEG was under the misimpression that MCAS operated only during a high-speed, wind up turn and could not operate at lower Mach speeds, such as at Mach 0.2. Boeing Employee-1 and Boeing Employee-2 therefore knew, at least as of the time of this chat communication, that the FAA AEG's provisional "Level B" differences-training determination had been based in part on outdated and inaccurate information about MCAS.

34.     Boeing Employee-1 and Boeing Employee-2 also knew that MCAS's expanded operational scope was relevant to the FAA AEG's decisions about the content of the 737 MAX

FSB Report, including whether to include information about MCAS. Boeing Employee-1 and Boeing Employee-2 similarly understood that it was their responsibility to update the FAA AEG about any relevant changes to the 737 MAX's flight controls—such as MCAS's expanded operational scope.

35.     Despite knowing that the FAA AEG had issued its provisional "Level B" determination without any awareness that MCAS's operational scope had been expanded to include high angle of attack conditions in nearly the entire speed range of ordinary commercial flight, Boeing Employee-1 and Boeing Employee-2 did not correct the FAA AEG's understanding of MCAS's operational scope or otherwise ensure that the FAA AEG's "Level B" determination was based on an accurate understanding of MCAS's operation. Instead, Boeing—through Boeing Employee-1 and Boeing Employee-2—intentionally withheld and concealed from the FAA AEG their knowledge of MCAS's expanded operational scope.

*Boeing, Through Boeing Employee-1 and Boeing Employee-2, Deceived the FAA AEG About MCAS's Operational Scope and Told the FAA AEG to Delete MCAS from the 737 MAX FSB Report*

36.     For example, shortly after the simulated test flight described in paragraph 30, Boeing Employee-1 talked with FAA AEG Employee-1, who asked Boeing Employee-1 about the simulated test flight. Boeing Employee-1 intentionally withheld and concealed from FAA AEG Employee-1 the fact that MCAS's operational scope had been expanded beyond what the FAA AEG relied upon when it issued its provisional "Level B" differences-training determination for the 737 MAX.

37.     Around the time that Boeing Employee-1 and Boeing Employee-2 discussed MCAS's expanded operational scope, Boeing Employee-1 asked a Boeing senior engineer assigned to the 737 MAX program about MCAS's operational scope. The senior engineer

confirmed to Boeing Employee-1 that MCAS could activate beyond the limited operational scope of a high-speed, wind-up turn. The senior engineer suggested that Boeing Employee-1 contact certain subject-matter experts at Boeing for more specific information about MCAS's operational scope.

38. On or about November 17, 2016, the FAA AEG emailed three Boeing employees, including Boeing Employee-1, Boeing Employee-2, and another Boeing employee, a draft of the forthcoming 737 MAX FSB Report. That same day, Boeing Employee-1 asked Boeing Employee-2 and the other Boeing employee to review the draft 737 MAX FSB Report "for any glaring issues."

39. On or about November 22, 2016, the other Boeing employee emailed the draft 737 MAX FSB Report back to the FAA AEG with proposed edits. Boeing Employee-1 and Boeing Employee-2 were included on this email. Boeing Employee-1 included a proposed edit to delete a reference to MCAS, and wrote, "We agreed not to reference MCAS since it's outside normal operating envelope." Neither Boeing Employee-1 nor Boeing Employee-2 shared the fact of MCAS's expanded operational scope with the FAA AEG or otherwise corrected the FAA AEG's misimpression that MCAS's operational scope was limited to high-speed, wind-up turns.

40. In doing so, Boeing Employee-1 and Boeing Employee-2 deceived the FAA AEG into believing that the basis upon which the FAA AEG had initially "agreed" to remove any information about MCAS from the 737 MAX FSB Report—that MCAS could only activate during the limited operational scope of a high-speed, wind-up turn—remained the same. Boeing Employee-1 and Boeing Employee-2 withheld their knowledge of MCAS from the FAA AEG to avoid risking the FAA AEG taking any action that could threaten the differences-training determination for the 737 MAX.

41.    On or about January 17, 2017, Boeing Employee-1 again reminded the FAA AEG in an email to delete any reference to MCAS from the forthcoming 737 MAX FSB Report, and wrote, "Flight Controls:  Delete MCAS, recall we decided we weren't going to cover it [. . .] since it's way outside the normal operating envelope."  Again, Boeing Employee-1 deceived the FAA AEG into believing that the basis upon which the FAA AEG had initially "decided" to remove any information about MCAS from the 737 MAX FSB Report—that MCAS could only activate during the limited operational scope of a high-speed, wind-up turn—remained the same.

42.    By concealing MCAS's expanded operational scope from the FAA AEG, Boeing, through Boeing Employee-1 and Boeing Employee-2, defrauded, impaired, obstructed, defeated, and interfered with the FAA AEG's lawful function to evaluate MCAS and to include information about MCAS in the 737 MAX FSB Report.

43.    Based on Boeing's misleading statements, half-truths, and omissions to the FAA AEG about MCAS, and in reliance on those statements and omissions, the FAA AEG agreed to delete all information about MCAS from the 737 MAX FSB Report.

44.    From in or around January 2017 through in or around July 2017 (when the 737 MAX FSB Report was published), Boeing Employee-1 and Boeing Employee-2 sent and caused to be sent emails to representatives of various Boeing airline customers that had agreed to purchase the 737 MAX, including major U.S.-based airlines.  In these emails, Boeing Employee-1 and Boeing Employee-2 or members of their 737 MAX Flight Technical Team referenced and included drafts of the forthcoming 737 MAX FSB Report and airplane manuals and pilot-training materials for Boeing's 737 MAX airline customers.  None of these items contained any information about MCAS, consistent with Boeing Employee-1's and Boeing Employee-2's efforts to deceive the FAA AEG into deleting information about MCAS.

*The FAA AEG Published the 737 MAX FSB Report Without Any Information about MCAS and
Required No Greater than "Level B" Differences Training*

45.     On or about July 5, 2017, the FAA AEG published the first 737 MAX FSB Report,
which included the FAA AEG's "Level B" differences-training determination for the 737 MAX.

46.     Because of Boeing's intentional withholding of information from the FAA AEG,
the final version of the 737 MAX FSB Report lacked information about MCAS, and relevant
portions of this 737 MAX FSB Report were materially false, inaccurate, and incomplete.  In turn,
airplane manuals and pilot-training materials for U.S.-based airlines lacked information about
MCAS, and relevant portions of these manuals and materials were similarly materially false,
inaccurate, and incomplete as a result.

47.     After the FAA AEG published the final version of the 737 MAX FSB Report,
Boeing continued to sell, and Boeing's U.S.-based airline customers were permitted to fly, the 737
MAX.  Pilots flying the 737 MAX for Boeing's airline customers were not provided any
information about MCAS in their airplane manuals and pilot-training materials.

*Lion Air Flight 610:  The First 737 MAX Crash Exposed MCAS's Operational Scope*

48.     On October 29, 2018, Lion Air Flight 610, a Boeing 737 MAX, crashed shortly
after takeoff into the Java Sea near Indonesia.  All 189 passengers and crew on board died.

49.     Following the Lion Air crash, the FAA AEG learned that MCAS activated during
the flight and may have played a role in the crash.  The FAA AEG also learned for the first time
about MCAS's expanded operational scope.

50.     In and around the same time, Boeing employees, including Boeing Employee-2,
met with personnel from the FAA AEG to discuss, among other things, MCAS's operational
scope.  After that meeting, Boeing Employee-2 told FAA AEG Employee-1 that he was previously

unaware of MCAS's expanded operational scope and otherwise misled FAA AEG Employee-1 about Boeing Employee-2's prior knowledge of MCAS.

51.     Also, in and around the same time, Boeing Employee-2 caused Boeing to present a false and misleading presentation to the FAA AEG about MCAS. Boeing investigated, among other things, what information Boeing Employee-1 and Boeing Employee-2 provided to the FAA AEG about MCAS. In connection with this investigation, Boeing Employee-2 caused Boeing to represent in a presentation to the FAA AEG that, during the training-evaluation process, Boeing and the FAA AEG had "discussed and agreed on [the] removal of MCAS" from the 737 MAX FSB Report and associated materials. This representation was misleading because Boeing Employee-2 had failed to disclose the "shocker alert" chat communication and the fact that the FAA AEG was deprived of relevant information about MCAS.

52.     Following the Lion Air crash, Boeing proposed changes to the operational scope of MCAS, and the FAA AEG worked with Boeing to evaluate these changes to MCAS for purposes of pilot training.

*Ethiopian Airlines Flight 302: The Second 737 MAX Crash and the Grounding of the Fleet*

53.     On March 10, 2019, Ethiopian Airlines Flight 302, a Boeing 737 MAX, crashed shortly after takeoff near Ejere, Ethiopia. All 157 passengers and crew on board died. Following the Ethiopian Airlines crash, the FAA AEG learned that MCAS activated during the flight and may have played a role in the crash.

54.     On March 13, 2019, the 737 MAX was officially grounded in the United States, indefinitely halting further flights of this airplane by any U.S.-based airline.

*Boeing's Pecuniary Gross Gain*

55.    Boeing derived a pecuniary gross gain of $243,600,000 by committing the offense with which it is charged in the criminal Information. This amount represents Boeing's cost-savings from its above-described conduct associated with the implementation of full-flight simulator training for the 737 MAX.

\*        \*        \*

## ATTACHMENT B

## <u>CERTIFICATE OF BOARD APPROVAL</u>

WHEREAS, The Boeing Company (the "Company") has been engaged in discussions with the United States Department of Justice, Criminal Division, Fraud Section and the United States Attorney's Office for the Northern District of Texas (collectively, the "Offices") regarding issues arising in relation to the Offices' investigation of violation of U.S. fraud laws by certain of the Company's employees;

WHEREAS, on January 7, 2021 in the U.S. District Court for the Northern District of Texas, 4:21-cr-00005-O, the Offices filed a one-count Information (the "Information") charging the Company with one count of Conspiracy to Defraud the United States, in violation of Title 18, United States Code, Section 371;

WHEREAS, on January 7, 2021, the Offices deferred prosecution of the Information pursuant to a deferred prosecution agreement (the "DPA"), 4:21-cr-00005-O, Dkt. No. 4;

WHEREAS, on May 14, 2024, the Offices determined that the Company breached the DPA;

WHEREAS, the Company has been engaged in discussions with the Offices regarding the Offices' determination that the Company breached the DPA;

WHEREAS, in order to resolve such discussions, it is proposed that the Company enter into a non-prosecution agreement with the Offices (the "Agreement") and the Offices move to dismiss the Information without prejudice, and the Company consents to the same;

WHEREAS, the Board of Directors of the Company (the "Board") has been extensively briefed on discussions with the Offices regarding an agreement to resolve the Offices' investigation and determination that the Company breached the DPA;

WHEREAS, the Board was informed of the principal terms of the potential agreement by the Chief Legal Officer of the Company, together with outside counsel for the Company; and such counsel have advised the Board of the Company's rights, possible defenses, and the consequences of entering into the Agreement with the Offices and consenting to the motion to dismiss without prejudice; and the Board agreed that the Company should enter into an agreement on those terms and delegated to the President and Chief Executive Officer, the Chief Legal Officer, and other management the authority to finalize and execute the Agreement consistent with the principal terms briefed to the Board and subject to the final approval of the Chair of the Board;

WHEREAS, the Chair of the Board has reviewed documents relevant to the Agreement, and has been advised that the material terms of the final documents are consistent with the terms of the Agreement previously described to the Board;

Therefore, the Chair of the Board of Directors to whom the Board delegated authority has provided approval as to the following:

1.    The Company agrees and consents to dismissal of the Information without prejudice and agrees that the Company is not a prevailing party for purposes of the Hyde Amendment;

2.    The Company (a) enters into this non-prosecution agreement ("Agreement") with the Offices; (b) agrees to pay an overall criminal monetary penalty amount of $487,200,000, which reflects a fine at the top of the applicable Sentencing Guidelines fine range and the maximum fine allowable under Title 18, United States Code, Sections 371 and 3571(c), including credit for the $243,600,000 previously paid by the Company pursuant to the DPA, resulting in a remaining criminal penalty to be paid by the Company of $243,600,000, which will be paid to the United States Treasury, and to pay such penalty in accordance with terms set forth in the Agreement and

B-2

with respect to the conduct described in the Statement of Facts in Attachment A-2; (c) agrees to pay victim compensation to the heirs, relatives, and/or legal beneficiaries of the crash victims of Lion Air Flight 610 and Ethiopian Airlines Flight 302 (collectively, "Crash Victim Families") in the amount of $444.5 million; (d) agrees to make a sustained monetary investment in its compliance and safety programs of at least $455,000,000 as set forth in the Agreement; (e) agrees to retain an Independent Compliance Consultant to assess the Company's progress regarding remediation and implementation of the compliance measures described in Attachment C to the Agreement, in accordance with Attachment D to the Agreement; (f) agrees to ensure that its Board of Directors holds a meeting with the Crash Victim Families, should they wish to attend, and their legal representatives; (g) agrees to cooperate with and report to the Offices in accordance with the Agreement; and (h) agrees to continue to implement a compliance and ethics program reasonably designed, implemented, and enforced to prevent and detect violations of U.S. fraud laws throughout its operations, including, but not limited to, the minimum elements set forth in Attachment C of the Agreement.

3.    The Company accepts the terms and conditions of this Agreement, including, but not limited to, (a) a knowing waiver for purposes of this Agreement and any charges by the United States arising out of the conduct described in the attached Statement of Facts of any objection with respect to venue in the United States District Court for the Northern District of Texas; and (b) a knowing waiver of any defenses based on the statute of limitations for any prosecution relating to the conduct described in the attached Statement of Facts or relating to conduct known to the Offices prior to the date on which the NPA was signed that is not time-barred by the applicable statute of limitations on the date of the signing of the NPA;

4.      Mr. Ortberg, is authorized, empowered, and directed, on behalf of the Company to execute the Agreement consistent with the principal terms briefed to the Board of Directors, and to agree and consent to dismissal of the Information without prejudice;

5.      Mr. Ortberg is authorized, empowered, and directed to take any and all actions as may be necessary or appropriate and to approve the forms, terms, or provisions of any agreement or other documents as may be necessary or appropriate, to carry out and effectuate the purpose and intent of the foregoing approval; and

6.      All of the actions of Mr. Ortberg which actions were authorized by the approval, are severally ratified, confirmed, approved, and adopted as actions on behalf of the Company.

Date: May 28, 2025

By: _____
John Demers
Corporate Secretary
The Boeing Company

B-4

## ATTACHMENT C

## CORPORATE COMPLIANCE PROGRAM

In order to address any deficiencies in its internal controls, compliance code, policies, and procedures regarding compliance with U.S. fraud laws in connection with interactions with any domestic or foreign government agency, including the integration of its ethics and compliance program with its safety and quality programs as designed to deter violations of anti-fraud laws or policies, The Boeing Company (the "Company") agrees to continue to conduct, in a manner consistent with all of its obligations under this Agreement, appropriate reviews of its existing internal controls, policies, and procedures.

Where necessary and appropriate, the Company agrees to modify its compliance program, including internal controls, compliance policies, and procedures in order to maintain: (a) an effective system of internal controls designed to ensure the completeness and accuracy of records pertaining to interactions with any domestic or foreign government agency; and (b) a rigorous anti-fraud compliance program that incorporates relevant internal controls, compliance policies, and procedures in order to maintain an effective compliance program that is designed, implemented, and enforced to effectively deter and detect violations of U.S. fraud laws. The contemplated improvements to the Company's ethics and compliance program discussed herein include a commitment by the Company to the integration of its ethics and compliance program with its safety and quality programs for the purpose of deterring violations of anti-fraud laws or policies. At a minimum, this should include, but not be limited to, the following elements, to the extent they are not already part of the Company's existing internal controls, compliance code, policies, and procedures:

*Commitment to Compliance*

1.    The Company will ensure that its directors and senior management provide strong, explicit, and visible support and commitment to compliance with its corporate policy against violations of U.S. fraud laws, its compliance policies, and its Code of Conduct, and demonstrate rigorous support for compliance principles via their actions and words.

2.    The Company will ensure that mid-level management throughout its organization reinforce leadership's commitment to compliance policies and principles and encourage employees to abide by them. The Company will create and foster a culture of ethics and compliance with the law in their day-to-day operations at all levels of the Company.

*Periodic Risk Assessment and Review*

3.    The Company will implement a risk management process to identify, analyze, and address the individual circumstances of the Company, in particular the fraud risks facing the Company.

4.    On the basis of its periodic risk assessment, the Company shall take appropriate steps to design, implement, or modify each element of its compliance program to reduce the risk of violations of U.S. fraud laws, its compliance policies, and its Code of Conduct.

*Policies and Procedures*

5.    The Company will develop and promulgate a clearly articulated and visible corporate policy against violations of U.S. fraud laws, which shall be memorialized in a written compliance policy or policies.

6.    The Company will develop and promulgate compliance policies and procedures designed to reduce the prospect of violations of U.S. fraud laws and the Company's compliance policies and Code of Conduct, and the Company will take appropriate measures to encourage and

support the observance of ethics and compliance policies and procedures against violations of U.S. fraud laws by personnel at all levels of the Company. These anti-fraud policies and procedures shall apply to all directors, officers, and employees and, where necessary and appropriate, outside parties acting on behalf of the Company, including all agents and business partners. The Company shall notify all employees that compliance with the policies and procedures is the duty of individuals at all levels of the Company.

7.    The Company will ensure that it has a system of internal controls reasonably designed to ensure the completeness and accuracy of records pertaining to interactions with any domestic or foreign government agency.

8.    The Company shall review its anti-fraud compliance policies and procedures as necessary to address changing and emerging risks and update them as appropriate to ensure their continued effectiveness, taking into account relevant developments in the field and evolving international and industry standards.

*Independent, Autonomous, and Empowered Oversight*

9.    The Company will assign responsibility to one or more senior corporate executives of the Company for the implementation and oversight of the Company's anti-fraud compliance policies and procedures. Such corporate official(s) shall have the authority to report directly to independent monitoring bodies, including internal audit, the Company's Board of Directors, or any appropriate committee of the Company's Board of Directors, and shall have an adequate level of autonomy from management as well as sufficient resources, authority, and support from senior leadership to maintain such autonomy.

*Training and Guidance*

10.    The Company will implement mechanisms designed to ensure that its Code of Conduct and anti-fraud compliance policies and procedures are effectively communicated to all directors, officers, employees, and, where necessary and appropriate, agents and business partners. These mechanisms shall include: (a) periodic training for all directors and officers, all employees in positions of leadership or trust, positions that require such training (e.g., internal audit, sales, legal, compliance, finance), or positions that otherwise pose a fraud risk to the Company, and, where necessary and appropriate, agents and business partners; and (b) metrics for measuring knowledge retention and effectiveness of the training. The Company will conduct training in a manner tailored to the audience's size, sophistication, or subject matter expertise and, where appropriate, will discuss prior compliance incidents.

11.    The Company will maintain, or where necessary establish, an effective system for providing guidance and advice to directors, officers, employees, and, where necessary and appropriate, agents and business partners, on complying with the Company's anti-fraud compliance policies and procedures, including when they need advice on an urgent basis.

*Confidential Reporting Structure and Investigation of Misconduct*

12.    The Company will maintain, or where necessary establish, an effective system for internal and, where possible, confidential reporting concerning violations of the Company's Code of Conduct or anti-fraud compliance policies and procedures and protection of directors, officers, employees, and, where appropriate, agents and business partners, who make such reports. To ensure effectiveness, the Company commits to following applicable anti-retaliation and whistleblower protection laws, and to appropriately training employees on such laws.

13.    The Company will maintain, or where necessary establish, an effective and reliable process with sufficient resources for responding to, investigating, and documenting allegations of violations of U.S. fraud laws or the Company's anti-fraud compliance policies and procedures.

*Compensation Structures and Consequence Management*

14.    The Company will implement clear mechanisms to incentivize behavior amongst all directors, officers, employees, and, where necessary and appropriate, parties acting on behalf of the Company that comply with its corporate policy against violations of the anti-fraud laws, its compliance policies, and its Code of Conduct. These incentives shall include, but shall not be limited to, the implementation of criteria related to compliance in the Company's compensation and bonus system.

15.    The Company will institute appropriate disciplinary procedures to address, among other things, violations of the anti-fraud laws and the Company's Code of Conduct and anti-fraud compliance policies and procedures by the Company's directors, officers, and employees. Such procedures should be applied consistently and fairly, regardless of the position held by, or perceived importance of, the director, officer, or employee. The Company shall implement procedures designed to ensure that where misconduct is discovered, reasonable steps are taken to remedy the harm resulting from such misconduct, and designed to ensure that appropriate steps are taken to prevent further similar misconduct, including assessing the internal controls, Code of Conduct, and compliance policies and procedures and making modifications necessary to ensure the overall anti-fraud compliance program is effective.

*Third-Party Management*

16.     The Company will institute appropriate risk-based due diligence and compliance requirements pertaining to the retention and oversight of all agents and business partners, including:

      a.     properly documented due diligence pertaining to the hiring and appropriate and regular oversight of agents and business partners;

      b.     informing agents and business partners of the Company's commitment to abiding by U.S. fraud laws, and of the Company's Code of Conduct and anti-fraud compliance policies and procedures; and

      c.     seeking a reciprocal commitment from agents and business partners.

17.     Where necessary and appropriate, the Company will include standard provisions in agreements, contracts, and renewals thereof with all agents and business partners that are reasonably calculated to prevent violations of U.S. fraud laws, which may, depending upon the circumstances, include: (a) representations and undertakings relating to compliance with U.S. fraud laws; (b) rights to conduct audits of the records of the agent or business partner to promote compliance with the foregoing; and (c) rights to terminate an agent or business partner as a result of any breach of U.S. fraud laws, the Company's Code of Conduct or compliance policies or procedures, or the representations and undertakings related to such matters.

*Mergers and Acquisitions*

18.     The Company will develop and implement policies and procedures for mergers and acquisitions requiring that the Company conduct appropriate risk-based due diligence on potential new business entities, including appropriate U.S. fraud law due diligence by legal, accounting, and compliance personnel.

19.    The Company will apply its Code of Conduct and compliance policies and procedures regarding U.S. fraud laws as quickly as is practicable to newly acquired businesses or entities merged with the Company and will promptly:

     a.    train the directors, officers, employees, agents, and business partners consistent with Paragraph 10 above on U.S. fraud laws and the Company's compliance policies and procedures regarding U.S. fraud laws;

     b.    where warranted, conduct a fraud-specific audit of all newly acquired or merged businesses as quickly as practicable; and

     c.    where warranted, establish a plan to integrate the acquired businesses or entities into the Company's enterprise resource planning systems as quickly as practicable.

*Monitoring and Testing*

20.    The Company will conduct periodic reviews and testing of all elements of its compliance program to evaluate and improve their effectiveness in preventing and detecting violations of U.S. fraud laws and the Company's Code of Conduct and anti-fraud compliance policies and procedures, taking into account relevant developments in the field and evolving international and industry standards.

21.    The Company will ensure that compliance and control personnel have sufficient direct or indirect access to relevant sources of data to allow for timely and effective monitoring and/or testing of transactions.

*Analysis and Remediation of Misconduct*

22.    The Company will conduct a root cause analysis of misconduct, including prior misconduct, to identify any systemic issues and/or any control failures. The Company will timely and appropriately remediate the root causes of misconduct. The Company will ensure that root

causes, including systemic issues and control failures, and relevant remediations are shared with management as appropriate.

## ATTACHMENT D

## ENHANCED COMPLIANCE REPORTING REQUIREMENTS AND INDEPENDENT COMPLIANCE CONSULTANT

The Boeing Company (the "Company") agrees that it will report to the United States Department of Justice, Criminal Division, Fraud Section and the United States Attorney's Office for the Northern District of Texas (collectively, the "Offices"), periodically.

As required under Paragraph 9 of the Agreement, during the Term, the Company shall review, test, and update its compliance program and internal controls, policies, and procedures described in Attachment C.  The Company shall be required to conduct at least two reviews.  To assist in the reviews, the Company shall retain an independent compliance consultant as described below ("Independent Compliance Consultant").  The Independent Compliance Consultant will assist the Company in assessing the effectiveness of the Company's compliance program and internal controls, observe the Company's self-testing, make recommendations to the Company that are reasonably designed to improve the effectiveness of the Company's program for ensuring compliance with U.S. fraud laws, and submit to the Offices at least two reports regarding the Company's review, remediation, implementation, and testing of its Compliance Program, all as described further below.  The Company and Independent Consultant shall, at not less than three-month intervals during the Term, meet with the Offices regarding remediation, implementation, and testing of the Company's compliance program and internal controls, policies, and procedures described in Attachment C.

1.      In conducting the reviews, the Company shall undertake the following activities, among others: (a) inspection of relevant documents, including the Company's current policies, procedures, and training materials concerning compliance with U.S. fraud laws; (b) inspection and

testing of the Company's systems, procedures, and internal controls, including record keeping and internal audit procedures at sample sites; (c) meetings with, and interviews of, relevant current and, where appropriate, former directors, officers, employees, business partners, agents, and other persons; and (d) analyses, studies, and, comprehensive testing of the Company's compliance program.

2.    Prior to conducting each review, the Company and the Independent Compliance Consultant shall be required to prepare and submit to the Offices a joint workplan for the review. The workplan shall specify the role that each party shall play in carrying out the necessary activities to complete the review and report. The Offices shall have thirty (30) calendar days after receipt of the written work plan to provide comments.

3.    The Independent Compliance Consultant shall be retained for the Term specified in Paragraph 5 of the Agreement.  The Independent Compliance Consultant's responsibility is to assess and support the Company's compliance with Paragraphs 8 and 9 of the Agreement, including the Corporate Compliance Program in Attachment C, as necessary to address and reduce the risk of any recurrence of the Company's misconduct, as described in Attachment A-2, and to address the Offices' basis for breach, as described in Attachment A-1.  During the term of the Agreement, the Independent Compliance Consultant will assist the Company in assessing the effectiveness of the Company's compliance program and internal controls, record-keeping, policies, and procedures as they relate to the Company's current and ongoing compliance with U.S. fraud laws, particularly in connection with interactions with any domestic or foreign government agency, including integration of its compliance program with its safety and quality programs as necessary to detect and deter violations of anti-fraud laws or policies.  The Independent Compliance Consultant will observe and assess the Company's self-testing and

compliance with Attachment C (Corporate Compliance Program) of this Agreement.

4.    The Independent Compliance Consultant is not intended to supplant the oversight authority of the Federal Aviation Administration (FAA)—or that of any pertinent foreign aviation regulator, e.g., the European Union Aviation Safety Agency—including over matters related to design, engineering, manufacturing, and safety. The same is true as to the authority of the National Transportation Safety Board. As a result, the Independent Compliance Consultant will not substantively review the Company's design, engineering, or manufacturing processes and decisions, or the correctness of any of the Company's decisions relating to compliance with the FAA's regulatory regime.

5.    The Independent Compliance Consultant shall make recommendations to the Company that are reasonably designed to improve the effectiveness of the Company's program for ensuring compliance with U.S. fraud laws.  The Independent Compliance Consultant should consult with the Company concerning his or her findings and recommendations on an ongoing basis.  The Company maintains ultimate decision making over the implementation of any particular recommendation and shall provide to the Offices the reasons for not implementing any recommendation.

6.    By no later than one year from the date the Independent Compliance Consultant is retained, the Independent Compliance Consultant shall submit to the Offices a report summarizing its observations regarding the Company's review, remediation, implementation, and testing of its compliance program and internal controls, policies, and procedures described in Attachment C. The Independent Compliance Consultant's reports shall also set forth a summary of its work, any recommendations, and the results of its efforts to assist the Company in ensuring that its compliance program is reasonably designed, implemented and enforced so that the program is

effective in deterring and detecting violations of U.S. Fraud laws.  The Independent Compliance Consultant shall provide a follow-up report no later than thirty (30) days before the end of the Term.  The Offices shall consider the Independent Compliance Consultant's reports in evaluating whether the Company has met its obligations under Attachment C.

7.     The Company and the Independent Compliance Consultant shall meet with the Offices to discuss each report.  At least every three (3) months, and more frequently if the Independent Compliance Consultant, the Company, and the Offices deem it appropriate, the Independent Compliance Consultant and the Company will meet with the Offices to discuss the status of the Independent Compliance Consultant's work, and any suggestions, comments, or improvements the Independent Compliance Consultant and the Company may wish to discuss with or propose to the Offices.  If the Independent Compliance Consultant believes it appropriate, he or she also can request a meeting with the Offices at any time including to discuss any recommendations that the Company does not believe it appropriate to implement, if that occurs.

8.     The Company will submit to the Offices in writing a proposed Independent Compliance Consultant for the Offices' evaluation and approval.  The written proposal shall include the following:

a.     a description of the proposed Independent Compliance Consultant's qualifications and credentials, which shall include, at a minimum, (i) demonstrated expertise with respect to U.S. fraud laws, including experience counseling on anti-fraud compliance issues; and (ii) substantial demonstrated experience designing, evaluating, or administering corporate compliance programs and internal controls, including anti-fraud policies, procedures, and internal controls, for a publicly-traded company;

b.      a written certification by the proposed Independent Compliance Consultant that he/she will not be employed by or be affiliated with the Company for a period of not less than two years from the date of the termination of the term of the Agreement; and

c.      a written certification by the proposed Independent Compliance Consultant that he/she has no ongoing personal, professional, or financial interest in the Company or any legal matters involving the Company.

9.      The Offices shall evaluate and decide whether to approve the proposed Independent Compliance Consultant within thirty (30) days of submission by Boeing.  Such evaluation and approval will be based solely on the factors set forth above in Paragraph 8(a)-(c).

10.      The Offices and the Company represent and commit that in exercising their decision-making authority under this Agreement with respect to the Independent Compliance Consultant evaluation, and approval, they will consider only the qualifications and merits of the candidates and will not take into account or otherwise engage in unlawful discrimination based on race, gender, or any other protected class.

11.      The Company agrees that it will not employ or be affiliated with the Independent Compliance Consultant for a period of not less than two years from the date on which the Agreement's term expires. Nor will the Company discuss with the Independent Compliance Consultant the possibility of further employment or affiliation during the term of the Agreement.

12.      Submissions by the Independent Compliance Consultant and the Company, including any reports, will likely include proprietary, financial, confidential, and competitive business information.   Moreover, public disclosure of the submissions could discourage cooperation, impede pending or potential government investigations and thus undermine the objectives of the reporting requirement.  For these reasons, among others, the submissions and the

contents thereof are intended to remain and shall remain non-public, except as otherwise agreed to by the parties in writing, or except to the extent the Offices determine in their sole discretion that disclosure would be in furtherance of the Offices discharge of their duties and responsibilities or is otherwise required by law.

13.    (a)    Except as set forth below in sub-paragraphs (b), (c) and (d), should the Independent Compliance Consultant discover during the course of his or her engagement that the Company may have engaged in unlawful activity in violation of U.S. laws ("Potential Misconduct"), the Independent Compliance Consultant shall immediately report the Potential Misconduct to the Company's Chief Legal Officer, Chief Compliance Officer, and/or Audit Committee for further action, unless the Potential Misconduct was already so disclosed. The Independent Compliance Consultant also may report Potential Misconduct to the Offices at any time, and shall report Potential Misconduct to the Offices when they request the information.

(b)    In some instances, the Independent Compliance Consultant should immediately report Potential Misconduct directly to the Offices and not to the Company. The presence of any of the following factors militates in favor of reporting Potential Misconduct directly to the Offices and not to the Company, namely, where the Potential Misconduct: (1) involves senior management of the Company or (2) involves obstruction of justice.

(c)    If the Independent Compliance Consultant believes that any Potential Misconduct has occurred and may constitute a crime ("Actual Misconduct"), the Independent Compliance Consultant shall immediately report the Actual Misconduct to the Offices. When the Independent Compliance Consultant discovers Actual Misconduct, the Independent Compliance Consultant shall disclose the Actual Misconduct solely to the Offices, and, in such cases, disclosure of the Actual Misconduct to the Chief Legal Officer, Chief Compliance Officer, and/or the Audit

Committee of the Company should occur as the Offices and the Independent Compliance Consultant deem appropriate under the circumstances.

(d)     The Independent Compliance Consultant shall address in his or her reports the appropriateness of the Company's response to disclosed Potential Misconduct or Actual Misconduct, whether previously disclosed to the Offices or not.

(e)     Further, if the Company or any entity or person working directly or indirectly for or on behalf of the Company withholds information necessary for the performance of the Independent Compliance Consultant's responsibilities and the Independent Compliance Consultant believes that such withholding is without just cause, the Independent Compliance Consultant shall also immediately disclose that fact to the Offices and address the Company's failure to disclose the necessary information in his or her reports.

(f)     Neither the Company nor anyone acting on its behalf shall take any action to retaliate against the Independent Compliance Consultant for any such disclosures or for any other reason.

14.     Any disclosure by the Company to the Independent Compliance Consultant concerning evidence or allegations of violations of U.S. fraud laws shall not relieve the Company of any otherwise applicable obligation to truthfully disclose such matters to the Offices, pursuant to the Agreement. Notwithstanding any other provision of this Attachment, the Company shall retain its attorney-client privilege and work-product protections and in no event shall be required to waive its attorney-client privilege.

## ATTACHMENT E

## <u>CERTIFICATION</u>

To:     United States Department of Justice
        Criminal Division, Fraud Section

        United States Attorney's Office
        Northern District of Texas

Re:     Non-Prosecution Agreement Disclosure Certification

The undersigned certify, pursuant to Paragraph 7 of the non-prosecution agreement entered

into on May 29, 2025, by and between the Department of Justice, Criminal Division, Fraud Section

and the United States Attorney's Office for the Northern District of Texas (collectively, the

"Offices") and The Boeing Company (the "Company") (the "Agreement"), that undersigned are

aware of the Company's disclosure obligations under Paragraph 7 of the Agreement, and that the

Company has disclosed to the Offices any and all evidence or allegations of conduct required

pursuant to Paragraph 7 of the Agreement, which includes evidence or allegations of any violation

of U.S. fraud laws committed by the Company's employees or agents upon any domestic or foreign

government agency ("Disclosable Information"). This obligation to disclose information extends

to any and all Disclosable Information that has been identified through the Company's compliance

and controls program, whistleblower channel, internal audit reports, due diligence procedures,

investigation process, or other processes. The undersigned further acknowledge and agree that the

reporting requirements contained in Paragraph 7 and the representations contained in this

certification constitute a significant and important component of the Agreement and of the Offices'

determination whether the Company has satisfied its obligations under the Agreement.

The undersigned hereby certify that they are the Chief Executive Officer and the Chief

Financial Officer of the Company, respectively, and that each has been duly authorized by the

Company to sign this Certification on behalf of the Company.

This Certification shall constitute a material statement and representation by the undersigned and by, on behalf of, and for the benefit of, the Company to the executive branch of the United States for purposes of 18 U.S.C. § 1001, and such material statement and representation shall be deemed to have been made in the Northern District of Texas. This Certification shall also constitute a record, document, or tangible object in connection with a matter within the jurisdiction of a department and agency of the United States for purposes of 18 U.S.C. § 1519, and such record, document, or tangible object shall be deemed to have been made in the Northern District of Texas.

Date: _____        Name (Printed): _____

                                     Name (Signed): _____
                                     Chief Executive Officer
                                     The Boeing Company

Date: _____        Name (Printed): _____

                                     Name (Signed): _____
                                     Chief Financial Officer
                                     The Boeing Company

**ATTACHMENT F**

**COMPLIANCE CERTIFICATION**

To:     United States Department of Justice
        Criminal Division, Fraud Section

        United States Attorney's Office
        Northern District of Texas

Re:     Non-Prosecution Agreement Certification


The undersigned certify, pursuant to Paragraph 8 of the non-prosecution agreement entered into on May 29, 2025, by and between the Department of Justice, Criminal Division, Fraud Section and the United States Attorney's Office for the Northern District of Texas (collectively, the "Offices") and The Boeing Company (the "Company") (the "Agreement"), that the undersigned are aware of the Company's compliance obligations under Paragraphs 8-10 of the Agreement, and that, based on the undersigned's review and understanding of the Company's anti-fraud compliance program, the Company has implemented an anti-fraud compliance program that meets the requirements set forth in Attachment C to the Agreement. The undersigned certify that such compliance program is reasonably designed to detect and prevent violations of the U.S. fraud laws throughout the Company's operations.

The undersigned hereby certify that they are respectively the Chief Executive Officer of the Company and the Chief Compliance Officer of the Company and that each has been duly authorized by the Company to sign this Certification on behalf of the Company.

This Certification shall constitute a material statement and representation by the undersigned and by, on behalf of, and for the benefit of, the Company to the executive branch of the United States for purposes of 18 U.S.C. § 1001, and such material statement and representation shall be deemed to have been made in the Northern District of Texas. This Certification shall also constitute a record, document, or tangible object in connection with a matter within the jurisdiction

F-1

of a department and agency of the United States for purposes of 18 U.S.C. § 1519, and such record,

document, or tangible object shall be deemed to have been made in the Northern District of Texas.

Date: _____     Name (Printed): _____

                                  Name (Signed): _____
                                  Chief Executive Officer
                                  The Boeing Company

Date: _____     Name (Printed): _____

                                  Name (Signed): _____
                                  Chief Compliance Officer
                                  The Boeing Company